**PAUL C. GARNER, ESQ.** (-0039)
Attorney for Plaintiffs
C/O Brooks & Associates
P.O. Box 232472
Encinitas, CA 92024
Tel: (760) 600-0081
email: pcg@garnerlaw.com

FILED

'12 DEC 21 AM 8: 45

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

NV

DEPUTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

------------------------------------------------------------

CASE NO.

LINDSAY R. COOPER, JAMES R. SUTTON,
KIM GIESEKING, AUTUMN GIESEKING, AN
INFANT BY HER MOTHER AND NATURAL
GUARDIAN, KIM GIESEKING, CHARLES A. YARRIS,
ROBERT M. MILLER, CHRISTOPHER G. BITTNER,
ERIC MEMBRILA, and JUDY GOODWIN,

'12 CV 3032 JLS WMc

                            Plaintiffs,

        -against-                              **VERIFIED COMPLAINT
                                               (DEMAND FOR JURY TRIAL)**

TOKYO ELECTRIC POWER COMPANY, INC. aka
TEPCO,

                            Defendant.

------------------------------------------------------------

      Plaintiffs, by their attorney, PAUL C. GARNER, ESQ., as and for their Verified

Complaint, respectfully allege, upon information and belief:

<u>JURISDICTION & PARTIES</u>

      1.  The plaintiffs, LINDSAY R. COOPER, JAMES R. SUTTON, KIM

GIESEKING, AUTUMN GIESEKING, AN INFANT BY HER MOTHER AND

NATURAL GUARDIAN, KIM GIESEKING, CHARLES A. YARRIS, ROBERT M.

MILLER, CHRISTOPHER G. BITTNER, ERIK MEMBRILA, and JUDY GOODWIN,

at all times herein mentioned were among the members of the U.S. Navy crew and

attached to the U.S.S. RONALD REAGAN (CVN-76), whose home port was San Diego,

California, when they were exposed to radiation off the coast at Fukushima prefecture, Japan, whereat the Fukushima Nuclear Power Plant (hereinafter, "FNPP") is located, on and after March 11, 2011, during the mission known as "Operation Tomadachi."[1]

2. Plaintiff, LINDSAY R. COOPER, born July 12, 1989, who served as a aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned herein a citizen of the State of California.

3. Plaintiff, JAMES R. SUTTON, born June 10, 1987, who served as a boatswain's mate who was aircraft director on the flight deck, is and was at all times mentioned a citizen of the State of Washington.

4. Plaintiff, KIM GIESEKING, born January 28, 1989, who served as a boatswain's mate on the flight deck, is and was at all times mentioned a citizen of the State of California.

5. Plaintiff, AUTUMN GIESEKING, BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, born October 15, 2011, is and was a citizen of the State of California.[2]

6. Plaintiff, CHARLES A. YARRIS, born December 3, 1988, who served as a boatswain's mate as a director on the flight deck, is and was at all times mentioned a

---

1 On March 14, 2011, the U.S. 7th Fleet and aircraft aboard it were repositioned away from Japan's FNPP after detecting contamination in the air and on the helicopters returning to the U.S.S. Ronald Reagan (CVN-76) from ferrying supplies to the land.

[2] As many know, infants are most vulnerable due to their more rapidly growing cells and when the maternal host is exposed to radioactive isotopes, this can be fatal or highly damaging to the fetus. It has been reported that by one year post Fukushima (by May, 2012) up to 35% of Japan's monitored children have been found with cysts or other unnatural development on their thyroid glands. This indicates there is both increased and unsafe levels in their environment and that they should have been evacuated to far more than only 12-20 miles beyond the FNPP site.

citizen of the State of Ohio.

7.  Plaintiff, ROBERT M. MILLER, born April 19, 1986, who served as a boatswain's mate handler in the air department, is and was at all times mentioned a citizen of the State of California.

8.  Plaintiff, CHRISTOPHER G. BITTNER, born July 21, 1985, who served as an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned a citizen of the State of New Mexico.

9.  Plaintiff, ERIC MEMBRILA, born July 28, 1974, who served as a specialist in air decontamination, is and was at all times mentioned a citizen of the State of California.

10.  Plaintiff, JUDITH C. GOODWIN, born January 9, 1988, was an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned a citizen of the State of New Mexico.

11.  The defendant,  TOKYO ELECTRIC POWER COMPANY, INC. aka TEPCO, (hereinafter, "TEPCO"), at all times herein mentioned, was and still is a foreign corporation organized and existing under the laws of Japan, with its principal place of business situated at 1-1-3 Uchisai wai-Cho, Chiyoda-Ku, the city of Tokyo, Japan, and with offices located at Suite 720, 1901 L Street N.W., Washington, D.C. 20036.

12.  The defendant, TEPCO, is a wholly owned public benefit subsidiary of the government of Japan, charged with the responsibility to provide electric power  to the people of Japan.

13.  At all times herein mentioned, defendant TEPCO derived substantial

revenue from its activities via goods used or consumed in the United States of America, including the State of California, through its operation of the FNNP.

14. At all times herein mentioned, defendant TEPCO expected or should reasonably have expected its acts to have consequences in the State of California and elsewhere within the United States of America.

15. At all times herein mentioned, the defendant TEPCO derived substantial revenue from interstate or international commerce.

16. At all times herein mentioned, the defendant TEPCO owned the premises whereat the FNPP was situated, within the prefecture of Fukushima, Japan.

17. At all times herein mentioned, the defendant TEPCO was one of the owners of the FNPP.

18. At all times herein mentioned, the defendant TEPCO was a lessee of the FNPP.

19. At all times herein mentioned, the defendant TEPCO, defendant's servants, agents and/or employees operated the FNPP.

20. At all times herein mentioned, the defendant TEPCO, defendant's servants, agents and/or employees maintained the FNPP.

21. At all times herein mentioned, the defendant TEPCO, defendant's servants, agents and/or employees managed the FNPP.

22. At all times herein mentioned, the defendant TEPCO, defendant's servants, agents and/or employees controlled the FNPP.

23. At all times herein mentioned, the defendant TEPCO, defendant's

servants, agents and/or employees supervised the FNPP.

24. On or after March 10, 2011, the defendant TEPCO, defendant's servants, agents and/or employees attempted repairs at the FNPP.

25. On or after March 10, 2000, the defendant TEPCO, defendant's servants, agents and/or employees inspected the FNPP.

26. On or before March 10, 2011, the defendant TEPCO, defendant's servants, agents and/or employees constructed the FNPP.

27. More than 20 years ago, the defendant TEPCO, defendant's servants, agents and/or employees designed the FNPP.

28. The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. §1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.[3]

29. Maritime law falls within this Court's jurisdiction to be applied in the manner of a common law Court. As such, venue rules do not apply and Plaintiffs beg leave to refer all issues of law to the Court.[4]

## AS AND FOR A FIRST CAUSE OF ACTION

### (Negligence)

30. At all times herein mentioned, it was the duty of the defendant TEPCO,

---

[3]Diversity jurisdiction is currently codified at 28 U.S.C. §1332, http://www.law.cornell.edu/uscode/28/1332thml; also see Ghotra v. Bandila Shipping, Inc., 713 F3d 1050, 1054, 9th Cir. 1997

[4]See Supplemental Rule F(9), 28 U.S.C. 1390(B); Admiralty, 28 U.S.C. §1331(1); substantive law of admiralty applies, Yamaha Motor Corp. U.S.A. v. Calhoun, 516 U.S. 199, 206, 116 S.Ct. 619, 623; Exxon Shipping Co. v. Barer, 554 U.S. 471, 489-90, 128 S.Ct. 2605, 2619

defendant's servants, agents and/or employees to maintain said FNPP, in a reasonably safe and suitable condition and in good repair.

