**PAUL C. GARNER, ESQ.** (#132524)
**C/O LAW OFFICES OF BONNER & BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
Mail to: P.O. Box 232472
Encinitas, CA 92024
Tel: (760) 600-0081
Fax: (760) 918-1984
pcg@garnerlaw.com

CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF BONNER & BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFFS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDSAY R. COOPER, JAMES R. SUTTON, KIM GIESEKING, A. G., AN INFANT BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, CHARLES A. YARRIS, ROBERT M. MILLER, CHRISTOPHER G. BITTNER, ERIC MEMBRILA, JUDY C. GOODWIN, JENNIFER L. MICKE, JOHN W. SEELBACH, MAURICE D. ENIS, JAIME L. PLYM, NATHAN J. PIEKUTOWSKI, CAROLYN A. WHITE, LOUIE VIERNES, MICHAEL L. SEBOURN, K. S., AN INFANT BY HIS FATHER AND NATURAL GUARDIAN, MICHAEL L. SEBOURN, CHRISTIAN M. | Case No.: 12-CV-3032-JLS-WMc<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br>1.  NEGLIGENCE<br>2.  STRICT LIABILITY FAILURE TO WARN<br>3.  STRICT LIABILITY FOR DESIGN DEFECT<br>4.  STRICT LIABILITY FOR MISREPRESENTATIONS<br>5.  DECEPTIVE BUSINESS ACTS AND PRACTICES<br>6.  PUBLIC NUISANCE<br>7.  PRIVATE NUISANCE<br>8.  FRAUD<br>9.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>10. STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES |

EBUENG, PAUL J. ENCINIAS, DANIEL E. HAIR, ADAM W. KRUTZLER, DAVID K. MALONE, ROBERT SELIGMAN, ELOI A. WHITEMAN, JASON D. HENRY, NELLIE ALLEN-LOGAN, JAMI BESCHORNER, NATHAN CANCHE, NATHAN CRISWELL, JASON TROY FRIEL, OSCAR GONZALEZ, DAVID HAHN, JAMES JACKSON, D. J., A MINOR BY HIS FATHER AND NATURAL GUARDIAN JAMES JACKSON, JARRETT BRADY JOHNSTON, JOSEPH MEDINA, ADAM MINTZ, MALLORY K. MORROW, WILLIAM NETHERTON, MICHELLE ODEN, DONALD RAIRIGH, CHRISTOPHER RICKARD, ANDREW RIVERA, STEVEN RAY SIMMONS, AKEEM SMITH, JUSTIN SPENCER, ALAN SPURLING, ANGEL TORRES, AND "JOHN & JANE DOES" 1-70,000,

   Plaintiffs,

  vs.

TOKYO ELECTRIC POWER COMPANY, INC. aka TEPCO, and Does 1 through 200, inclusive

   Defendants

11. NEGLIGENCE PER SE: RES IPSA LOQUITUR
12. PRESUMPTION OF NEGLIGENCE PER SE

JURY TRIAL DEMANDED

Plaintiffs, by their attorneys, PAUL C. GARNER, ESQ**.** and CHARLES A. BONNER ESQ. as and for their First Amended Complaint, respectfully allege, upon information and belief:

## JURISDICTION AND PARTIES

1. The Plaintiffs, LINDSAY R. COOPER, JAMES R. SUTTON, KIM GIESEKING, A. G., AN INFANT BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, CHARLES A. YARRIS, ROBERT M. MILLER, CHRISTOPHER G. BITTNER, ERIK MEMBRILA, JUDY

GOODWIN, JENNIFER L. MICKE, JOHN SEELBACH, MAURICE D. ENIS, JAIME L. PLYM, NATHAN J. PIEKUTOWSKI, CAROLYN A. WHITE, LOUIE VIERNES, MICHAEL L. SEBOURN, K. S., AN INFANT BY HIS FATHER AND NATURAL GUARDIAN, MICHAEL L. SEBOURN, CHRISTIAN M. EBUENG, PAUL J. ENCINIAS, DANIEL E. HAIR, ADAM W. KRUTZLER, DAVID K. MALONE, ROBERT SELIGMAN, ELOI A. WHITEMAN, JASON D. HENRY, NELLIE ALLEN-LOGAN, JAMI BESCHORNER, NATHAN CANCHE, NATHAN CRISWELL, JASON TROY FRIEL, OSCAR GONZALEZ, DAVID HAHN, JAMES JACKSON, D. J., A MINOR BY HIS FATHER AND NATURAL GUARDIAN JAMES JACKSON, JARRETT BRADY JOHNSTON, JOSEPH MEDINA, ADAM MINTZ, MALLORY K. MORROW, WILLIAM NETHERTON, MICHELLE ODEN, DONALD RAIRIGH, CHRISTOPHER RICKARD, ANDREW RIVERA, STEVEN RAY SIMMONS, AKEEM SMITH, JUSTIN SPENCER, ALAN SPURLING, ANGEL TORRES, and JOHN & JANE DOES" 1-70,000, at all times herein mentioned were among the members of the U.S. Navy crews of the U.S.S. RONALD REAGAN (CVN-76), with its home port in San Diego, California, or the crews of other vessels participating as part of the Reagan Strike Force, 7th Fleet, as well as land-based service personnel, and/or their dependants. All of the Plaintiffs were repeatedly exposed to ionizing radiation on or after March 11, 2011, off the coast of Fukushima prefecture, Japan, where the Fukushima Nuclear Power Plant (hereinafter, "FNPP") is located. All of the Plaintiffs were exposed during a mission known as "Operation Tomadachi."[1]

---

[1] On March 14, 2011, the U.S. 7th Fleet, other U.S. Naval personnel, and aircraft aboard the vessels were repositioned away from Japan's FNPP after detecting contamination in the air and on the helicopters returning to the U.S.S. Ronald Reagan (CVN-76) from ferrying supplies to the land.  Other service personnel were aboard other vessels, on aircraft deployed by the U.S., or land based.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**   12-CV-3032-JLS-WMc

2.  Plaintiff, LINDSAY R. COOPER, born July 12, 1989, who served as an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned herein a citizen of the State of California.

3. Plaintiff JAMES R. SUTTON, born June 10, 1987, who served as a boatswain's mate and was aircraft director on the flight deck, is and was at all times mentioned a citizen of the State of Washington.

4. Plaintiff KIM GIESEKING, born January 28, 1989, who served as a boatswain's mate on the flight deck, is and was at all times mentioned a citizen of the State of California.

5. Plaintiff A. G., BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, born October 15, 2011, is and was a citizen of the State of California.

6. Plaintiff CHARLES A. YARRIS, born December 3, 1988, who served as a boatswain's mate as a director on the flight deck, is and was at all times mentioned a citizen of the State of Ohio.

7. Plaintiff ROBERT M. MILLER, born April 19, 1986, who served as a boatswain's mate handler in the air department, is and was at all times mentioned a citizen of the State of California.

8. Plaintiff CHRISTOPHER G. BITTNER, born July 21, 1985, who served as an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned a citizen of the State of New Mexico.

9. Plaintiff ERIC MEMBRILA, born July 28, 1974, who served as a specialist in air decontamination, is and was at all times mentioned a citizen of the State of California.

10. Plaintiff JUDY C. GOODWIN, born January 9, 1988, was an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned a citizen of the State of New Mexico.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

11.Plaintiff JENNIFER L. MICKE, born October 14, 1990, who served as an aviation structural mechanic, is and was at all times mentioned a citizen of the State of Wisconsin.

12.Plaintiff JOHN W. SEELBACH, born October 19, 1985, who served as an aviation electronics troubleshooter, is and was at all times mentioned a citizen of the State of California.

13.Plaintiff MAURICE D. ENIS, born October 8, 1987, who served as a navigation quartermaster, is and was at all times mentioned a citizen of the State of Florida.

14.Plaintiff JAIME L. PLYM, born October 26, 1984, who served as a navigator-plotter, is and was at all times mentioned a citizen of the State of Florida.

15.Plaintiff NATHAN J. PIEKUTOWSKI, born February 15, 1991, who served as a land-based marine, is and was at all times mentioned a citizen of the State of Illinois.

16.Plaintiff CAROLYN A. WHITE, born October 16, 1979, who served as expedition division chief, is and was at all times mentioned a citizen of the State of California.

17.Plaintiff LOUIE VIERNES, born April 4, 1987, who served as a deck seaman on the U.S.S. Cowpens, is and was at all times mentioned a citizen of the State of California.

18.Plaintiff MICHAEL L. SEBOURN, born August 24, 1974, who served as a decontamination coordinator in Japan, is and was at all times mentioned a citizen of the State of California.

19.Plaintiff K. S.[2], born November 10, 2002, who resided with his father and natural guardian, MICHAEL L. SEBOURN, is and was at all times mentioned a citizen of the State of California.

---

[2] Infants are most vulnerable due to their more rapidly growing cells, and when the maternal host is exposed to radioactive isotopes, this can be fatal or highly

20. Plaintiff CHRISTIAN EBUENG, born January 20, 1988, who served as an aviation life-support technician, is and was at all times mentioned a citizen of the State of California.

21. Plaintiff PAUL J. ENCINIAS, born March 10, 1984, who served as plane captain, launch and recovery, is and was at all times mentioned a citizen of the State of California.

22. Plaintiff DANIEL E. HAIR, born September 13, 1984, who served as an administrator, is and was at all times mentioned a citizen of the State of California.

23. Plaintiff ADAM W. KRUTZLER, born December 18, 1989, who served as an aircraft electrician, plane captain and flight deck supervisor, is and was at all relevant times a citizen of Oklahoma.

24. Plaintiff DAVID K. MALONE, born April 12, 1985, who served as an aircraft engine mechanic, aviation machinist mate, is and was at all times mentioned a citizen of the State of Washington.

25. Plaintiff ROBERT SELIGMAN, born August 26, 1985, who served as an aircraft fuel technician, is and was at all times mentioned a citizen of the State of Arizona.

26. Plaintiff ELOI A. WHITEMAN, born December 1, 1949, who served as a technician, is and was at all times mentioned a citizen of the State of California.