31.  At all relevant times herein mentioned, the defendant, TEPCO, knowingly and negligently caused, permitted and allowed false and misleading information concerning the true condition of the FNPP to be disseminated to the public, including the U.S. Navy Department.

32.  At all relevant times, the defendant, TEPCO, was aware that the U.S. Navy and its personnel would rely upon their representations as to the condition of FNPP and its environs in the performance of their efforts to provide humanitarian assistance, during its relief mission to ferry food and water to the inhabitants of the ravaged city of Sendai, located within the prefecture of Fukushima, Japan, following the earthquake and tsunami on March 10, 2011.

33.  At all relevant times herein mentioned, the radiation produced at the FNPP does not occur naturally.

34.  The radiation produced as a result of nuclear fission which was utilized to boil water in order to produce steam generated power.

35.  At all relevant times, the defendant, TEPCO, was aware that exposure to even a low dose of radiation creates a danger to one's health and that is important to accurately report actual levels.[5]

---

[5]

Numerous studies indicate that even low dose radiation is a danger to health: see eg.. "No Safe Dose - Japan's Low -Dose Radiation Disaster," http://rense.com/general95/no-safe-dose.htm; "Even Low-level radioactivity is damaging.  Broad analysis of many radiation studies finds no exposure threshold that precludes harm to life," http://www.sc.edu/news/newsarticle.php?nid=5214#.UKljmkvma6X; Meta-Review of 46 Studies: Even the Lowest-Level Radiation is Damaging to Human Health,

36. As a consequence of the earthquake and tsunami, the reactors were damaged and power to the cooling mechanism of the FNPP was interrupted, resulting in a meltdown of the fuel and reactor itself, thereby triggering the release of high levels of radiation.[6]

37. Nuclear radiation is a known human carcinogen that is linked to many human health problems. The U.S. Environmental Agency ("EPA") classifies it as a human carcinogen.[7]

---

http://www.washingtonsblog.com/2012/11/meta-review-of-42-studies-even-the-lowest-level-radiation-is-damaging-to-human-health.html

[6]At Fukushima, large releases of radioactivity apparently came from the concrete pools, where spent fuel rods, clad with a special alloy, were placed to cool down after their use in the reactors. These spent fuel rods were extremely hot – up to 2,000 degrees Fahrenheit – and needed a constant circulation of cold water to keep them from burning up.

[7]According to experts, "[t]here is a near universal acceptance that epidemiological data demonstrates an excess risk of delayed cancer incidence above a dose of 0.1 sieverts. All who met with Fukushima's radioactive fallout are probably to have some problem with the thyroid." See http://enenews.com/watch-all-people-met-fukushimas-radioactive fallout-problem-thyroid-many-tokyo-already-developing-problems-video;

Nuclear expert Claudia French, who was professor emeritus of molecular and cell biology at UC Berkeley, who worked on the "Manhattan Project" on uranium effects, and established the Biomedical Research Division of the Lawrence Livermore National Laboratory, wrote in his 1990 book that "by any reasonable standard of biomedical proof" there is no threshold level (no harmless dose) of ionizing radiation with respect to radiation mutagenesis and carcinogenesis – a conclusion supported in 1995 by a government-funded radiation committee.

"The results of surveys and biological monitoring of children and adults of Chernobyl point unambiguously to a steady, rapid and dramatic deterioration of health of all victims of the impact of the Chernobyl accident," wrote Drs. E.B. Burlakova and A.G. Nazarov of the Emanuel Institute of Biochemical Physics, Russian Academy of Sciences, Moscow. Most interesting, the go on to say, "The dose dependence of the radiation effect may be non-linear, non-monotonic and polymodal in character. Over certain dose ranges, low-level irradiation is more devastating with regard to the results of its action on an organism or a population than acute high-level radiation."

Moreover, Dr. Ernest J. Sternglass, professor emeritus of radiation physics at the University of Pittsburgh School of Medicine, in his book, Secret Fallout – Low-Level Radiation From Hiroshima To Three-Mile Island, indicated that the risk increased with each additional picture. This clearly suggests that there was no significant healing of the damage and thus that the cancer-causing effects of radiation were cumulative.

7

38.  When radiation from a reactor is spilled or leaks, it contaminates the environs and poses a serious health threat to humans and other species.  The greater the concentration of radiation that escapes from the reactor or fuel rods, the higher the risk to humans, creating an enhanced threat to human health.

39.  Radiation does not readily break down and biodegrade in the ground or water or apparatus exposed to it.  Research now shows that it will persist in the environment for decades, since it has a half-life in excess of 77 years, far longer than the life expectancy of humans exposed to it.

40.  The FNPP was constructed at Fukushima on or around 19      .

41.  During their lifetimes before March 11, 2011, the Plaintiffs, and each of them,  had never been exposed to harmful levels of radiation, including the time they served aboard the U.S.S. Ronald Reagan (CV-76).

42.  The defendant, TEPCO, created an increased risk of radiation exposure to the Plaintiffs by failing to provide them with warning of the actual increased risk of exposure to the known level of the  risk to the plaintiffs, to public officials, persons and entities engaged in the humanitarian effort known as "Operation Tomadachi," who responded to radiation spill, or to the general public.

43.  The Defendant TEPCO's  conduct included acts and practices that operated as a fraud upon the Plaintiffs, public officials, and the general public.  The conduct included false statements of material fact, or the making of statements which, in

---

Exposure to radiation causes a cascade of free radicals that wreak havoc on the body. Radiation also decimates the body's supply of glutathione, which allows free radicals to run rampant through one's body's tissues and organs.

light of the circumstances, omitted material facts necessary to make such statements not misleading.

44.   The liability of the Defendant TEPCO arises from the defendant's conspiracy to accomplish, and/or aided and abetted in the commission of wrongful conduct alleged herein, and/or intentionally, knowingly, or in reckless disregard for the true facts, engaged in the alleged wrongful conduct.

45.   With respect to such wrongful conduct, Defendant TEPCO and the government of Japan, conspired and acted in concert, among other things, to create an illusory impression that the extent of the radiation that had leaked from the site of the FNPP was at levels that would not pose a threat to the Plaintiffs, in order to promote its interests and those of the government of Japan, knowing that the information it disseminated was defective, incomplete and untrue, while omitting to disclose the extraordinary risks posed to he plaintiffs who were carrying out their assigned duties aboard the U.S.S. Ronald Reagan.

46.   Each of the agents, servants and/or employees of the Defendant, TEPCO, and those responsible within the government of Japan committed acts in furtherance of the above-alleged conspiracy and ratified and adopted the acts of each co-conspirator and their agents.

47.   As a direct and proximate result of the wrongful acts and conspiracy described above,  Plaintiffs suffered damages as alleged herein.

48.   Defendant TEPCO controlled all of the activities at the FNPP, and therefore is solely responsible for the enhanced threat to radiation exposure and for causing

the damages alleged in this Complaint.

49. Were it not for certain nuclear whistle blowers whose information was considered by outside experts after March 11, 2011, the public, including the Plaintiffs herein, would have to rely upon the glib and technically inaccessible reports from Defendant herein, TEPCO or the Japanese government, to determine the extent of the radiation at the FNPP site as a result of the release of nuclear material at that time.[8]

---

[8]Web sites such as "enews.com"; "fukushima-diary.com" and "rense.com" have operated as information clearing houses for mainstream news, academic studies and independent sources of publication about the nuclear crisis in Japan.