27. NELLIE ALLEN-LOGAN, JAMI BESCHORNER, NATHAN CANCHE, NATHAN CRISWELL, JASON TROY FRIEL, OSCAR GONZALEZ, DAVID HAHN, JAMES JACKSON, D. J., A MINOR BY HIS FATHER AND NATURAL GUARDIAN JAMES JACKSON, JARRETT BRADY JOHNSTON, JOSEPH MEDINA, ADAM MINTZ, MALLORY K. MORROW, WILLIAM

damaging to the fetus. It has been reported that by one year post Fukushima (by May, 2012), up to 35% of Japan's monitored children have been found with cysts or other unnatural developments on their thyroid glands. This indicates there are both increased and unsafe levels in their environment and that they should have been evacuated to far more than only 12-20 miles beyond the FNPP site.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                   12-CV-3032-JLS-WMc

NETHERTON, MICHELLE ODEN, DONALD RAIRIGH, CHRISTOPHER RICKARD, ANDREW RIVERA, STEVEN RAY SIMMONS, AKEEM SMITH, JUSTIN SPENCER, ALAN SPURLING, ANGEL TORRES, at all relevant times were members of the armed forces, dependants, and support personnel, who served in a variety of capacities, and who are and were, at all times mentioned, citizens of the United States of America..

28. Plaintiffs have only recently, within all the relevant statutes of limitation periods, discovered the facts pertaining to the nature and extent of their injuries, and facts that Defendants' conduct, including Defendants' fraudulent misrepresentations, which induced Plaintiffs reasonable and justifiable reliance, is the actual and proximate cause of their injuries, damages and harm. This delayed discovery tolls, both in equity and in law, the expiration of the statutes of limitation.

29. Plaintiffs "JOHN & JANE" DOES 1-70,000, are members of the armed forces, dependants, and support personnel, who served in a variety of capacities, and who are and were, at all times mentioned, citizens of the United States of America.

30. The Defendant, TOKYO ELECTRIC POWER COMPANY, INC. aka TEPCO, (hereinafter, "TEPCO"), at all times herein mentioned, was and still is a foreign corporation, organized and existing under the laws of Japan, with its principal place of business situated at 1-1-3 Uchisai wai-Cho, Chiyoda-Ku, in the city of Tokyo, Japan, and with offices located at Suite 720, 1901 L Street N.W., Washington, D.C. 20036.  In 2003, TEPCO registered as a California foreign corporation with the California Secretary of State. During all times relevant, TEPCO conducted business as a foreign Corporation registered in the state of California. Japan is a member of the Hague Convention, having become a signatory on June 27, 1957. The Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matter**s** is the

multilateral treaty governing the enforcement of judgments entered by one nation's court or legal authorities in other signatory nations. Hence, TEPCO is subject to the jurisdiction of this United States Federal District Court, which is empowered to enforce any Judgment against DEFENDANTS, including DEFENDANT TEPCO, pursuant to the Hague Convention.

31. The Defendant, TEPCO, is a wholly owned public benefit corporation, and the government of Japan is its principal shareholder, charged with the responsibility to provide electric power to the people of Japan.

32. At all times herein mentioned, Defendant TEPCO derived substantial revenue from its activities via goods used or consumed in the United States of America, its several states, including the State of California, through its operation of the FNNP.

33. At all times herein mentioned, Defendant TEPCO expected or should reasonably have expected its acts to have consequences in the State of California and elsewhere within the United States of America.

34. At all times herein mentioned, the Defendant TEPCO derived substantial revenue from interstate or international commerce.

35. At all times herein mentioned, the Defendant TEPCO owned the premises where the FNPP was situated, within the prefecture of Fukushima, Japan.

36. At all times herein mentioned, the Defendant TEPCO was one of the owners of the FNPP.

37. At all times herein mentioned, the Defendant TEPCO was a lessee of the FNPP.

38. At all times herein mentioned, the Defendant TEPCO, Defendant's servants, agents and/or Defendant's employees operated the FNPP.

39. At all times herein mentioned, the Defendant TEPCO, Defendant's servants, agents and/or employees maintained the FNPP.

40. At all times herein mentioned, the Defendant TEPCO, Defendant's servants, agents and/or employees managed the FNPP.

41. At all times herein mentioned, the Defendant TEPCO, Defendant's servants, agents and/or employees controlled the FNPP.

42. At all times herein mentioned, the Defendant TEPCO, Defendant's servants, agents and/or employees supervised the FNPP.

43. On or before March 10, 2011, the Defendant TEPCO, Defendant's servants, agents and/or employees attempted repairs at the FNPP.

44. On or before March 10, 2000, the Defendant TEPCO, Defendant's servants, agents and/or employees inspected the FNPP.

45. On or before March 10, 2011, the Defendant TEPCO, Defendant's servants, agents and/or employees constructed the FNPP.

46. More than 20 years ago, the Defendant TEPCO, Defendant's servants, agents and/or employees designed the FNPP.

47. The jurisdiction of this Court over the subject matter in this action is predicated upon 28 U.S.C. §1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs.[3]

48. Maritime law falls within this Court's jurisdiction to be applied in the manner of a common law Court. As such, venue rules do not apply and Plaintiffs beg leave to refer all issues of law to the Court.[4]

## DOE DEFENDANTS

---

[3] Diversity jurisdiction is currently codified at 28 U.S.C. §1332, http://www.law.cornell.edu/uscode/28/1332thml;  also see Ghotra v. Bandila Shipping, Inc., 713 F3d 1050, 1054, 9th Cir. 1997
[4]  See Supplemental Rule F(9), 28 U.S.C. 1390(B); Admiralty, 28 U.S.C. §1331(1); substantive law of admiralty applies, Yamaha Motor Corp. U.S.A. v. Calhoun, 516 U.S. 199, 206, 116 S.Ct. 619, 623; Exxon Shipping Co. v. Barer, 554 U.S. 471, 489-90, 128 S.Ct. 2605, 2619

49.Plaintiffs do not know the true names and capacities, whether individual, corporate, associate, or otherwise of DEFENDANT Does 1 through 200 inclusive and therefore sue these Defendants by such fictitious names.  Plaintiffs will amend their complaint to allege their true names and capacities when this has been ascertained.

//

## RESPONDENT SUPERIOR

50.All of the described conduct, acts, and failures to act are attributed to agents and employees under the direction and control, and with the permission, consent and authorization of DEFENDANTS.  Said acts, conduct and failures to act were within the scope of such agency and/or employment, and each of the DEFENDANTS ratified the acts and omissions of each of the other DEFENDANTS. Each of these acts and failures to act is alleged against each DEFENDANT, whether acting individually, jointly, or severally. At all times relevant herein, each DEFENDANT was acting within the course and scope of his or her employment.

## FIRST CAUSE OF ACTION
### (Negligence)
### Against all DEFENDANTS

51.Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

52. At all times herein mentioned, it was the duty of the Defendant TEPCO, Defendant's servants, agents and/or employees to maintain said FNPP in a reasonably safe and suitable condition, and in good repair.

53.At all relevant times herein mentioned, the Defendant, TEPCO, knowingly and negligently caused, permitted and allowed false and misleading information concerning the true condition of the FNPP to be disseminated to the public, including the U.S. Navy, Air Force, and Marines.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**     12-CV-3032-JLS-WMc

54. How did Operation Tomodachi begin?  A request for help from the Japanese Embassy to Kurt Campbell, assistant secretary of state for East Asian and Pacific affairs, who quickly turned to Gregory Jaczko, then chairman of the US Nuclear Regulatory Commission, and Admiral Mike Mullen, Chairman of the Joint Chiefs of Staff.

55. Prior to March 12, 2011, TEPCO knew that the U.S. Navy rescue mission personnel were in danger of being irradiated by spreading radiation from Unit 1 at the six-reactor, Fukushima-Daiichi nuclear complex. At least three other reactors were in danger of failing, including the spent fuel pool of reactor Unit 4, holding 1,535 bundles of irradiated fuel. TEPCO concealed this information from the U.S. Navy.

56. Defendants' fraudulent conduct: On March 12, 2011, as the USS Ronald Reagan and Carrier Strike Group 7 arrived two miles off the coast, Fukushima Unit 1 blew up. Unit 3 exploded on March 14, releasing plums of hydrogen gases migrating through a shared vent, which destroyed the containment building at Unit 4, exposing the spent fuel pool to the air. Unit 2 exploded on March 15. Tokyo Electric Power Company (TEPCO) announced that most of the fuel in Units 1, 2, and 3 were intact. They were not intact. This was a false, misleading, conscious misrepresentation. The true facts were that the fuel in Units 1, 2, and 3 had fused into a molten mass and were oozing through the bottom of their destroyed reactors. TEPCO likewise hid, covered-up, concealed these facts and falsely represented the true facts to the U.S. Navy, leading the Navy to rely on the false representation that the levels of radiation were within safe levels. Plaintiffs suffered harms, damage and suffered, and continued to suffer, life threatening injuries as a result of TEPCO's conscious misrepresentations.

57. At all relevant times, the Defendant, TEPCO, was aware that the U.S. Navy and its personnel would rely upon its representations as to the condition of FNPP and its environs in the performance of their efforts to provide humanitarian

assistance, during its relief mission to ferry food and water to the inhabitants of the ravaged city of Sendai, located within the prefecture of Fukushima, Japan, following the earthquake and tsunami on March 11, 2011.

58. At all relevant times herein mentioned, the radiation produced at the FNPP does not occur naturally.

59. The radiation, which was produced as a result of nuclear fission, was utilized to boil water in order to produce steam generated power.