Professor Jeff Kingston of Temple University in Tokyo has presented a thorough chronology of the Fukushimka nuclear crisis from the political perspective and also opines that the disaster "was preceded by a series of mishaps, cover-ups, irresponsible practices, close calls and ignored warnings . . . it was an accident waiting to happen." As he explains in "Mismanaging Risk":

> So who is to blame for the three meltdowns at Fukushima? The nuclear village tried to shift the blame onto PM Kan, spreading erroneous information about his visit to Fukushima Daiichi to the effect that he forced TEPCO to stop venting and subsequently alleging he ordered the halt of pumping of seawater to cool the reactors and spent fuel rods in adjacent pools . . . but this was TEPCO's responsibility and had nothing to do with the Kan's visit on March 12 . . . TEPCO retracted its allegations against Kan, but not before damaging Kan's reputation . . . Scapegoating Kan served many purposes, especially diverting attention away from TEPCO's, NISA's and METI's responsibility and for the accident and woeful crisis response. . . .

> The third party panel that investigated the nuclear crisis . . . was harshly critical of TEPCO and the government, pointing out that the utility was ill-prepared for a crisis and that its' workers made critical errors . . . workers and their managers were inadequately trained to cope with an emergency situation. . . . Their mishandling of emergency procedures contributed to the crisis.

> The investigators also pilloried TEPCO and the government's mishandling of the evacuation of residents living near the plant, in many instances evacuating people to places where levels of radiation were higher than those where they had left. . . . The panel confirmed that data generated by the System for Prediction of Emergency Dose Information (SPEEDI) on radiation dispersal was available and could have been used to evacuate residents at greatest risk to safer areas, but this information was not provided to the Prime Minister's crisis management center until March 23. . . . [O]ne month after the original evacuation, the government used this SPEEDI data to move evacuees out of harms way, meaning that many had been subjected to substantial doses of avoidable radiation exposure.

50. At all times relevant herein, the Japanese government kept representing that there was no danger of radiation contamination to the U.S.S. Reagan (CVN-76) and/or its crew, that "everything is under control," "all is OK, you can trust us," and there is "no immediate danger" or threat to human life, all the while lying through their teeth about the reactor meltdowns at FNPP.[9]

51. Such reports were widely circulated within the defendant, TEPCO's, organization at the time it was published, despite the fact that the Defendant knew that higher levels of radiation existed within the area whereat the Plaintiffs and their vessel would be and were operating.[10]

---

> TEPCO and its regulators . . . failed to act on fresh and compelling evidence about tsunami risk, a blind spot that left the plant needlessly vulnerable. . . . Telltale warnings began accumulating over the decade prior to 3/11 tsunami. . . . Clearly there is no basis to TEPCO's claim that the scale of the 3/11 tsunami was inconceivable; the utility chose to ignore centuries of geological evidence and repeated 21st century warnings from modern scientists, including in-house researchers. . . . Inexcusably, TEPCO did not make safety its ethos while lax oversight by the government allowed this culture of complacency to persist long after it was obvious that TEPCO was cutting corners to cut costs."

Mismanaging Risk and the Fukushima Nuclear Crisis, http://japanfocus.org/-Jeff-Kingston/3724

[9]Assumptions and pronouncements made on behalf of TEPCO by Mr. Goshi Hosono who is a lawyer and not a nuclear scientist. http://www.dpj.or.jp./english/217

"Any intelligent layperson who considers the technical aspects of the disaster will be at a loss as to how the plant operators will be able to restore the cooling system, which may be badly damaged, to reactors that themselves may be unrepairable or in various states of meltdown. If the nuclear fuel in the reactors has melted through to the floor, what would be the point of setting up a cooling system to a dysfunctional reactor and a pool of melted fuel? No one in the government clearly answers these questions . . ." Testimony from Japan: Evolving Coverup of a Nuclear Disaster, http://www.globalresearch.ca/index.php?context=va&aid=24302

[10]Shortly after the nuclear accident on March 11, 2011, it became apparent that Japan's "downplaying" of the disaster was leading to "informational uncertainty."
"It is absolutely imperative that Japanese officials become more transparent in their crisis communication. It is equally imperative, as this present crisis makes clear, that officials around the world realize the severe harm that can be inflicted by the obfuscation and distortion of critical information in the wake of catastrophe." (continued on next page)

11

52. Defendant TEPCO's management, acting individually, jointly, and through officials of the government of Japan, publicly claimed that there was no danger to persons, including the Plaintiffs, who were carrying out their assigned mission during "Operation Tomadachi."

53. Privately, however, the Defendant were aware of the true condition of the zone within which the Plaintiffs were operating.

54. Belatedly, after March 11, 2011, Defendant TEPCO prepared and circulated a memo that stated: "We agree that radiation is greater within the zone and that "[b]ecause of its levels subsequent to the tsumani's occurrence, from an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to remedial requirements."

55. Defendant were also aware that the potential health risk was greater than its agents were reporting.

56. Defendant's acts, including those of their agents within the government of Japan, amounted to material misrepresentations of the safety of those operating within the zone of radiation, and/or fraudulent concealment of a known defect.

57. Certain communications between TEPCO and public officials demonstrate

---

Downplaying Disaster, Informational Uncertainty in the Wake of Japan's Nuclear Crisis,

http://www.counterpunch.org/2011/03/22/informational-uncertainty-in-the-wake-of-japan-s-nuclear-crisis/

TEPCO downplayed the extent and level of radiation that were then spewing from the FNPP.

the difference between Defendant's actual knowledge of the true properties and condition of the area around the FNPP, and their public posture and pronouncements regarding the levels of exposure, and are evidence of Defendant's misconduct at the time.

58. The Defendant TEPCO mobilized to convince the government of Japan, its people, the U.S. Navy, the Plaintiffs, and the world that it was then safe to live and work within the zone surrounding the FNPP, within which they were assigned to operate, knowing that to be untrue.[11]

59. Such misrepresentations concerning the level of danger from radiation which omitted the contrary and more accurate information that radiation was already known to be at levels higher than reported by the defendant TEPCO, is evidence of Defendant's practice of using any available means to conceal from the Plaintiffs, the U.S. Navy, and the public, the actual risk that "Operation Tomadachi" posed to them.

60. The defendant, TEPCO, further misrepresented that available data established that there was no evidence that the level of radiation within the zone of operation posed any significant risk of harm to health of the Plaintiffs, or that human exposure within that area to the radiation release to them was negligible, that sufficient data exists to

---

[11]Nuclear expert, Arnie Gundersen, has emphasized the true nature of the conditions with regard to reactor units 1 - 3 that they will "get to the point where they throw some concrete down on top of it and come back in 300 years." Gundersen believes this may not even be cleaned up in "500 years!"See Arnie Gundersen discussing the peril worldwide consequences if reactor no. 4 collapses: http.//ifyoulovethisplanet.org/?p=6282

A former nuclear insider and equally esteemed whistle blower in Lauren Moret has asserted that the Fukushima radiation cloud reached the West Coast on the Jet Stream by March 18, 2011, or just one week following the catastrophe. Interestingly, the president and his family left for the southern hemisphere and a letter was issued to the medical communities that they should not use Iodine-related diagnostics which would be about over exposure.

reasonably determine or predict that operating therein will not have an adverse effect on health of the Plaintiffs or the environment, and that further testing is therefore not needed to develop such data, knowing same to be untrue. Instead, Defendant's paramount concern was that any delay in providing assistance to the people living near the FNPP would have a significant adverse economic impact.[12]

61.   These misrepresentations are further evidence that the Defendant was willing to ignore facts known to them and to misrepresent the properties and impacts of radiation within the zone around the FNPP in furtherance of the defendant government's goal to avoid the evacuation of Tokyo and the potentially dire economic consequences of such a course of action.