60. At all relevant times the Defendant, TEPCO, was aware that exposure to even a low dose of radiation creates danger to peoples' health and was also aware of the importance of accurately reporting actual levels.[5]

61. As a consequence of the earthquake and tsunami, the reactors were damaged and power to the cooling mechanism of the FNPP was interrupted, resulting in a meltdown of the fuel and reactors themselves, thereby triggering the release of high levels of ionizing radiation, including radioactive cesium.[6]

---

[5] Numerous studies indicate that even low dose radiation poses a severe danger to health; see eg., "No Safe Dose - Japan's Low -Dose Radiation Disaster," http://rense.com/general95/no-safe-dose.htm; "Even Low-level radioactivity is damaging.  Broad analysis of many radiation studies finds no exposure threshold that precludes harm to life," http://www.sc.edu/news/newsarticle.php?nid=5214#.UKljmkvma6X; Meta-Review of 46 Studies: Even the Lowest-Level Radiation is Damaging to Human Health,

 http://www.washingtonsblog.com/2012/11/meta-review-of-42-studies-even-the-lowest-level-radiation-is-damaging-to-human-health.html

[6] At Fukushima, large releases of radioactivity apparently came from the concrete pools, where spent fuel rods, clad with a special alloy, were placed to cool down after their use in the reactors.  These spent fuel rods were extremely hot – up to 2,000 degrees Fahrenheit – and needed a constant circulation of cold water to keep them from burning up.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

62.Nuclear radiation is a known human carcinogen that is linked to many human health problems. The U.S. Environmental Agency ("EPA") classifies it as a human carcinogen.[7]

_____

[7] According to experts, "[t]here is a near universal acceptance that epidemiological data demonstrates an excess risk of delayed cancer incidence above a dose of 0.1 sieverts.  All who met with Fukushima's radioactive fallout are probably to have some problem with the thyroid."  See http://enenews.com/watch-all-people-met-fukushimas-radioactive fallout-problem-thyroid-many-tokyo-already-developing-problems-video;

Nuclear expert Claudia French, who was professor emeritus of molecular and cell biology at UC Berkeley, who worked on the "Manhattan Project" on uranium effects, and established the Biomedical Research Division of the Lawrence Livermore National Laboratory, wrote in his 1990 book that "by any reasonable standard of biomedical proof" there is no threshold level (no harmless dose) of ionizing radiation with respect to radiation mutagenesis and carcinogenesis – a conclusion supported in 1995 by a government-funded radiation committee.

"The results of surveys and biological monitoring of children and adults of Chernobyl point unambiguously to a steady, rapid and dramatic deterioration of health of all victims of the impact of the Chernobyl accident," wrote Drs. E.B. Burlakova and A.G. Nazarov of the Emanuel Institute of Biochemical Physics, Russian Academy of Sciences, Moscow.  Most interesting, the go on to say, "The dose dependence of the radiation effect may be non-linear, non-monotonic and polymodal in character.  Over certain dose ranges, low-level irradiation is more devastating with regard to the results of its action on an organism or a population than acute high-level radiation."

Moreover, Dr. Ernest J. Sternglass, professor emeritus of radiation physics at the University of  the Pittsburgh School of Medicine, in his book, Secret Fallout – Low-Level Radiation From Hiroshima To Three-Mile Island, indicated that the risk increased with each additional picture.  This clearly suggests that there was no significant healing of the damage and thus that the cancer-causing effects of radiation were cumulative.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

63. When radiation from a reactor is spilled or leaks, it contaminates the environs and poses a serious health threat to humans and other species. The greater the concentration of radiation that escapes from the reactor or fuel rods, the higher the risk to humans, creating an enhanced threat to human health.

64. Radiation does not readily break down and does not biodegrade in the ground or water or apparatus exposed to it.  Research shows that it will persist in the environment for decades, since it has a half-life in excess of 77 years, far longer than the life expectancy of humans exposed to it.

65. The FNPP was constructed at Fukushima more than 20 years ago.

66. During their lifetimes before March 12, 2011, the Plaintiffs, and each of them, had never been exposed to harmful levels of radiation, including the time they served aboard the U.S.S. Ronald Reagan (CVN-76), aboard other vessels within the strike force, on land or air or sea, or at any other times or places.

67. The Defendant TEPCO created an increased risk of radiation exposure to the Plaintiffs by failing to provide them with warning of the actual increased risk of exposure rather than the level of risk of which the Plaintiffs were informed. This failure to inform of the true risk of exposure also extended to public officials, persons and entities engaged in the humanitarian effort known as "Operation Tomadachi," which dealt with the humanitarian consequences following the radiation spill. In addition, TEPCO'S failure extended to the general public.

68. Defendant TEPCO's conduct included acts and practices that operated as a fraud upon the Plaintiffs, public officials, and the general public. The conduct included false statements of material fact, or the making of statements which, in light of the circumstances, omitted material facts, with the result of making such statements misleading.

---

Exposure to radiation causes a cascade of free radicals that wreak havoc on the body.  Radiation also decimates the body's supply of glutathione, which allows free radicals to run rampant through the body's tissues and organs.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**     12-CV-3032-JLS-WMc

69. The liability of the Defendant TEPCO arises from the Defendant's conspiracy to perpetrate, and/or aid and abet in the commission of wrongful conduct alleged herein, and/or intentionally, knowingly, or in reckless disregard for the true facts, engage in the alleged wrongful conduct.

70. With respect to such wrongful conduct, Defendant TEPCO and the government of Japan conspired and acted in concert, among other things, to create an illusory impression that the extent of the radiation that had leaked from the site of the FNPP was at levels that would not pose a threat to the Plaintiffs. They did so in order to promote their interests and those of the government of Japan, knowing that the information they disseminated was defective, incomplete and untrue, while failing to disclose the extraordinary risks posed to the Plaintiffs who were carrying out their assigned duties and humanitarian mission aboard the U.S.S. Ronald Reagan or elsewhere.

71. Each of the agents, servants and/or employees of the Defendant, TEPCO, and the persons responsible within the government of Japan committed acts in furtherance of the above-alleged conspiracy. All of the conspirators ratified and adopted the acts of each co-conspirator and their agents.

72. As a direct and proximate result of the wrongful acts and conspiracy described above, Plaintiffs suffered damages as alleged herein.

73. Defendant TEPCO controlled all of the activities at the FNPP, and therefore is solely responsible for the enhanced threat of radiation exposure and for causing the damages alleged in this Complaint.

74. Only due to concerned nuclear whistle blowers whose information was considered by outside experts after March 11, 2011, does the public, including the Plaintiffs herein, now not have to rely upon the glib and technically inaccessible reports from Defendant herein, TEPCO, or the Japanese government, and have

been able to determine the extent of the radiation at the FNPP site as a result of the

release of nuclear material at that time.[8]

_____

[8] Web sites such as "enews.com"; "fukushima-diary.com" and "rense.com" have operated as information clearing houses for mainstream news, academic studies and independent sources of publication about the nuclear crisis in Japan.

Professor Jeff Kingston of Temple University in Tokyo has presented a thorough chronology of the Fukushimka nuclear crisis from the political perspective and also opines that the disaster "was preceded by a series of mishaps, cover-ups, irresponsible practices, close calls and ignored warnings . . . it was an accident waiting to happen."  As he explains in "Mismanaging Risk":

So who is to blame for the three meltdowns at Fukushima?  The nuclear village
tried to shift the blame onto PM Kan, spreading erroneous information about his visit to Fukushima Daiichi to the effect that he forced TEPCO to stop venting and subsequently alleging he ordered the halt of pumping of seawater to cool the reactors and spent fuel rods in adjacent pools . . . but this was TEPCO's responsibility and had nothing to do with the Kan's visit on March 12 . . . TEPCO retracted its allegations against Kan, but not before damaging Kan's reputation . . . Scapegoating Kan served many purposes, especially diverting attention away from TEPCO's, NISA's and METI's responsibility and for the accident and woeful crisis response. . . .

The third party panel that investigated the nuclear crisis . . . was harshly critical of
TEPCO and the government, pointing out that the utility was ill-prepared for a crisis and that its' workers made critical errors . . . workers and their managers were inadequately trained to cope with an emergency situation. . . . Their mishandling of emergency procedures contributed to the crisis.

The investigators also pilloried TEPCO and the government's mishandling of the evacuation of residents living near the plant, in many instances evacuating people to places where levels of radiation were higher than those where they had left. . . .
The panel confirmed that data generated by the System for Prediction of Emergency Dose Information (SPEEDI) on radiation dispersal was

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

75.At all times relevant herein, TEPCO and the Japanese government kept representing that there was no danger of radiation contamination to the U.S.S. Reagan (CVN-76), other vessels in the fleet, and/or their crew, and/or persons situated on the land. They asserted that "everything is under control," "all is OK, you can trust us," and there is "no immediate danger" or threat to human life, all the while lying unashamedly about the reactor meltdowns at FNPP.[9]

---

available and could have been used to evacuate residents at greatest risk to safer areas, but this information was not provided to the Prime Minister's crisis management center until March 23. . . . [O]ne month after the original evacuation, the government used this SPEEDI data to move evacuees out of harms way, meaning that many had been subjected to substantial doses of avoidable radiation exposure.

TEPCO and its regulators . . . failed to act on fresh and compelling evidence about
tsunami risk, a blind spot that left the plant needlessly vulnerable. . . . Telltale warnings began accumulating over the decade prior to 3/11 tsunami. . . . Clearly there is no basis to TEPCO's claim that the scale of the 3/11 tsunami was inconceivable; the utility chose to ignore centuries of geological evidence and repeated 21st century warnings from modern scientists, including in-house researchers. . . . Inexcusably, TEPCO did not make safety its ethos while lax oversight by the government allowed this culture of complacency to persist long after it was obvious that TEPCO was cutting corners to cut costs."

Mismanaging Risk and the Fukushima Nuclear Crisis, http://japanfocus.org/-Jeff-Kingston/3724

[9] Assumptions and pronouncements made on behalf of TEPCO by Mr. Goshi Hosono who is a lawyer and not a nuclear scientist. http://www.dpj.or.jp./english/217

"Any intelligent layperson who considers the technical aspects of the disaster will be at a loss as to how the plant operators will be able to restore the cooling system, which may be badly damaged, to reactors that themselves may be unrepairable or in various states of meltdown.  If the nuclear fuel in the reactors has melted through to the floor, what would be the point of setting up a cooling

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

76. Such reports were widely circulated within the Defendant TEPCO's organization at the time it was published, despite the fact that the Defendant knew that much higher levels of radiation existed within the area where the Plaintiffs and their vessels or rescue missions were operating.[10]

77. Defendant TEPCO's management, acting individually, jointly, and through officials of the government of Japan, publicly claimed that there was no danger to persons, including the Plaintiffs, who were carrying out their assigned mission during "Operation Tomadachi."

78. Privately, however, the Defendant and the Government of Japan were aware of the true and dangerous condition of the zone in which the Plaintiffs were operating.

79. Belatedly, after March 12, 2011, Defendant TEPCO prepared and circulated a memo that stated: "We agree that radiation is greater within the zone and that "[b]ecause of its levels subsequent to the tsunami's occurrence, from an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to remedial requirements."