62.   Despite the duty arising from such unsupported assurances of safety, Defendant TEPCO breached said duty to properly disclosed its knowledge of the true risks

---

[12]The government of Japan continues to dismiss the idea that the quakes themselves were the main cause of the nuclear meltdowns, while attributing the entire crisis to "unforeseen" natural phenomena of the tidal wave, yet its admits that the quake caused "a 3-square-centimeter rupture in the piping of the emergency cooling system for the No. 1 reactor." In addition, it notes "the possibility that the tremors from the earthquake created a tiny rupture of 0.3 square centimeters or less, which later grew larger when the reactor temperature and pressure rose and radioactive substances leaked from there." Government Probe: Reactor Cooling Botched at Fukushima No. 1, But Not No. 2 Plant,

http://ajw.asahi.com/article/0311disaster/analysis/AJ201207240096

This is untrue, given that witnesses saw that the Unit 1 building collapsing before the tsunami arrived: "One worker, a maintenance engineer in his late twenties who was at the Fukushima complex on March 11, recalls hissing and leaking of pipes. 'I personally saw pipes that came apart and I assume that there were many more that had been broken throughout the plant. There's no doubt that the earthquake did a lot of damage inside the plant,' he said. There wer definitely leaking pipes but we don't know which pipes – that has to be investigated. I also saw that part of the wall of the turbine building for Unit 1 had come away. That crack might have affected the reactor." Meltdown: What Really Happened at Fukushima?, http://www.theatlantic wire.com/global/2011/07/meltdown-what-really-happened-fukushima/39541/

14

of the levels of radiation within the area subsumed in "Operation Tomkadachi."

63. Instead, the Defendant TEPCO pursued a policy to cause rescuers, including the Plaintiffs, to rush into an unsafe area which was too close to the FNPP that had been damaged. Relying upon the misrepresentations regarding health and safety made by TEPCO, upon information and belief, the U.S. Navy was lulled into a false sense of security. The officers and crew of the U.S.S. Reagan (CVN-76) believed that it was safe to operate within the waters adjacent to the FNPP, without doing the kinds of research and testing that would have verified the problems known to the Defendant TEPCO at that time, which have since come to plague the Plaintiffs, who relied upon the accuracy of the representations made as to their well-being and safety.[13]

64. Despite having knowledge of the inevitability of radiation exposure to them, Defendant TEPCO chose not to warn the Plaintiffs, the U.S. Navy, public officials, or the general public.

65. Defendant TEPCO intentionally and knowingly made misleading environmental claims with knowledge that these claims of environmental safety to the Plaintiffs' detriment.

66. The intentional and tortious conduct of the Defendant TEPCO was aimed at and encompassed the entire area surrounding the FNPP, including the waters adjacent to the Fukushima FNPP, whereat the Plaintiffs were employed and operating.

_____

[13]"Many Japanese are now wary of the governments' assurances about test results, and Tokyo Electric has made people more suspicious by refusing to let independent experts survey the waters inside the roughly 12-mile exclusion zone around the plant." Fears Accompany Fishermen in Japanese Disaster Region,

http://www.nytimes.com/2012/06/26/world/asia/fears-accompany-fishermen-in-japanese-disaster-region.html?_r=1Etpagewanted=print

67. Defendant knew or in the exercise of due care should have known that the Plaintiffs, among several thousand other crewmen aboard the U.S.S. Ronald Reagan (CVN-76), as well as others, would be directly impacted by Defendant TEPCO's conduct.

68. Honesty and fair-dealing is a basic and most precious resource, as well as a fundamental commodity of incalculable value. The Plaintiffs and the U.S. Navy had the right to know the actual conditions they would confront during "Operation Tomadachi."

69. Plaintiffs relied upon the truth of information provided to their commanding officers, had a special and unique stake in the preservation of their physical and mental well-being.

70. Upon information and belief, based upon currently available data, through its conduct, the Defendant TEPCO rendered the Plaintiff's' infirm and poisoned their bodies.

71. The Plaintiffs must now endure a lifetime of radiation poisoning and suffering which could have and should have been avoided.

72. Upon information and belief, the Defendant TEPCO failed to timely and adequately test the water to which the Plaintiffs were exposed in order to detect contamination.

73. Upon information and belief, the Defendant TEPCO, its agents, servants and/or employees failed to perform proper and inadequate testing within the theater of their operation of the radiation levels to which the Plaintiffs and their vessel would be exposed, to their detriment.

74. On or about March 11, 2011 and thereafter, the Defendant TEPCO never warned the Plaintiffs, or general public about the actual or potential level of radioactive contamination there and then existing.

75. Upon information and belief, the Defendant TEPCO constructed and operated the FNPP with the knowledge that the nuclear fuel had a potential to leak, or in reckless disregard for knowledge as to whether or not the FNNP could leak radiation into the

16

environment.

76. As owner, operator and/or promoter of nuclear power, Defendant TEPCO had a duty to the Plaintiffs arising from, among other things, their: (a) vastly superior knowledge and resources than those of the Plaintiffs; (b) material representations and/or omissions concerning the levels of radiation contamination; and (c) marketing, promotion and sales of power generated by nuclear fission, without warning of the foreseeable adverse impact it would have on the environment on which Plaintiffs relied.

77. Defendant's duties included, but are not limited to, the duty: (a) to reasonably protect Plaintiffs' health and well-being; (b) to timely inform public officials and the Plaintiffs of the level of actual or potential spills from the FNPP and its storage tanks and reactors; (c) to timely warn public officials and the Plaintiffs of the nature and risks of they would confront; (d) to warn public officials and Plaintiffs of the properties that make it a threat to their health and well-being; (e) to timely warn all persons, including the Plaintiffs, who relied upon their representations, despite the propensity of radiation from the FNPP to move great distances upon being released into the environment, as well as its potential health risks and noxious properties and the need for timely and adequate testing; and (f) such other duties as may be shown during discovery and at trial.

78. Defendant TEPCO breached its duties, causing damages including damages to the Plaintiffs caused by contamination of their bodies with radiation, with its dire consequences to their physical and emotional well-being.

79. Unbeknownst to the Plaintiffs who indirectly relied on Defendant's representations regarding environmental safety, and directly and/or indirectly relied on omissions of any warnings, the increased levels of radiation at the FNPP was accompanied by a surge in incidents of serious contamination to those living around the FNPP.

80. Defendant TEPCO also knew or should have known that the system it then currently used for storing spent fuel rods, and ensuring the containment of radiation and

utilization of nuclear material at the FNPP was faulty, inadequate and leaking.

81.   Defendant TEPCO also knew or should have known that the radiation released at the FNPP is remarkably recalcitrant to natural degradation, and once dispersed into the environment is extremely difficult to clean up.

82.   According to then existing data  uniquely known to the defendant at the time, the Plaintiffs' consequent exposure to radiation within their zone of operation, then indicated that radiation levels had already reached levels exceeding the levels of exposure to which those living the same distance from Chernobyl experienced who subsequently developed cancer.[14]

83. Consequently, the potential for the development of cancer in the Plaintiffs has also been enhanced due to the levels of exposure experienced by them during "Operation Tomadachi."