80. Defendant was also aware that the potential health risk was far greater than its agents were reporting.

---

system to a dysfunctional reactor and a pool of melted fuel?   No one in the government clearly answers these questions . . ."  Testimony from Japan: Evolving Coverup of a Nuclear Disaster, http://www.globalresearch.ca/index.php?context=va&aid=24302

[10] Shortly after the nuclear accident on March 11, 2011, it became apparent that Japan's "downplaying" of the disaster was leading to "informational uncertainty." "It is absolutely imperative that Japanese officials become more transparent in their crisis communication.  It is equally imperative, as this present crisis makes clear, that officials around the world realize the severe harm that can be inflicted by the obfuscation and distortion of critical information in the wake of catastrophe."

Downplaying Disaster, Informational Uncertainty in the Wake of Japan's Nuclear Crisis,

81. Defendant's acts, including those of its agents within the government of Japan, amounted to material misrepresentations of the safety of those operating within the zone of radiation, and/or fraudulent concealment of a known defect.

82. Communications between TEPCO and public officials demonstrate the difference between Defendant's actual knowledge of the true properties and condition of the area around the FNPP, and their public posture and pronouncements regarding the levels of exposure, and are evidence of Defendant's misconduct at the time.

83. The Defendant TEPCO mobilized to convince the government of Japan, its people, the U.S. Navy, Air Force, and Marines, the Plaintiffs, and the world that it was safe to live and work within the zone surrounding the FNPP, within which they were assigned to operate, knowing that to be untrue.[11]

84. Such misrepresentations concerning the level of danger from radiation, which omitted the opposite and more accurate information that radiation was already known to be at levels higher than reported by the Defendant TEPCO, is evidence of Defendant's practice of using any available means to conceal from the Plaintiffs, the U.S. Navy, Air Force and Marines, and the public, the actual risk that "Operation Tomadachi" posed to them.

---

[11] Nuclear expert, Arnie Gundersen, has emphasized the true nature of the conditions with regard to reactor units 1 - 3 that they will "get to the point where they throw some concrete down on top of it and come back in 300 years." Gundersen believes this may not even be cleaned up in "500 years!" See Arnie Gundersen discussing the peril worldwide consequences if reactor no. 4 collapses: http.//ifyoulovethisplanet.org/?p=6282
A former nuclear insider and equally esteemed whistle blower Lauren Moret, has asserted that the Fukushima radiation cloud reached the West Coast on the Jet Stream by March 18, 2011, or just one week following the catastrophe. Interestingly, the president and his family left for the southern hemisphere and a letter was issued to the medical communities that they should not use Iodine-related diagnostics which would be about over exposure.

85.The Defendant, TEPCO, further misrepresented the danger by claiming that available data established that there was no evidence of the level of radiation within the zone of operation posing any significant risk of harm to the health of the Plaintiffs. TEPCO insisted that human exposure within that area to the radiation release in the affected area was negligible to them, that sufficient data existed to reasonably determine or predict that operating therein would not have an adverse effect on health of the Plaintiffs or the environment, and that further testing was therefore not needed to develop such data, knowing all of these claims to be untrue. Instead, Defendant's paramount concern was that any delay in providing assistance to the people living near the FNPP would have a significant adverse economic impact.[12]

---

[12] The government of Japan continues to dismiss the idea that the quakes themselves were the main cause of the nuclear meltdowns, while attributing the entire crisis to "unforeseen" natural phenomena of the tidal wave, yet its admits that the quake caused "a 3-square-centimeter rupture in the piping of the emergency cooling system for the No. 1 reactor." In addition, it notes "the possibility that the tremors from the earthquake created a tiny rupture of 0.3 square centimeters or less, which later grew larger when the reactor temperature and pressure rose and radioactive substances leaked from there." Government Probe: Reactor Cooling Botched at Fukushima No. 1, But Not No. 2 Plant,

 http://ajw.asahi.com/article/0311disaster/analysis/AJ201207240096

This is untrue, given that witnesses saw that the Unit 1 building collapsing before the tsunami arrived: "One worker, a maintenance engineer in his late twenties who was at the Fukushima complex on March 11, recalls hissing and leaking of pipes. 'I personally saw pipes that came apart and I assume that there were many more that had been broken throughout the plant. There's no doubt that the earthquake did a lot of damage inside the plant,' he said. There wer definitely leaking pipes but we don't know which pipes – that has to be investigated. I also saw that part of the wall of the turbine building for Unit 1 had come away. That crack might have affected the reactor." Meltdown: What Really Happened at Fukushima?, http://www.theatlantic wire.com/global/2011/07/meltdown-what-really-happened-fukushima/39541/

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                12-CV-3032-JLS-WMc

86.These misrepresentations are further evidence that the Defendant was willing to ignore facts known to it and to misrepresent the properties and impact of radiation within the zone around the FNPP in furtherance of the Defendant's and the government's goal to avoid the evacuation of Tokyo and the potentially dire economic consequences of such a course of action.

87.Despite the duty arising from such unsupported assurances of safety, Defendant TEPCO breached said duty to properly disclose its knowledge of the true risks of the levels of radiation within the area subsumed in "Operation Tomadachi."

88.Instead, the Defendant TEPCO pursued a policy which caused rescuers, including the Plaintiffs, to rush into an unsafe area which was too close to the FNPP that had been damaged.  Relying upon the misrepresentations regarding health and safety made by TEPCO, upon information and belief, the U.S. Navy was lulled into a false sense of security. The officers and crew of the U.S.S. Reagan (CVN-76) and other vessels believed that it was safe to operate within the waters adjacent to the FNPP, without doing the kinds of research and testing that would have verified the problems known to the Defendant TEPCO at that time. All of these omissions and misrepresentations have since come to plague the Plaintiffs who relied upon the accuracy of the representations made regarding their well-being and safety.[13]

---

[13] "Many Japanese are now wary of the governments' assurances about test results, and Tokyo Electric has made people more suspicious by refusing to let independent experts survey the waters inside the roughly 12-mile exclusion zone around the plant."  Fears Accompany Fishermen in Japanese Disaster Region,

http://www.nytimes.com/2012/06/26/world/asia/fears-accompany-fishermen-in-japanese-disaster-region.html?_r=1Etpagewanted=print

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

89. Despite having knowledge of the inevitability of radiation exposure to the Plaintiffs and others in the area, Defendant TEPCO chose not to warn the Plaintiffs, the U.S. Navy, public officials, or the general public.

90. Defendant TEPCO intentionally and knowingly made misleading environmental claims with knowledge that these claims of environmental safety were untrue, to the Plaintiffs' detriment.

91. The intentional and tortious conduct of the Defendant TEPCO was aimed at and encompassed the entire area surrounding the FNPP, including the waters, land and air adjacent to the Fukushima FNPP, where the Plaintiffs were employed and operating.

92. Defendant knew or in the exercise of due care should have known that the Plaintiffs, among several thousand other crewmen aboard the U.S.S. Ronald Reagan (CVN-76), as well as others, would be directly and harmfully impacted by Defendant TEPCO's conduct.

93. Honesty and fair-dealing is a basic and most precious resource, as well as a fundamental commodity of incalculable value. The Plaintiffs and the U.S. Navy had the right to know the actual conditions they would confront during "Operation Tomadachi."

94. Plaintiffs relied upon the truth of information provided to their commanding officers, who had a special and unique stake in the preservation of their crews' physical and mental well-being.

95. Upon information and belief, based upon currently available data, through its conduct, the Defendant TEPCO rendered the Plaintiffs infirm and poisoned their bodies.

96. The Plaintiffs must now endure a lifetime of radiation poisoning and suffering which could have and should have been avoided.

97. Upon information and belief, the Defendant TEPCO failed to timely and adequately test the water to which the Plaintiffs were exposed in order to detect contamination.

98. Upon information and belief, the Defendant TEPCO, its agents, servants and/or employees failed to perform proper and adequate testing within the theater of their operation of the radiation levels to which the Plaintiffs and/or their vessels would be exposed, to the Plaintiffs' detriment.

99. On or about March 11, 2011 and thereafter, the Defendant TEPCO never warned the Plaintiffs, or the general public about the actual or potential level of radioactive contamination there and then existing.

100.     Upon information and belief, the Defendant TEPCO constructed and operated the FNPP with the knowledge that the nuclear fuel had a potential to leak, or in reckless disregard of knowledge as to whether or not the FNNP could leak radiation into the environment.

101.     As owner, operator and/or promoter of nuclear power, Defendant TEPCO had a duty to the Plaintiffs arising from, among other things, its: (a) vastly superior knowledge and resources than those of the Plaintiffs; (b) material representations and/or omissions concerning the levels of radiation contamination; and (c) marketing, promotion and sales of power generated by nuclear fission, without warning of the foreseeable adverse impact it would have on the environment in which Plaintiffs were operating.

102.     Defendant's duties included, but are not limited to, the duty: (a) to reasonably protect Plaintiffs' health and well-being; (b) to timely inform public officials and the Plaintiffs of the level of actual or potential spills from the FNPP and its storage tanks and reactors; (c) to timely warn public officials and the Plaintiffs of the nature and risks they would confront; (d) to warn public officials and Plaintiffs of the properties that make radiation a threat to their health and well-being; (e) to timely warn all persons, including the Plaintiffs, who relied upon their

representations, despite the propensity of radiation from the FNPP to move great distances upon being released into the environment, as well as its potential health risks and noxious properties and the need for timely and adequate testing; and (f) such other duties as may be shown during discovery and at trial.

103.    Defendant TEPCO breached its duties, causing damages, including damages to the Plaintiffs, caused by contamination of their bodies with radiation, with dire consequences to their physical and emotional well-being.

104.    Unbeknownst to the Plaintiffs who indirectly relied on Defendant's representations regarding environmental safety, and directly and/or indirectly relied on omissions of any warnings, the increased levels of radiation at the FNPP were accompanied by a surge in incidents of serious contamination of those living and working around the FNPP.

105.    Defendant TEPCO also knew or should have known that the system it then was using for storing spent fuel rods and for the containment of radiation and utilization of nuclear material at the FNPP was faulty, inadequate and leaking.

106.    Defendant TEPCO also knew or should have known that the radiation released at the FNPP is remarkably recalcitrant to natural degradation and, once dispersed into the environment, is extremely difficult to clean up.