84.   The kind of misleading communication engaged in by the defendant, utterly failed to alert public officials, including the U.S. Navy, the Plaintiffs, and the  general public to the danger posed by coming too close to the FNPP and completely omitted the kind of detailed directions that would be required to avoid the contamination of Plaintiffs with radiation.

85.   The conduct of the Defendant TEPCO  was outrageous and/or so reckless and/or wantonly negligent as to be the equivalent of a conscious disregard of the rights of the Plaintiffs, entitling them to recover punitive damages.  This conduct includes, but is not

---

[14]The nuclear community has now created a special rating system for Fukushima – assigning it to a new category, above Chernobyl, as a no. 8 level nuclear disaster.  Fukushima is a "[m]ulti-source major nuclear accident requiring international assistance and monitoring.  See Nuclear incident scales: http://www.coasttocoastam.com/pages/portzline-images: Measured as quadrillions or petabecquerals (10 to the 15th Power) See, Becqueral: http://www.//wikipedia.org/wiki/Becquerel , the radiation was comparable to Chernobyl, being well over half, if not equivalent in volume.  See, Chernobyl: Assessment of Radiological and Health Impact 2002 Update of Chernobyl: Ten Years On, http://www.oecd-nea.org/rp/chernoble/c02.html

limited to: (1) manufacturing and marketing power from the FNPP causing radiation exposure despite specific actual knowledge of a serious defect that lead inevitably to the contamination of Plaintiffs' bodies; (2) intentionally misrepresenting and concealing the true levels of radiation existing at and around the FNPP between March 10-11, 2011 and thereafter; (3) marketing and promoting power generated at the FNPP as environmentally safe and beneficial, despite specific knowledge to the contrary; (4) storing and continuing to store radioactive fuel rods at the FNPP, despite knowledge that the cooling tanks were leaking; (5) failing to issue any warnings to the Plaintiffs as to the health dangers of their continued exposure to the air and water adjacent to the FNPP; (6) conducting inadequate testing and inaccurately representing and reporting to the Plaintiffs that their presence aboard the U.S.S. Reagan at the locations whereat they were operating was safe, in disregard of the true facts; (7) failing to accept financial responsibility for damages caused to the Plaintiffs who rely upon their physical and mental well-being in order to perform their assigned duties and provide for their families, that is now compromised due to excessive radiation contamination.

86. As manufacturer, distributor, seller, supplier, marketer and/or promoter of nuclear power, Defendant TEPCO had a duty to ensure that the product when used as intended was reasonably safe to property, air and water upon the Plaintiffs relied, and Defendant failed to exercise due care and caution.

87. Defendant had the clear duty and the financial means to determine whether any latent defects existed at the FNPP, including its storage facilities, and to warn Plaintiffs and public officials of the latent defects known to them, their agents and employees. The Defendant breached this duty.

88. Defendant TEPCO breached its duty to warn the Plaintiffs who relied upon its expertise and pronouncements.

89. Defendant TEPCO affirmatively and voluntarily undertook to conduct and

report research related to the environmental hazards and benefits of the continued operation of the FNPP, and failed to exercise due care and caution in connection with said undertaking.

90. Defendant TEPCO, its agents, servants and/or employees breached their duties and committed acts of negligence toward the Plaintiffs in the design, manufacture, marketing and/or sale of nuclear power, including but not limited to failing or failing to adequately ensure the integrity of their storage tanks at the FNPP before the earthquake and tsunami; failing to provide warnings or adequate warnings of the enhanced risk to health posed by supplying and storing nuclear fuel to the FNPP; and intentionally, recklessly and/or negligently concealing and/or omitting to disclose the true facts about the levels of radiation at and near the FNPP, and of the true facts about the condition of the roof storage tanks and reactors at said location.

91. Defendant TEPCO, its agents, servants and/or employees knew, or in the exercise of reasonable care should have known that the levels of radiation at the FNPP posed a greater and enhanced hazard to land, air and water as described above, that contact with and/or ingestion of radiation posed a threat to the health and well-being of the Plaintiffs and those persons utilizing sea water in an effort to decontaminate the U.S. Reagan (CVN-76), its attached helicopters, and otherwise potable water, that they possibly contained radiation at a level of possible human carcinogenity, and that the Plaintiffs would suffer injury to body and mind, property damage, and other hardship from the contamination and loss of their water supply.[15]

---

[15]TEPCO has admitted that "a total of about 10 becquerals hour of radioactive cesium was being emitted from the No. 1 to No. 3 reactors as of June. That is about one-80 millionths of the level that was being spewed immediately after the accident." After 500 days, Fukushima No. 1 Plant Not Out of the Woods,

http://ajw.asahi.com/article/0311disaster/fukushima/AJ201207240087

While the worst Chernobyl had to offer was pretty much over after it had blown its lid, Fukushima still releases vastly greater amounts of harmful radiation due to the nuclear fuel that remains at the site.

92. Defendant's negligence proximately caused widespread contamination of Plaintiffs' environs, including their air and water supply.

93. Plaintiffs have suffered and been damaged, all as described above and herein, as a direct and proximate result of Defendant' negligence.

94. Upon information and belief, as a further direct and proximate result of Defendant's negligence, Plaintiffs have been and will be required to undergo further medical testing, evaluation and medical procedures, including but not limited to chelation therapy and bone marrow transplants in an effort to seek cure, and will be required to employ extraordinary means to achieve cure.

95. As a further direct and proximate result of Defendant's negligence, the Plaintiffs incurred losses and damages for personal injury and property damage, loss of use and enjoyment of life and their property, the need for periodic medical examination and treatment, and economic losses, including wage loss, and the expenditure of time and money, and will continue to incur losses and damages in the future.

96. Plaintiffs also face additional and irreparable harm to their life expectancy, which has been shortened and cannot be restored to its prior condition.

97. Solely as a result of the defendant's negligence, carelessness and recklessness, the Plaintiffs, were caused to suffer severe and serious personal injuries to mind and body, and further, that the Plaintiffs were subjected to great physical pain and mental anguish.

98. By reason of the foregoing, the Plaintiffs were severely injured and damaged, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are believed to be permanent in nature and duration, and the Plaintiffs will be permanently caused to suffer pain, inconvenience and other effects of such injuries; the Plaintiffs incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries; and the Plaintiffs will be

21

unable to pursue their usual duties with the same degree of efficiency as prior to this incident, all to the Plaintiffs's great damage.

99.   The Defendant' conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, and more particularly, the rights, life and safety of the Plaintiffs; and was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations.

100.   Due to Defendant' negligence, each of the Plaintiffs are entitled to compensatory damages in the sum of TEN MILLION ($10,000,000.00) DOLLARS, plus punitive damages in the sum of THIRTY MILLION ($30,000,000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Strict Liability For Failure to Warn)

101. The Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "100" of the Complaint as if fully set forth at length herein.

101.   As manufacturer, designer, distributor, supplier, seller and marketer of nuclear power, the Defendant had a duty not to put in the market a product that poses a serious danger to land, air and soil upon which the Plaintiffs relied without issuing warnings of the risk posed by the product to the Plaintiffs, the public, and public officials during "Operation Tomadachi."

103.   Defendant breached this duty by manufacturing, distributing, selling and marketing power produced by nuclear reaction with actual or constructive knowledge that the product posed a high degree of risk to the safety and well-being of the Plaintiffs, without issuing any warnings or without sufficient warnings of the enhanced risk.