107.    According to then existing data uniquely known to the Defendant at the time, the Plaintiffs' consequent exposure to radiation within their zone of operation indicated that radiation levels had already reached levels exceeding the levels of exposure to which the people living the same distance from Chernobyl experienced, and who subsequently developed cancer.[14]

_____

[14] The nuclear community has now created a special rating system for Fukushima – assigning it to a new category, above Chernobyl, as a no. 8 level nuclear disaster. Fukushima is a "[m]ulti-source major nuclear accident requiring international assistance and monitoring.  See Nuclear incident scales: http://www.coasttocoastam.com/pages/portzline-images;

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

108.    Consequently, the potential for the development of cancer in the Plaintiffs has also been dangerously heightened due to the levels of exposure experienced by them during "Operation Tomadachi."

109.    The kind of misleading communication engaged in by the Defendant utterly failed to alert public officials, including the U.S. Navy, the Plaintiffs, and the general public to the danger of coming too close to the FNPP, and completely omitted the kind of detailed directions and precautions that would have been required to avoid the contamination of Plaintiffs with radiation.

110.    The conduct of the Defendant TEPCO was outrageous and/or so reckless and/or wantonly negligent as to be the equivalent of a conscious disregard of the rights of the Plaintiffs, entitling them to recover punitive damages. This conduct includes, but is not limited to: (1) manufacturing and marketing power from the FNPP causing radiation exposure despite specific actual knowledge of a serious defect that led inevitably to the contamination of Plaintiffs' bodies; (2) intentionally misrepresenting and concealing the true levels of radiation existing at and around the FNPP between March 10-11, 2011 and thereafter; (3) marketing and promoting power generated at the FNPP as environmentally safe and beneficial, despite specific knowledge to the contrary; (4) storing and continuing to store radioactive fuel rods at the FNPP, despite knowledge that the cooling tanks were leaking; (5) failing to issue any warnings to the Plaintiffs as to the health dangers of their continued exposure to the air and water adjacent to the FNPP; (6) conducting inadequate testing and inaccurately representing and reporting to the Plaintiffs that their presence aboard the U.S.S. Reagan at the locations where they were operating was safe, in disregard of the true facts; (7) failing to accept

---

Measured as quadrillions or petabecquerals (10 to the 15th Power) See, Becqueral: http://www.//wikipedia.org/wiki/Becquerel , the radiation was comparable to Chernobyl, being well over half, if not equivalent in volume.  See, Chernobyl: Assessment of Radiological and Health Impact 2002 Update of Chernobyl: Ten Years On, http://www.oecd-nea.org/rp/chernoble/c02.html

**FIRST AMMENDED COMPLAINT FOR DAMAGES**          12-CV-3032-JLS-WMc

financial responsibility for damages caused to the Plaintiffs who rely upon their physical and mental well-being in order to perform their assigned duties and provide for their families, which is now compromised due to excessive radiation contamination.[15]

111.    As manufacturer, distributor, seller, supplier, marketer and/or promoter of nuclear power, Defendant TEPCO had a duty to ensure that the product when used as intended was reasonably safe to property, air and water upon which the Plaintiffs relied, and Defendant failed to exercise due care and caution.

112.    Defendant had the clear duty and the financial means to determine whether any latent defects existed at the FNPP, including its storage facilities, and to warn Plaintiffs and public officials of the latent defects known to them, their agents and employees.  The Defendant breached this duty.

113.    Defendant TEPCO breached its duty to warn the Plaintiffs who relied upon TEPCO'S expertise and pronouncements.

114.    Defendant TEPCO affirmatively and voluntarily undertook to conduct and report research related to the environmental hazards and benefits of the continued operation of the FNPP, and failed to exercise due care and caution in connection with said undertaking.

115.    Defendant TEPCO, its agents, servants and/or employees breached their duties and committed acts of negligence toward the Plaintiffs in the design, manufacture, marketing and/or sale of nuclear power, including but not limited to failing or failing to adequately ensure the integrity of their reactors and/or storage

---

[15] The purposes of punitive damages are to punish a defendant and to deter similar acts in the future.

Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law. Ninth Circuit Manual of Model Jury Instructions Civil: 5.5 Punitive Damages.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**          12-CV-3032-JLS-WMc

tanks at the FNPP before the earthquake and tsunami; failing to provide warnings or adequate warnings of the enhanced risk to health posed by supplying and storing nuclear fuel to the FNPP; and intentionally, recklessly and/or negligently concealing and/or omitting to disclose the true facts  about the levels of radiation at and near the FNPP, and of the true facts of the condition of the roof storage tanks and reactors at said location.

116.    Defendant TEPCO, its agents, servants and/or employees knew, or in the exercise of reasonable care should have known that the levels of radiation at the FNPP posed a greater and enhanced hazard to land, air and water as described above, that contact with and/or ingestion of radiation posed a threat to the health and well-being of the Plaintiffs and those  persons utilizing sea water in an effort to decontaminate the U.S. Reagan (CVN-76), its attached helicopters, and otherwise potable water, that they possibly contained radiation at a level of concern as a possible human carcinogen, and that the Plaintiffs would suffer injury to body and mind, property damage, and other hardship from the contamination and loss of their air and water supply.[16]

117.    Defendant's    negligence    proximately    caused    widespread contamination of Plaintiffs' environs, including their air and water supply.

118.    Plaintiffs have suffered and been damaged, all as described above and herein, as a direct and proximate result of Defendant's negligence.

---

[16] TEPCO has admitted that "a total of about 10 becquerals per hour of radioactive cesium was being emitted from the No. 1 to No. 3 reactors as of June.  That is about one-80 millionths of the level that was being spewed immediately after the accident."  After 500 days, Fukushima No. 1 Plant Not Out of the Woods,

 http://ajw.asahi.com/article/0311disaster/fukushima/AJ201207240087

While the worst Chernobyl had to offer was pretty much over after it had blown its lid, Fukushima still releases vastly greater amounts of harmful radiation due to the nuclear fuel that remains at the site.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

119.     Upon information and belief, as a further direct and proximate result of Defendant's negligence, Plaintiffs have been and will be required to undergo further medical testing, evaluation and medical procedures, including but not limited to chelation therapy, bone marrow transplants and/or genetic re-programming for leukemia, in an effort to seek cure, and will be required to employ extraordinary means to achieve cure.

120.     As a further direct and proximate result of Defendant's negligence, the Plaintiffs incurred losses and damages for personal injury and property damage, loss of use and enjoyment of life and their property, the need for periodic medical examination and treatment, and economic losses, including wage loss, and the expenditure of time and money, and will continue to incur losses and damages in the future.

121.     Plaintiffs also face additional and irreparable harm to their life expectancy which has been shortened and cannot be restored to its prior condition.

122.     Solely as a result of the Defendant's negligence, carelessness and recklessness, the Plaintiffs suffered severe and serious personal injuries to mind and body, and further, the Plaintiffs were subjected to great physical pain and mental anguish.

123.     By reason of the foregoing, the Plaintiffs were severely injured and damaged, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are believed to be permanent in nature and duration, and the Plaintiffs will permanently suffer pain, inconvenience and other effects of such injuries; the Plaintiffs incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries; and the Plaintiffs will be unable to pursue their usual duties with the same degree of efficiency as prior to this incident, all to the Plaintiffs' great damage.

124.    The Defendant's conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, and more particularly, the rights, life and safety of the Plaintiffs; and was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations.

125.    Due to Defendant's negligence, each of the Plaintiffs is entitled to compensatory damages in a sum to be determined by the jury, plus punitive damages in a sum equal to treble the damages determined to be adequate by the jury.

WHEREFORE, Plaintiffs request relief as hereinafter provided

## SECOND CAUSE OF ACTION
### (Strict Liability Failure To Warn)
### Against all DEFENDANTS

126.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

127.    As manufacturer, designer, distributor, supplier, seller and marketer of nuclear power, the Defendant had a duty not to put a product in the market that poses a serious danger to land, air and soil without issuing warnings of the risk posed by the product to the Plaintiffs, the public, and public officials during "Operation Tomadachi."

128.    Defendant breached this duty by manufacturing, distributing, selling and marketing power produced by nuclear reaction with the actual or constructive knowledge that the product posed a high degree of risk to the safety and well-being of the Plaintiffs, without issuing any warnings or without sufficient warnings of the enhanced risk.

129.    Defendant breached this duty by manufacturing, distributing, selling and generating nuclear power at the Fukushima Daichi reactors and by improperly storing nuclear fuel rods at the FNPP with the actual or constructive knowledge

that the product posed a high degree of risk to the safety and health of the Plaintiffs, without issuing any warnings or without sufficient warnings of the enhanced risk.

130.     Defendant had actual and/or constructive knowledge that radiation would be released into soil, air and water upon which the Plaintiffs would rely. Defendant had actual and/or constructive knowledge of the properties of radiation that would ensure that, once released into the environment, radiation would spread further and in concentrations that would cause injury to the Plaintiffs.

131.     Defendant represented and warranted that the levels of contamination to which the Plaintiffs would be exposed were less than harmful to them and that their presence during "Operation Tomdachi" would not cause any different or greater harm to them than they might have experienced on missions in the past.

132.     At all relevant times, the Defendant knew that the reactors and storage tanks at the FNPP were then leaking and emitting high levels of radiation.

133.     Defendant knew that the U.S. Navy would necessarily operate the U.S.S. Reagan (CVN-76) with its crew of approximately 5,500 aboard, as well as other vessels in the waters adjacent to the FNPP, without the benefit of independent inspection or evaluation of the area for defects, and in reliance upon the veracity and completeness of representations made by the Defendant.

134.     At all relevant times herein, the Defendant failed to warn the Plaintiffs, the U.S. Navy, Air Force, and Marines, and public officials of the properties and actual levels of radiation detected at the FNPP at that time.

135.     At all relevant times herein, by example the Defendant failed to warn the U.S. Navy, Air Force, and Marines and the Plaintiffs that the levels of radiation in the waters adjacent to the FNPP posed significant threats to human, animal and aquatic health; created a need for those living or working aboard vessels in the adjacent waters to conduct frequent tests to determine the actual level of radiation exposure; failed to warn as to the actual risks and protective measures necessary to

ensure the Plaintiffs' well-being; and failed to issue other required warnings as may be shown at trial.

136.     The Defendant knew or should have known of the properties and characteristics of radiation exposure that comprise the risk and danger which is different in kind, degree and magnitude from the risks and dangers inherent in the performance of the Plaintiffs' duties in non-nuclear radiation zones.