104.   Defendant breached this duty by manufacturing, distributing, selling and nuclear generated power at the Fukushima Daichi reactors and the improper storage of

22

nuclear fuel rods at the FNPP with actual or constructive knowledge that the product posed a high degree of risk to the safety and health of the Plaintiffs, without issuing any warnings or without sufficient warnings of the enhanced risk.

105. Defendant had actual and/or constructive knowledge that radiation would be released into soil , air and water upon which the Plaintiffs would rely. Defendant had actual and/or constructive knowledge of the properties of radiation that would ensure that, once released into the environment, radiation would spread further and in concentrations that would cause injury to the Plaintiffs.

106. Defendant represented and warranted that the levels of contamination to which the Plaintiffs would be exposed were less than harmful to them and that their presence during "Operation Tomdachi would not cause any different or greater harm to them than they may have experienced on missions in the past.

107. At all relevant times, the Defendant knew that the reactors and storage tanks at the FNPP were then leaking and emitting high levels of radiation.

109. Defendant knew that the U.S. Navy would necessarily operate the U.S.S. Reagan (CVN-76) with its crew of approximately 5,500 aboard, as well as other vessels in the waters adjacent to the FNPP, without the benefit of independent inspection or evaluation of the area for defects, and in reliance upon the veracity and completeness of representations made by the Defendant.

110. At all relevant times herein, the Defendant failed to warn the Plaintiffs, the U.S. Navy, and public officials of the properties and actual levels of radiation detected at the FNPP at that time.

111. At all relevant times herein, by example the Defendant failed to warn the U.S. Navy and the Plaintiffs that the levels of radiation in the waters adjacent to the FNPP posed significant threats to human, animal and aquatic health; created a need for those living or working aboard vessels in the adjacent waters to conduct frequent tests to

determine the actual level of radiation exposure; as to the actual risks and protective measures necessary to ensure the Plaintiffs' well-being; and required other warnings as may be shown at trial.

112. The Defendant knew or should have known of the properties and characteristics of radiation exposure that comprise the risk and danger which is different in kind degree and magnitude from the risks and dangers inherent in the performance of the Plaintiffs' duties in non-nuclear radiation zones.

113. The Plaintiffs and the U.S. Navy were unaware of the true levels of such risks, which were not of a kind that they would ordinarily discover or could protect themselves against in the absence of sufficient warnings by the Defendant.

114. Once the Defendant became aware of the actual levels of contamination and decided to withhold such vital and accurate information as to those levels around the FNPP, including the zone in which the Plaintiffs were performing their assigned duties, harm to the Plaintiffs was inevitable and could not be avoided or minimized due to the absence of warnings.

115. Defendant's conduct was unreasonable in the circumstances.

116. As set forth above, available scientific data, of which the Defendant had actual or constructive knowledge, gives rise to the reasonable inference that the alleged dangers existed and were foreseeable.

117. Defendant's failure to warn the Plaintiffs and others, as alleged herein, proximately caused reasonably foreseeable damages to the Plaintiffs.

118. The harm to the Plaintiffs proximately caused by Defendant's wrongful conduct includes those injuries and damages herein alleged.

119. By engaging in said conduct, the Defendant's misconduct constituted a defective or unreasonably dangerous practice because of the Defendant' failure to warn, for which Defendant are strictly liable to Plaintiffs.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Strict Liability for Design Defect)

120.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "119" of the Complaint as if fully set forth at length herein.

121.  The Defendant during the relevant time period was the designer, manufacturer, and creator of the FNPP.

122.  Defendant had a duty of due care to design and manufacture reasonably safe FNPP.

123.  Defendant had a duty of care to test the FNPP to determine the risks posed to the environment generally, water, and air in the surrounding vicinity.

124.  Defendant had a duty not to put on the market an unsafe and defectively designed product that posed a serious danger to the Plaintiffs' and others' health and well-being.

125.  Defendant breached said duties of due care when it manufactured a defectively designed product, namely the FNPP, with actual or constructive knowledge of the defects.[16]

---

[16]There exists an accumulation of evidence that the earthquake itself was the primary cause of the meltdowns, something [TEPCO] does not want to admit–that there are other inherent flaws in the way the power plant was built and operated.  See Report on Nuclear Disaster Holds Key to Reactor's Fate,

http://online.wsj.com/article/SB10001424052702304441405774821136587755518.html

Nuclear expert Gundersen points out that the service pumps failed because they were positioned in such a way that they were flooded by the tidal wave on 311.  These pumps send water from the ocean to cool the back up diesel generators.  "There could have been 14 meltdowns and not three.  If you look at the data, there were six units at Fukushima Daiichi (Power Station No. 1), there are four at Fukushima Daini (Station No. 2), three at Onagawa and one at Tokai.  The net affect is that there were 37 diesel generators between those plants.  24 of those diesels were knocked out by the tsunami.  You need the diesels to cool the plant."  At FNPP no. 1 the tsunami flooded the actual diesel generators, but at the other plants, the "tsunami knocked out the cooling water to the diesels, something called service water.  So, Japan narrowly missed 14 meltdowns and not three

25

126. Due to the design defect, the FNPP was not reasonably safe and protective of the environment generally and Plaintiffs', among others', health and well-being.

127. Any utility of nuclear generated power does not outweigh the risks inherent in manufacturing and maintaining a FNPP designed in that manner.[17]

128. The defective design of the Defendant's FNPP, as alleged herein, proximately caused reasonably foreseeable damages to the Plaintiffs.

129. The Defendant's conduct in the design, manufacture, and maintenance the FNPP, a defective or unreasonably dangerous product, makes Defendant strictly liable to the Plaintiffs.

FOURTH CAUSE OF ACTION
(Strict Liability For Misrepresentations
Restatement (Second) of Torts § 402B)

130. Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "129" of the Complaint as if fully set forth at length herein.

131. This claim for relief is brought under Restatement (Second) of Torts § 402B and/or the common law of product liability.

---

because the cooling water to 24 of 37 diesels was destroyed." See Gundersen, July 6, 2012, Pacifica Radio Host Ian Masters and Fairewinds' Arnie Gundersen: Lessons Not Learned From Fukushima Daiichi, http://www.fairewinds.com/radio; SolarIMG Podcast with Arnie Gundersen–Aug 10/2012, http://solarimg.org/?p=3021

[17]The FNPP site is fraught with danger, with constant reports of highly toxic water leaking from this pipe or that, or this reactor or that. For example, water in Unit 2 turbine basement was found to have 47 million becquerals per liter. Unit 2 Water 10 Times More Radioactive than Unit 1,

http://enenews.com/unit-2-10-times-more-radioactive-than-unit-1-47000000-Becquerals-per-liter-in-turbine-room-basement

132. As designer, manufacturer, or maintainer of the FNPP, the Defendant, in the course of advertising and promoting their product, made misrepresentations of one or more material facts concerning the character and properties of the condition of the FNPP at all relevant times.

133. These misrepresentations included, but were not limited to, claims that the FNPP (a) was environmentally beneficial; (b) was "clean"; (c) was not contaminated by radiation in dangerous levels at all relevant times; (d) did not pose a greater risk of radiation exposure to humans than other methods of generating power; (e) was not more likely than other forms of power generation to cause injury; (f) all harmful radiation was safely contained during its use; (g) was inherently safe at all relevant times  by providing a benign warning; and (h) the levels of radiation were adequately tested and shown not to pose a health hazard or an enhanced risk to the environment or to the Plaintiffs' health and well-being, who reasonably relied upon them

134. Such misrepresentations were made to public officials, the Plaintiffs and the public, who reasonably relied upon them.