137.     The Plaintiffs, the U.S. Navy, and other branch services were unaware of the true levels of such risks, which were not of a kind that they would ordinarily discover or could protect themselves against in the absence of sufficient warnings by the Defendant.

138.     Once the Defendant became aware of the actual levels of contamination and decided to withhold such vital and accurate information as to those levels around the FNPP, including the zone in which the Plaintiffs were performing their assigned duties, harm to the Plaintiffs was inevitable and could not be avoided or minimized due to the absence of warnings.

139.     Defendant's conduct was unreasonable in the circumstances.

140.     As set forth above, available scientific data, of which the Defendant had actual or constructive knowledge, gives rise to the reasonable inference that the alleged dangers existed and were foreseeable.

141.     Defendant's failure to warn the Plaintiffs and others, as alleged herein, proximately caused reasonably foreseeable damages to the Plaintiffs.

142.     The harm to the Plaintiffs proximately caused by Defendant's wrongful conduct includes those injuries and damages herein alleged.

143.     By engaging in said conduct, the Defendant's misconduct constituted a defective or unreasonably dangerous practice because of the Defendant' failure to warn, for which Defendant is strictly liable to Plaintiffs.

WHEREFORE, Plaintiffs request relief as hereinafter provided

## THIRD CAUSE OF ACTION
### (Strict Liability For Design Defect)
### Against all DEFENDANTS

144.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

145.     The Defendant during the relevant time period was the designer, manufacturer, and creator of the FNPP.

146.     Defendant had a duty of due care to design and manufacture a reasonably safe FNPP.

147.     Defendant had a duty of care to test the FNPP to determine the risks posed to the environment generally, water, and air in the surrounding vicinity.

148.     Defendant had a duty not to put on the market an unsafe and defectively designed product that posed a serious danger to the Plaintiffs' and others' health and well-being.

149.     Defendant breached said duties of due care when it manufactured a defectively designed product, namely the FNPP, with actual or constructive knowledge of the defects.[17]

---

[17] There exists an accumulation of evidence that the earthquake itself was the primary cause of the meltdowns, something [TEPCO] does not want to admit–that there are other inherent flaws in the way the power plant was built and operated. See Report on Nuclear Disaster Holds Key to Reactor's Fate,

http://online.wsj.com/article/SB10001424052702304441405774821136587755518.html

Nuclear expert Gundersen points out that the service pumps failed because they were positioned in such a way that they were flooded by the tidal wave on 311. These pumps send water from the ocean to cool the back-up diesel generators. "There could have been 14 meltdowns and not three.  If you look at the data, there were six units at Fukushima Daiichi (Power Station No. 1), there are four at Fukushima Daini (Station No. 2), three at Onagawa and one at Tokai.  The net affect is that there were 37 diesel generators between those plants.  24 of those

150.    Due to the design defect, the FNPP was not reasonably safe and protective of the environment generally and Plaintiffs', among others, health and well-being.

151.    Any utility of nuclear generated power does not outweigh the risks inherent in manufacturing and maintaining a FNPP designed in that manner.[18]

152.    The defective design of the Defendant's FNPP, as alleged herein, proximately caused reasonably foreseeable damages to the Plaintiffs.

153.    The Defendant's conduct in the design, manufacture, and maintenance of the FNPP, a defective or unreasonably dangerous product, makes Defendant strictly liable to the Plaintiffs.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## FOURTH CAUSE OF ACTION
### (Strict Liability For Misrepresentations
### Restatement (Second) Of Torts § 402B
### Against all DEFENDANTS

154.    PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

---

diesels were knocked out by the tsunami.  You need the diesels to cool the plant." At FNPP no. 1 the tsunami flooded the actual diesel generators, but at the other plants, the "tsunami knocked out the cooling water to the diesels, something called service water.  So, Japan narrowly missed 14 meltdowns and not three because the cooling water to 24 of 37 diesels was destroyed."  See Gundersen, July 6, 2012, Pacifica Radio Host Ian Masters and Fairewinds' Arnie Gundersen: Lessons Not Learned From Fukushima Daiichi, http://www.fairewinds.com/radio; SolarilMG Podcast with Arnie Gundersen–Aug 10/2012, http://solarimg.org/?p=3021

[18] **Error! Main Document Only.**The FNPP site is fraught with danger, with constant reports of highly toxic water leaking from this pipe or that, or this reactor or that.  For example, water in Unit 2 turbine basement was found to have 47 million becquerals per liter.  Unit 2 Water 10 Times More Radioactive than Unit 1,

http://enenews.com/unit-2-10-times-more-radioactive-than-unit-1-47000000-Becquerals-per-liter-in-turbine-room-basement

155.     This claim for relief is brought under Restatement (Second) of Torts § 402B and/or the common law of product liability.

156.     As designer, manufacturer, or maintainer of the FNPP, the Defendant, in the course of advertising and promoting their product, made misrepresentations of one or more material facts concerning the character and properties of the condition of the FNPP at all relevant times.

157.     These misrepresentations included, but were not limited to, claims that the FNPP (a) was environmentally beneficial; (b) was "clean"; (c) was not contaminated by radiation in dangerous levels at all relevant times; (d) did not pose a greater risk of radiation exposure to humans than other methods of generating power; (e) was not more likely than other forms of power generation to cause injury; (f) all harmful radiation was safely contained during its use; (g) was inherently safe at all relevant times by providing a benign warning; and (h) the levels of radiation were adequately tested and shown not to pose a health hazard or an enhanced risk to the environment or to the Plaintiffs' health and well-being, who reasonably relied upon them

158.     Such misrepresentations were made to public officials, the Plaintiffs and the public, who reasonably relied upon them.

159.     The Plaintiffs have suffered harm to their bodies and property from actual exposure to radiation contamination as described herein and above, as a direct and proximate result of Defendant's misrepresentations and omissions, on which the Plaintiffs indirectly and justifiably relied, causing the damages alleged herein.

WHEREFORE, Plaintiffs request relief as hereinafter provided

## FIFTH CAUSE OF ACTION
### (Deceptive Business Acts and Practices
### Against all DEFENDANTS

160.     PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

161.     The Defendant is engaged in the business of providing power from the FNPP to consumers in Japan.

162.     The Defendant engaged in materially deceptive and misleading acts and practices in the production, distribution, marketing and selling of nuclear power, including but not limited to:

(a)     overstating any environmental benefits of the FNPP, while neglecting to mention or understating its actual environmental costs;

(b)   marketing nuclear power as a "clean" and environmentally "safe" and beneficial fuel;

(c)   misrepresenting the actual levels of radiation, including the statement that it posed no threat of harm to the Plaintiffs in the performance of their mission;

(d)   representing that the condition of the FNPP did not pose any unusual threat of harm as compared to a conventional, non-nuclear power plant;

(e)   failing to disclose that in the event of radiation leaking from the FNPP, it would be unable to contain the radiation in a manner and be far more likely to cause contamination than other sources of power generation;

(f)   misleading the public and the Plaintiffs to believe that they could safely perform their duties in the water adjacent to the FNPP despite the detected levels of radiation;

(g)   stating that the air and water at and about the FNPP were adequately tested and shown not to pose a health hazard or enhanced risk to the environment: meanwhile avoiding and discouraging additional testing; and

(h)   concealing the necessity for the Plaintiffs to take steps to undergo early detection modalities to determine whether or not they had been exposed to unsafe levels of radiation, a potential carcinogen and health hazard to all organs of the body.

163.    Defendant's materially deceptive and misleading practices proximately caused harm and damage to the Plaintiffs, including personal injury, property damage, loss of enjoyment of property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. Plaintiffs will continue to incur losses and damages in the future.

WHEREFORE, Plaintiffs request relief as hereinafter provided

## SIXTH CAUSE OF ACTION
### (Public Nuisance)
### Against all DEFENDANTS

164.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

165.    The Defendant has manufactured, distributed, marketed and promoted their product in a manner that has unreasonably endangered or injured the property, health, safety and comfort of the Plaintiffs, causing inconvenience and annoyance.

166.    The Defendant, by its negligent, reckless and willful acts and omissions as set forth above, has caused and permitted radiation contamination to a growing number of people who participated in "Operation Tomadachi" and others. This contamination has migrated, or threatens to continue to migrate into the environment, thereby contaminating the earth.[19]

---

[19] The level of cesium being emitted 500 days after March 11, 2011 was down from a peak of thousands of trillions of becquerals at the time of the reactor explosions." See Fukushima Derived Radinuclides in the Ocean and Biota Off Japan,

http//www.pnas.org/content/early/2012/03/26/1120794109.full.pdf=html?with-ds=yes;
Scientists: Far more Cesium Released than Previously Believed:

http://ajw.asahi.com/article/0311disaster/fukushima/AJ201202290025

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

A terabecquerel is a trillion Becquerals, a commonly used measure of radiation emitted by radioactive material.  So the New York <u>Times</u> is saying that early on 900,000,000,000,000,000 becquerals were released in the first 20 days of the nuclear disaster.  Radiation can damage the human body by breaking the chemical bonds in one's cells.  The amount of damage done depends on how much radiation one is exposed to.  This in turn depends on how much radioactive material is present in our environment, our food and so on.

"The greatest human experiment with radiation exposure is taking place in the Ukraine and Byelorussia, where much of the 50 million curies the Soviet government says were released  by the 1986 accident at Chernobyl is being felt. . . . Chernobyl legacy could include hundreds of thousands of additional cancer deaths. . . . Current estimates predict anything from 14,000 to 475,000 deaths worldwide from Chernobyl."  (A curie measures the intensity of radiation and is equal to 37 billion disintegrations per second.  As a reference point, the Hiroshima and Nagasaki bombs released an estimated one million curies.)  It should also be noted that Belarusian scientists reported an increase in a rare childhood thyroid cancer to 5,000 times its spontaneous occurrence in "clean" countries.  According to the 2000 report on Minsk's United Nations Development Program (UNDP), life expectancy in Belarus in the 1960s was almost level with that in Western Europe.  By 1999, 13 years after Chernobyl, it had fallen 12-14 years for men and 7-9 years for women.  A baby born in rural Belelrus today can expect to live 59 years.  But they may be very hard years, given that nearly half of Belarus' teenagers have serious health problems, with 45-47% of high school graduates suffering from physical disorders like gastrointestinal anomalies, weakened hearts, and cataracts; 40% of them have chronic "blood disorders" and malfunctioning thyroids.  The number of handicapped adolescents has tripled in the last decade.  It has always been known that ionizing radiation, in higher doses than background levels, can cause measurable increases in cancers and leukemias, as well as cause genetic mutations that affect future generations.