135. The Plaintiffs have suffered harm to their bodies and property from actual exposure to radiation contamination as described herein and above, as a direct and proximate result of Defendant's misrepresentations and omissions, on which the Plaintiffs indirectly and justifiably relied, causing the damages alleged herein.

### FIFTH CAUSE OF ACTION
(Deceptive Business Acts and Practices)

136. The Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "135" of the Complaint as if fully set forth at length herein.

137. The Defendant are engaged in the business of providing power from the FNPP to consumers in Japan.

27

138.   The Defendant engaged in materially deceptive and misleading acts and practices in the production, distribution, marketing and selling of nuclear power, including but not limited to:

(a)   overstating any environmental benefits of the FNPP while neglecting to mention or understating its actual environmental costs;

(b)  marketing nuclear power as a "clean" and environmentally "safe" and beneficial fuel;

(c)  misrepresenting the actual levels of radiation, including by stating that it posed no threat of harm to the Plaintiffs in the performance of their mission;

(d)  representing that the condition of the FNPP did not pose any unusual threat of harm as compared to a conventional, non-nuclear power plant;

(e)  failing to disclose that when radiation leaked from the FNPP, it would be unable to contain the radiation in a manner that was far more likely to cause contamination than other sources of power generation;

(f)  leading the public and the Plaintiffs to believe that they could safely perform their duties in the water adjacent to the FNPP despite the detected levels of radiation;

(g) stating that the air and water at and about the FNPP were adequately tested and shown not to pose a health hazard or enhanced risk to the environment while avoiding and discouraging additional testing; and

(h)  concealing the necessity for the Plaintiffs to take steps to undergo early detection modalities to determine whether or not they had been exposed to unsafe levels of radiation, a potential carcinogen.

139. Defendant's materially deceptive and misleading practices proximately caused harm and damage to the Plaintiffs, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. Plaintiffs will continue to incur losses and damage in the future.

SIXTH CAUSE OF ACTION
(Public Nuisance)

140. Plaintiffs repeat and reallege each and every allegation contained in

28

paragraphs numbered "1" through "139" of the Complaint as if fully set forth at length herein.

141. The Defendant has manufactured, distributed, marketed and promoted their product in a manner that has unreasonably endangered or injured the property, health, safety and comfort of the Plaintiffs, causing inconvenience and annoyance.

142. The Defendant, by its negligent, reckless and willful acts and omissions as set forth above, has caused and permitted radiation contamination to a growing number of people who participated in "Operation Tomadachi" and others. This contamination has migrated, or threatens to continue to migrate into the environment, thereby contaminating the earth.[18]

---

[18]The level of cesium being emitted 500 days after March 11, 2011 was down from a peak of thousands of trillions of becquerals at the time of the reactor explosions." See Fukushima Derived Radinuclides in the Ocean and Biota Off Japan,

http//www.pnas.org/content/early/2012/03/26/1120794109.full.pdf=html?with-ds=yes; Scientists: Far more Cesium Released than Previously Believed:

http://ajw.asahi.com/article/0311disaster/fukushima/AJ201202290025

A terabecquerel is a trillion Becquerals, a commonly used measure of radiation emitted by radioactive material. So the New York Times is saying that early on 900,000,000,000,000,000 becquerals were released in the first 20 days of the nuclear disaster. Radiation can damage the human body by breaking the chemical bonds in one's cells. The amount of damage done depends on how much radiation one is exposed to. This in turn depends on how much radioactive material is present in our environment, our food and so on.

"The greatest human experiment with radiation exposure is taking place in the Ukraine and Byelorussia, where much of the 50 million curies the Soviet government says were released by the 1986 accident at Chernobyl is being felt. . . . Chernobyl legacy could include hundreds of thousands of additional cancer deaths. . . . Current estimates predict anything from 14,000 to 475,000 deaths worldwide from Chernobyl." (A curie measures the intensity of radiation and is equal to 37 billion disintegrations per second. As a reference point, the Hiroshima and Nagasaki bombs released an estimated one million curies.) It should also be noted that Belarusian scientists reported an increase in a rare childhood thyroid cancer to 5,000 times its spontaneous occurrence in "clean" countries. According to the 2000 report on Minsk's United Nations Development Program (UNDP), life expectancy in Belarus in the 1960s was almost level with that in Western Europe. By 1999, 13 years after Chernobyl, it had fallen 12-14 years for men and 7-9 years for women. A baby born in rural Belelrus today can expect to live 59 years. But they may be very hard years, given that nearly half of Belarus' teenagers have serious health problems,

143. Actual and threatened radiation contamination caused by the Defendant's conduct has damaged Plaintiffs' health and substantially and unreasonably interfered with Plaintiffs' use, benefit and enjoyment of their properties, in a way that an ordinary, reasonable person would find is a substantial inconvenience, annoyance and injury.

144. The ongoing conditions found sitewide at the FNPP and country wide, also have caused and are causing a material loss of good health because of actual and threatened continued radiation contamination and exposure.

145. Plaintiffs, who were exposed to excessive levels of radiation, suffer special damages because, unlike the general public, they are at a heightened risk of developing injuries related to their exposure, including cancer.

146. Plaintiffs' special damages also include loss of health and increasingly widespread necessity to seek treatment and their future medical conditions have been rendered less certain, unsafe and unreliable. As a result, Plaintiffs suffer loss of enjoyment

---

with 45-47% of high school graduates suffering from physical disorders like gastrointestinal anomalies, weakened hearts, and cataracts; 40% of them have chronic "blood disorders" and malfunctioning thyroids. The number of handicapped adolescents has tripled in the last decade. It has always been known that ionizing radiation, in higher doses than background levels, can cause measurable increases in cancers and leukemias, as well as cause genetic mutations that affect future generations.

Thus, the New York Times has reported that in terms of radiation released in the first 20 days a the FNPP, 900,000 terabecquerels translates into 27 million curies. It is over a year later and no one knows or is saying how much aggregate radiation has been released, but clearly it's a staggering amount.

One curie is the amount of radiation equal to the disintegration of 37 billion atoms – 37 billion becquerals – per second. Obviously, it is a very large amount of radiation. If one multiplies these amounts (27 million curies times 37 billion radioactive atoms), the result is just a little more than 900,000 terabecquerels . . . all the way up to 999,000,000,000,000,000 becquerals, which translates into 999,000,000,000,000,000 nuclear particles decaying in the first 20 days after the Fukushima nuclear nightmare.

of life, among other injuries.

147. The Defendant knew or in the exercise of reasonable care should have known that the introduction and use of radiation based energy would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of the Plaintiffs' lives.

148. The Defendant has violated and/or threatenened to violate a public right to pure air and water.

149. As a direct and proximate result of Defendant's acts and omissions creating the above described nuisance, Plaintiffs who were exposed to radioactive materials, who constitute a considerable number of people, have suffered special damages and injury in the form of damage to their persons and property and endangerment to their health and safety than those persons not exposed to such materials in the zone of danger at the FNPP.

### SEVENTH CAUSE OF ACTION
(Private Nuisance)

150. Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "149" of the Complaint as if fully set forth at length herein.

151. The Plaintiffs' bodies have been contaminated by radiation poisoning as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of the Defendant, all as alleged herein.

152. The contamination of Plaintiffs' persons caused by the Defendant conduct has substantially and unreasonably interfered with their physical well-being, use, benefit, and enjoyment of their properties and life.