Thus, the New York <u>Times</u> has reported that in terms of radiation released in the first 20 days a the FNPP, 900,000 terabecquerels translates into 27 million curies.  It is over a year later and no one knows or is saying how much aggregate radiation has been released, but clearly it's a staggering amount.

One curie is the amount of radiation equal to the disintegration of 37 billion atoms – 37 billion becquerals – per second.  Obviously, it is a very large amount of

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

167.   Actual and threatened radiation contamination caused by the Defendant's conduct has damaged Plaintiffs' health and substantially and has unreasonably interfered with Plaintiffs' use, benefit and enjoyment of their properties, in a way that an ordinary, reasonable person would find, resulting in substantial inconvenience, annoyance and injury.

168.   The ongoing conditions found site-wide at the FNPP and country wide, have caused and are causing a material loss of good health because of actual and threatened continued radiation contamination and exposure.

169.   Plaintiffs, who were exposed to excessive levels of radiation, suffer special damages because, unlike the general public, they are at a heightened risk of developing injuries related to their exposure, including cancer.

170.   Plaintiffs' special damages also include loss of health and increasingly widespread necessity to seek treatment. Their future medical conditions have been rendered less certain, unsafe and unreliable. As a result, Plaintiffs suffer loss of enjoyment of life and fear, among other injuries.

171.   The Defendant knew or in the exercise of reasonable care should have known that the introduction and use of radiation based energy would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of the Plaintiffs' lives.

172.   The Defendant has violated and/or threatened to violate a public right to pure air and water.

173.   As a direct and proximate result of Defendant's acts and omissions creating the above described nuisance, Plaintiffs who were exposed to radioactive materials and who constitute a considerable number of people, have suffered

---

radiation.  If one multiplies these amounts (27 million curies times 37 billion radioactive atoms), the result is just a little more than 900,000 terabecquerels . . . all the way up to 999,000,000,000,000,000 becquerals, which translates into 999,000,000,000,000,000 nuclear particles decaying in the first 20 days after the Fukushima nuclear nightmare.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                12-CV-3032-JLS-WMc

special damages and injury in the form of damage to their persons and property and endangerment to their health and safety, more so than those persons not exposed to such materials in the zone of danger at the FNPP.

WHEREFORE, Plaintiffs request relief as hereinafter provided

**SEVENTH CAUSE OF ACTION**
**(Private Nuisance)**
**Against all DEFENDANTS**

174.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

175.    The Plaintiffs' bodies have been contaminated by radiation poisoning as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of the Defendant, all as alleged herein.

176.    The contamination of Plaintiffs' persons caused by the Defendant's conduct has substantially and unreasonably interfered with their physical well-being, use, benefit, and enjoyment of their properties and life.

177.    The stigma and actual contamination of Plaintiffs' bodies has caused a material loss of value of their properties and life expectancy.

WHEREFORE, Plaintiffs request relief as hereinafter provided

**EIGHTH CAUSE OF ACTION**
**(Fraud)**
**Against all DEFENDANTS**

178.    Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

179.    Each of the acts, practices, misrepresentations, omissions and other wrongs complained about above have been engaged in by the Defendant with specific and deliberate intent to defraud and deceive the Plaintiffs, public officials, and the general public, or with reckless disregard for the truth or falsity regarding the claimed levels of radiation existent at all relevant times alleged herein.

180.    Prior to March 12, 2011, TEPCO knew the U.S. Navy rescue mission personnel were in danger of being irradiated by spreading radiation from Unit 1 at

the six-reactor, Fukushima-Daiichi nuclear complex. At least three other reactors were in danger of failing, including the spent fuel pool of reactor Unit 4, holding 1,535 bundles of irradiated fuel. TEPCO concealed this information from the U.S. Navy.

181.    Defendant's fraudulent conduct: On March 12, 2011 as the USS Ronald Reagan and Carrier Strike Group 7 arrived two miles off the coast, Fukushima Unit 1 blew up. Unit 3 exploded on March 14, releasing plums of hydrogen gases migrating through a shared vent, which destroyed the containment building at Unit 4, exposing the spent fuel pool to the air. Unit 2 exploded on March 15. Tokyo Electric Power Company (TEPCO) announced that most of the fuel in Units 1, 2, and 3 were intact. They were not intact. This was a false, misleading, conscious misrepresentation. The true facts were that the fuel in Units 1, 2, and 3 had fused into a molten mass and was oozing through the bottom of their destroyed reactors. TEPCO likewise hid, covered-up, concealed these facts and falsely represented the true facts to the U.S. Navy, leading the Navy to rely on the false representation that the levels of radiation were within safe levels. Plaintiffs suffered harms, damage and suffered, and continued to suffer, life threatening injuries as a result of TEPCO's conscious misrepresentations.

182.    At all relevant times, the Defendant, TEPCO, was aware that the U.S. Navy and its personnel would rely upon its representations as to the condition of FNPP and its environs in the performance of their efforts to provide humanitarian assistance, during its relief mission to ferry food and water to the inhabitants of the ravaged city of Sendai, located within the prefecture of Fukushima, Japan, following the earthquake and tsunami on March 11, 2011.

183.    Defendant, its agents, servants and or/employees made material misrepresentations of the true levels of contamination at the FNPP following the earthquake and tsunami, despite its knowledge of the actual conditions then and there existing. They also concealed known threats to environmental health and

safety of the Plaintiffs by such conduct in omitting to state material facts regarding the actual levels of radiation that were detected, and the recalcitrance of radiation to biodegradation and remediation.

184.     For example, after an explosion shook one of many stricken reactors at Japan's Fukushima Daiichi nuclear plant on Saturday March 12, 2011, power company officials initially offered the following, misleading explanation by memo, "A big sound and white smoke" were recorded near Reactor No. 1 and that the matter "was under investigation."

185.     A further example of a specific failure in representation or misrepresentation regarding the severity of the explosion is that the Prime Minister, Naoto Kan, berated power company officials for not informing the government of two explosions on Tuesday, March 15, 2011. "What in the world is going on?" Mr. Kan said in front of journalists, complaining that he saw television reports of the explosions before he had heard about them from the power company.

186.     On Wednesday March 16, 2011, in response to questions about the plumes of steam seen rising from Daiichi's Reactor No. 3, TEPCO managing agents stated the following: "We cannot confirm," and "It is impossible for me to say anything at this point."

187.     Another example of the false and misleading statements by TEPCO is evident in additional statements by Prime Minister, Naoto Kan, who said the following on May 20 before parliament: "[w]hat I told the public was fundamentally incorrect," referring to assessments from the government and TEPCO that reactors were stable and the situation was contained not long after March 11. Nan further stated the following: "The government failed to respond to Tepco's mistaken assumptions and I am deeply sorry."

188.     In making the material misrepresentations and omissions of fact as to the levels of radiation detected and as to the safety of Plaintiffs, the Defendant TEPCO, its agents, servants and/or employees, intended to induce the Plaintiffs

and others to view the radiation conditions to which they were exposed as environmentally safe. This induced the victims to enter an area known to be excessively contaminated to the extent that would exceed permissible limits then in effect; and effectively lulled the Plaintiffs and others into believing it was not necessary to take more immediate and timely measures to avoid exposure to harmful radiation to their bodies and that of Plaintiff GIESEKING'S then unborn child; and/or to seek more timely intervention following exposure.

189.     The actual facts differed from the representations made by the Defendant, its agents, servants and/or employees at the time.[20]

190.     The Defendant at all times had a great disparity of access and effectively controlled all information on matters related to the relevant properties of area in which the Plaintiffs were required to perform their duties. They had knowledge and a responsibility to inform, yet fraudulently withheld such information about the enhanced threat to Plaintiffs' health and well-being following their introduction into the area adjacent to the FNPP, the condition of the storage tanks at the plant, the condition of the groundwater, the water in which the U.S.S. Reagan (CVN-76) and other vessels and personnel were then operating, as well as those people who were land-based, given the results of radiation assessments it had obtained.

---

[20] Many engineers are "highly suspicious" of government assurances that the situation is not bleak.  For example, "Takashi Kei, a former cooling system worker at the plant now working as a radiation survey volunteer, said the utility company's executives are portraying the situation in the best possible light.  'There are leaks everywhere, wreckage too.  It's not as simple as they portray,' he said."  Japanese nuclear expert, Hiroaki Koide, recently said that "The state of the reactors is still deteriorating."
 In Japan, a Nuclear Ghost Town Stirs to Life,

http://openchannel.nbcnews.com/_news/2012/07/26/12839675-in-japan-a-nuclear-ghost-town-stirs-to-life?lite

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                                    12-CV-3032-JLS-WMc

191.    By virtue of Defendant's superior position and influence during all relevant transactions, the Plaintiffs and others had no reasonable opportunity to discover the true facts before participating in and/or becoming victims of the fraudulent transactions.[21]

192.    As a result of Defendants fraudulent statements, misrepresentations and/or omissions Plaintiffs, and each of them, were not directed by their supervising Officers to take necessary precautions to reduce exposure to radiation. For example the commanding officer of the USS Ronald Regan failed to maintain the "Circle William" lockdown procedures which would have limited exposure by closing ventilation and implementing other safety procedures. Additionally, none of the Plaintiffs on the USS Regan were provided radiation monitoring devices to monitor the level of radiation they were exposed to despite being positioned, at times, only a few miles from the failing plant. The lack of adequate safety precautions is a direct reflection of lack of proper information about the extent of the danger posed by the radiation leaked from the power plant.

---

[21] Operators of FNPP have admitted that radiation levels exceed 1-2 times previously announced.  Not surprisingly, TEPCO maintains it had no idea that workers were going to extreme lengths to conceal the radiation levels they were exposed to, but at least 10 workers and former workers have come forward to discuss the practices that kept them working without raising safety concerns. Frequently, the workers say, they would not wear the dosimeters designed to detect accumulated radiation levels.  They would simply leave the safety gear in their cars for the day.  "I have no idea how much radiation I was really exposed to," according to one worker, "The company also does not allow me to get health checks for cancer.  I am very concerned about my health," Rather than rock the boat, the workers do what is necessary to hide their radiation levels in order to have consistent work.