153. The stigma and actual contamination of Plaintiffs' bodies has caused a material loss of value of their properties and life expectancy

### EIGHTH CAUSE OF ACTION
(Fraud)

31

154. Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "153" of the Complaint as if fully set forth at length herein.

155. Each of the acts, practices, misrepresentations, omissions and other wrongs complained of above have been engaged in by the Defendant with specific and deliberate intent to defraud and deceive the Plaintiffs, public officials, and the general public, or with reckless disregard for the truth or falsity of the claimed levels of radiation existent at all relevant times alleged herein.

156. Defendant, its agents, servants and or/employees made material misrepresentations of the true levels of contamination at the FNPP following the earthquake and tsunami, despite its knowledge of the actual conditions then and there existing and/or concealed known threats to environmental health and safety of the Plaintiffs by such conduct in omitting to state material facts regarding the actual levels of radiation detected and its recalcitrance to biodegradation and remediation.

157. In making the material misrepresentations and omissions of fact as to the levels of radiation detected and as to the safety of Plaintiffs, the Defendant, its agents, servants and/or employees intended to induce the Plaintiffs, and officials to view the radiation conditions to which they were exposed as being environmentally safe, to enter an area known to be excessively contaminated to the extent that would exceed permissible limits then in effect; and effectively lulled the Plaintiffs and others into believing it was not necessary to take more immediate and timely measures to avoid exposure to harmful radiation to their bodies and that of Plaintiff GIESEKING'S then unborn child; and/or to seek more timely intervention following exposure.

158. The actual facts differed from the representations made by the

32

Defendant, their agents, servants and/or employees at the time.[19]

159. The Defendant at all times had a great disparity of access and effectively controlled all information on matters related to the relevant properties of area in which the Plaintiffs were required to perform their duties, the enhanced threat to plaintiffs' health and well-being following their introduction into the area adjacent to the FNPP, the condition of the storage tanks thereat, the condition of the groundwater, and the water in which the U.S.S. Reagan (CVN-76) was then operating, given the results of radiation assessments it had obtained.

160. By virtue of Defendant's superior position and influence during all relevant transactions, the Plaintiffs and others had no reasonable opportunity to discover the true facts before participating in and/or becoming victims of the fraudulent transactions.[20]

---

[19]Many engineers are "highly suspicious" of government assurances that the situation is not bleak. For example, "Takashi Kei, a former cooling system worker at the plant now working as a radiation survey volunteer, said the utility company's executives are portraying the situation in the best possible light. 'There are leaks everywhere, wreckage too. It's not as simple as they portray,' he said." Japanese nuclear expert, Hiroaki Koide, recently said that "The state of the reactors is still deteriorating."
In Japan, a Nuclear Ghost Town Stirs to Life,

http://openchannel.nbcnews.com/_news/2012/07/26/12839675-in-japan-a-nuclear-ghost-town-stirs-to-life?lite

[20]Operators of FNPP have admitted that radiation levels exceed 1-2 times previously announced. Not surprisingly, TEPCO maintains it had no idea that workers were going to extreme lengths to conceal the radiation levels they were exposed to, but at least 10 workers and former workers have come forward to discuss the practices that kept them working without raising safety concerns. Frequently, the workers say, they would not wear the dosimeters designed to detect accumulated radiation levels. They would simply leave the safety gear in their cars for the day. "I have no idea how much radiation I was really exposed to," according to one worker, "The company also does not allow me to get health checks for cancer. I am very concerned about my health," Rather than rock the boat, the workers do what is necessary to hide their radiation levels in order to have consistent work.

According to Japanese news, Asahi Shimbun (AS), Fukushima decontamination by TEPCO included making workers fake radiation readings.
NHK Documentary: Recently deteriorating working conditions at Fukushima plant causing workers to quit, http://enenews.com/nhk-documentary-working-conditions-deteriorating-

161. Plaintiffs' reliance on the Defendant's, their agents', servants' and/or employees' materially false and misleading representations and omissions of material information as to the levels of radiation detected, resulted in their exposure to unsafe levels of radiation, after the environment had already been contaminated by the Defendant's FNPP, and their agents', servants' and/or employees' conduct was unreasonable under the circumstances.[21]

162. The direct and/or indirect reliance of the Plaintiffs, the U.S. Navy, public officials and those persons who utilized the inaccurate information was to their detriment, and caused the injuries and harms as alleged herein.[22]

**WHEREFORE**, each Plaintiffs' pray for a judgment against the Defendant, as follows:

a. judgment awarding damages in the sum of TEN MILLION ($10,000,000.00) DOLLARS to each Plaintiff on the First through Eighth causes of action;

b. judgment awarding punitive damages in the sum of THIRTY MILLION ($30,000,000.00) DOLLARS or in such amount as shall be determined by the Court or a jury to be sufficient to punish the Defendant and to deter such conduct in the future on the First through Seventh causes of action;;

c. judgment ordering, requiring and compelling the Defendant to establish a fund in an amount not less than ONE HUNDRED MILLION ($100,000,000.00) DOLLARS available to advance and pay all costs and expenses of each of the Plaintiffs

---

fukushima-plant-

[21]Ocean Still Suffering From Fukushima Fallout, http://www.nature.com/news/ocean-still-suffering-from-fukushima fallout-1.11823; Top scientist suggests contaminated water is "actively being pumped out" into the ocean from Fukushima Plant, http://enenews.com/reuters-top-scientist-suggests-water-is-actively-being pumped-out-into-ocean-from-fukushima-plant-video

[22]The problem was caused by the Defendant who wish to ignore the reality regarding the on-going deposition and releases ". . . and thus came up with exposures that are too low. Also, I suspect that they have omitted hot particles and internal emitters from the dose assumptions. The same thing happened at TMI (Three Mile Island). Bad assumptions create low exposures. GIGO ('Garbage In Garbage Out')." If you start out with a weak hypothesis or faulty data, you will end up with the wrong results. Gundersen on WHO: I don't trust their data, http://enenews.com/gundersen-don't-trust-data-garbage-garbage-suspect-hot-particles-internal-emitters-left-radioactive-releases-underestimated

for medical examination, medical monitoring, and treatment by physicians of Plaintiffs'
choice ;

      d. interest, the costs and disbursements of this action, together with such other
and further relief as to this Court seems just and proper.

Dated: Encinitas, California
       December 12, 2012

PAUL C. GARNER, ESQ.
Attorney for Plaintiffs


## DEMAND FOR JURY TRIAL

    The Plaintiffs hereby demand a jury trial of all issues as provided by Rule
38(a) of the Federal Rules of Civil Procedure.

PAUL C. GARNER, ESQ.
Attorney for Plaintiffs


## ATTORNEY'S VERIFICATION


    PAUL C. GARNER, ESQ., an attorney duly admitted to practice law in the State of
California, makes the following affirmation under the penalty of perjury:

    I am the attorney of record for the plaintiffs.

    I have read the foregoing Complaint and know the contents thereof; the same is true
to my own knowledge except as to the matters therein stated to be alleged on information
and belief and that as to those matters, I believe them to be true.

    This verification is made by affirmant and not by plaintiffs because they are not in

the County of San Diego, which is the County where your affirmant maintains offices.

       The grounds of affirmant's belief as to all matters not stated upon affirmant's knowledge are correspondence had with the said plaintiffs, information contained in the said plaintiffs' file, which is in affirmant's possession, and other pertinent data relating thereto.

Dated: Encinitas, California
       December 12, 2012

PAUL C. GARNER, ESQ.

2