According to Japanese news, Asahi Shimbun (AS), Fukushima decontamination by TEPCO included making workers fake radiation readings. NHK Documentary: Recently deteriorating working conditions at Fukushima plant causing workers to quit, http://enenews.com/nhk-documentary-working-conditions-deteriorating-fukushima-plant-

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

193.     Plaintiffs allege on information and belief that their commanding officers received incorrect information regarding the levels of radiation and therefore failed to instruct Plaintiffs, and each of them, to take necessary precautions to minimize the exposure to radiation.

194.     Plaintiffs' reliance on the Defendant, its agents', servants' and/or employees' materially false and misleading representations and omissions of material information as to the levels of radiation detected, resulted in their exposure to unsafe levels of radiation, after the environment had already been contaminated by the Defendant's FNPP. Their agents', servants' and/or employees' conduct was unreasonable under the circumstances.[22]

195.     The direct and/or indirect reliance of the Plaintiffs, the U.S. Navy, public officials and those persons who utilized the inaccurate information was to their detriment, and caused the injuries and harms as alleged herein.[23]

WHEREFORE, Plaintiffs request relief as hereinafter provided

## NINTH CAUSE OF ACTION
### (Intentional Infliction Of Emotional Distress)
### Against all DEFENDANTS

---

[22] Ocean Still Suffering From Fukushima Fallout, http://www.nature.com/news/ocean-still-suffering-from-fukushima fallout-1.11823; Top scientist suggests contaminated water is "actively being pumped out" into the ocean from Fukushima Plant,

http://enenews.com/reuters-top-scientist-suggests-water-is-actively-being pumped-out-into-ocean-from-fukushima-plant-video

[23] The problem was caused by the Defendant who wished to ignore the reality regarding the on-going deposition and releases ". . . and thus came up with exposures that are too low.  Also, I suspect that they have omitted hot particles and internal emitters from the dose assumptions.  The same thing happened at TMI (Three Mile Island).  Bad assumptions create low exposures.  GIGO ('Garbage In Garbage Out')."  If you start out with a weak hypothesis or faulty data, you will end up with the wrong results.  Gundersen on WHO: I don't trust their data, http://enenews.com/gundersen-don't-trust-data-garbage-garbage-suspect-hot-particles-internal-emitters-left-radioactive-releases-underestimated

**FIRST AMMENDED COMPLAINT FOR DAMAGES**

196.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

197.      Defendants engaged in extreme and outrageous conduct by engaging in the following acts and omissions:

(a)    overstating any environmental benefits of the FNPP while neglecting to mention or understating its actual environmental costs;

(b)  marketing nuclear power as a "clean" and environmentally "safe" and beneficial fuel;

(c)  misrepresenting the actual levels of radiation, including by stating that it posed no threat of harm to the Plaintiffs in the performance of their mission;

(d)  representing that the condition of the FNPP did not pose any unusual threat of harm as compared to a conventional, non-nuclear power plant;

(e)  failing to disclose that when radiation leaked from the FNPP, it would be unable to contain the radiation and would be far more likely to cause contamination than other sources of power generation;

(f)  leading the public and the Plaintiffs to believe that they could safely perform their duties in the waters adjacent to the FNPP despite the detected levels of radiation;

(g) stating that the air and water at and about the FNPP were adequately tested and shown not to pose a health hazard or enhanced risk to the environment while avoiding and discouraging additional testing; and

(h)  concealing the necessity for the Plaintiffs to take steps to undergo early detection modalities to determine whether or not they had been exposed to unsafe levels of radiation, a potential carcinogen..

198.     As a direct and proximate result of the reckless and/or intentional conduct of Defendant, Plaintiffs suffered severe emotional distress and mental suffering by fearing that their exposure to Defendant's highly toxic and

carcinogenic emissions would lead to the development of cancer as well as other life threatening ailments.

199.     Defendant's acts proximately caused harm and damage to the Plaintiffs, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. Plaintiffs will continue to incur losses and damage in the future. Based on Plaintiffs' repeated exposure to ionizing radiation, Plaintiffs have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

200.     Defendant intended to cause or acted with conscious disregard of the probability of causing injury to Plaintiffs, and therefore, is liable for punitive damages.

WHEREFORE, Plaintiffs request relief as hereinafter provided

## TENTH CAUSE OF ACTION
### Strict Liability for Ultrahazardous Activities
### Against all DEFENDANTS

201.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

202.      Defendants engaged in an ultrahazardous activity that caused harm, damages, losses, injuries, including fear of contracting cancer, birth defects for their children, born and unborn, and economic and non-economic damages.

203.     Defendants are responsible for that harm, injuries, damages, both economic and non-economic because Defendants engaged in producing nuclear power, an ultra-hazardous activity, at FNPP.

204.     Plaintiffs' injuries, damages, losses and harm is  the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at Fukushima.

205.     Defendants' acts proximately caused harm and damage to the Plaintiffs, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. Plaintiffs will continue to incur losses and damage in the future. Based on Plaintiffs' repeated exposure to ionizing radiation, Plaintiffs have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

206.     Defendants intended to cause or acted with conscious disregard of the probability of causing injury to Plaintiffs, and therefore, are liable for punitive damages.

WHEREFORE, Plaintiffs request relief as hereinafter provided.


### ELEVENTH CAUSE OF ACTION
### Negligence per se: Res Ipsa Loquitur
### Against all DEFENDANTS

207.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

208.     Plaintiffs' harm was caused by a release of radiation from the FNPP that only Defendants controlled.

209.     Plaintiffs' voluntary actions did not cause or contribute to the events that harmed them.

210.     Plaintiffs' harm, injuries, damages and losses ordinarily would not have happened unless someone was negligent.

211.     Plaintiffs' injuries, damages, losses and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release of the nature and kind that was released at Fukushima.

**FIRST AMMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

212.     Defendants' acts proximately caused harm and damage to the Plaintiffs, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. Plaintiffs will continue to incur losses and damage in the future.  Based on Plaintiffs' repeated exposure to ionizing radiation, Plaintiffs have a reasonable fear that said exposure more likely than not increased their risk of developing cancer in the future.

WHEREFORE, Plaintiffs request relief as hereinafter provided

## TWELFTH CAUSE OF ACTION
Presumption of Negligence Per Se
Against all DEFENDANTS

213.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein

214.     Defendants' illegal, intentional, reckless and negligent conduct as herein above alleged, violated several State, Federal, and International laws, regulations, and statutes, which were enacted to protect the public, the communities and the environment, including the class of individuals to which Plaintiffs belong: Good Samaritans, rescue workers, indeed, the "TOMODACHIS" (friends), who offered help to the victims of the Fukushima meltdown. The 1972 Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, to which Japan is a signatory, bans the dumping of pollution at sea.

215.     The Inter-Governmental Conference on the Convention on the Dumping of Wastes at Sea, which met in London in November 1972 at the invitation of the United Kingdom, adopted this instrument, generally known as the London Convention. The London Convention, one of the first international conventions for the protection of the marine environment from human activities, came into force on 30 August, 1975.

216.     The London Convention contributes to the international control and prevention of marine pollution by prohibiting the dumping of certain hazardous materials. In addition, a special permit is required prior to dumping of a number of other identified materials and a general permit for other wastes or matter.

217.     "Dumping" has been defined as the deliberate disposal at sea of wastes or other matter from vessels, aircraft, platforms or other man-made structures, as well as the deliberate disposal of these vessels or platforms themselves. Annexes list wastes which cannot be dumped and others for which a special dumping permit is required.

218.     Amendments adopted in 1993 (which entered into force in 1994) banned the dumping into sea of low-level radioactive wastes. In addition, the amendments phased out the dumping of industrial wastes by 31 December, 1995 and banned the incineration at sea of industrial wastes.

219.     Defendants, and specifically, Defendant TEPCO, engaged in intentionally dumping in excess of 11,500 tons of radioactive water into the Pacific Ocean during and following the meltdown of the FNPP.

220.     Plaintiffs' injuries, damages, losses and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at Fukushima.

221.     Defendants' acts proximately caused harm and damage to the Plaintiffs, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. Plaintiffs will continue to incur losses and damage in the future.  Based on Plaintiffs' repeated exposure to ionizing radiation, Plaintiffs have a reasonable fear that said exposure more likely than not increased their risk of developing cancer in the future.

WHEREFORE, Plaintiffs request relief as hereinafter provided

PRAYER FOR RELIEF

1. For a judgment ordering, requiring and compelling the Defendants to establish a fund in an amount not less than one BILLION ($1,000,000,000.00) DOLLARS available to advance and pay all costs and expenses for each of the Plaintiffs for medical examination, medical monitoring, and treatment by physicians of Plaintiffs' choice ;

2. For special and economic damages, including lost wages, for all Causes of Action;

3. For general and non-economic damages for all Causes of Action;

4. For punitive damages for all Causes of Action;

5. For prejudgment interest at the prevailing legal rate;

6. For costs of the suit including reasonable attorneys' fees; and

7. For such other and further relief, including injunctive relief, as the Court may deem proper.

**Dated: June 4, 2013**          **RESPECTFULLY SUBMITTED,**

By: */S/ PAUL C. GARNER*
PAUL C. GARNER, ESQ.
Attorney for Plaintiffs

**Dated: June 4, 2013**          **RESPECTFULLY SUBMITTED,**
                    **LAW OFFICES OF BONNER & BONNER**

By: */S/CHARLES A. BONNER*
CHARLES A. BONNER
Attorney for Plaintiffs

//
//

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a jury trial of all issues as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

**Dated: June 4, 2013**          **RESPECTFULLY SUBMITTED,**


By: */S/PAUL C. GARNER*
PAUL C. GARNER, ESQ.
Attorney for Plaintiffs

**Dated: June 4, 2013**          **RESPECTFULLY SUBMITTED,**
                                 **LAW OFFICES OF BONNER & BONNER**


By: */S/CHARLES A. BONNER*
CHARLES A. BONNER
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I, CHARLES A. BONNER, am an attorney at Law Offices of Bonner & Bonner counsel of record for Plaintiffs in this action. I certify that on June 4, 2013, I caused the attached document to be served via this Court's Electronic Filing System on JOHN B. OWENS, counsel for Defendant, a registered user of that system. *See* Local Civil Rule 5.4.

DATED: June 4, 2013

**BY:*/S/ CHARLES A. BONNER***
CHARLES A. BONNER
ATTORNEY FOR PLAINTIFFS