PAUL C. GARNER (State Bar No. 132524)
c/o LAW OFFICES OF CHARLES A. BONNER
475 Gate Five Road, Suite 212
Sausalito, California 94965
Telephone:   (760) 600-0081
Facsimile:    (760) 918-1984

CHARLES A. BONNER (State Bar No. 85413)
A. CABRAL BONNER (State Bar No. 247528)
LAW OFFICES OF CHARLES A. BONNER
475 Gate Five Road, Suite 212
Sausalito, California 94965
Telephone:   (415) 331-3070
Facsimile:    (415) 331-2738

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDSAY R. COOPER; *et al.*,<br><br>           Plaintiffs,<br><br>vs.<br><br>TOKYO ELECTRIC POWER CO., INC.,<br>           Defendant. | Case No. 12-CV-3032 JLS WMc<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, TO DISMISS UNDER THE DOCTRINES OF FORUM NON CONVENIENS AND INTERNATIONAL COMITY**<br><br>Judge:  Hon. Janis L. Sammartino<br><br>Date:      October 3, 2013<br>Time:     1:30 PM<br>Crtrm:   4A (Schwartz Building)<br>             221 West Broadway<br>             San Diego |

# TABLE OF CONTENTS

**Contents**

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS ......................................................................... 2

LEGAL STANDARD ................................................................................ 2

LEGAL ARGUMENT .............................................................................. 4

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION ......................... 4

    A.   THE COURT NEED NOT STAND IN JUDGMENT OVER U.S. MILITARY'S DISCRETIONARY DECISION-MAKING IN ADJUDICATING PLAINTIFFS' TORT CLAIMS ......................... 4

    B.   RESTATEMENT (SECOND) OF TORTS § 449 PERMITS PLAINTIFFS' RECOVERY FOR TEPCO'S CONDUCT EVEN THOUGH MILITARY COMMAND ULTIMATELY MADE DEPLOYMENT DECISIONS ..................................................... 7

    C.   COMMUNICATIONS BETWEEN THE JAPANESE AND U.S. GOVERNMENT, AS WELL AS CONFIDENTIAL MATTERS CONCERNING THE NAVY'S TECHNOLOGICAL CAPABILITIES ARE BEYOND WHAT IS REQUIRED FOR THE COURT TO ADJUDICATE PLAINTIFFS' TORT CLAIMS .................................................. 10

    D.   AS THE 'VERY SUBJECT MATTER OF THIS ACTION' IS NOT THE TECHNICAL CAPABILITY OF THE U.S.S. RONALD REAGAN, THE STATE SECRETS BAR IS NOT APPLICABLE TO THE FACTS AT BAR .......................................... 11

II.  PLAINTIFFS' CLAIMS STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED ....................................................................... 12

    A.   PLAINTIFFS CAN STATE A CLAIM BECAUSE THEY CAN AND HAVE ALLEGED PROXIMATE CAUSATION ........... 12

    B.   PLAINTIFFS' CLAIMS, AS PLED, MEET THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE RULE 8 ................................................................. 13

        1.   As Operator And Controller Of Extremely Hazardous Radioactive Materials That Were Leaking And Being Released Into The Environment, TEPCO Had An Absolute Duty To Warn Plaintiffs As Rescuers Providing Relief ..................................................................... 13

123-cv-3032 JLS WMc

2.   Plaintiffs Have Sufficiently Alleged Factual Basis For Common Law Fraud Claim .....................14

3.   Defendant's Intentional Misrepresentation Of The Existence Of Dangerous Levels Of Radiation Made To Plaintiff Rescuers Is Extreme And Outrageous Conduct ..........15

4.   FIREFIGHTERS RULE IS UNAVAILABLE TO DEFENDANT WHO HEIGHTENED THE DANGEROUS CONDITIONS PLAINTIFFS HAD TO FACE..........................16

5.   Strict Liability Exists For Design Defect Of Fnpp Nuclear Power Plant Where Such Defect Could Not Be Readily Observed And Thereby Operated Without Inspection ..........................17

III.   MARITIME LAW DOES APPLY ..........................18

The United States Constitution provides that federal "judicial power" extends to "all cases of admiralty and maritime jurisdiction." Article III ..........................18

A.   ADMIRALTY JURISDICTION IS APPLICABLE AS A U.S. NAVY RESCUE MISSION CONSTITUTES TRADITIONAL MARITIME ACTIVITY ..........................25

B.   TEPCO'S TORT OF MISREPRESENTATION OCCURRED ON NAVIGABLE WATER ..........................18

IV.   THE CLAIMS ON BEHALF OF THE "DOE" PLAINTIFFS SHOULD NOT BE DISMISSED ..........................29

V.   THE COMPLAINT SHOULD NOT BE DISMISSED ON THE GROUNDS OF FORUM NON CONVENIENS ..........................31

A.   Japan Is Not an Adequate Alternative Forum ..........................32

1.   TEPCO Is Subject to Jurisdiction in the United States..........................34

2.   The United States Will Provide a Superior Forum..........................34

B.   The Relevant Private Interest Factors Favor Maintaining the Suit in the United States ..........................34

1. The Residence Of The Parties And The Witnesses ..........................35

2.   The Forum's Convenience To The Litigants ..........................38

3.   Whether Unwilling Witnesses Can Be Compelled To Testify ..........................49

4.   Access To Physical Evidence And Other Sources Of Proof..........................50

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

5.   The Cost Of Bringing Witnesses To Trial ................................. 52

6.   The Enforceability Of The Judgment ....................................... 53

7.   All Other Practical Problems That Make Trial Of A Case Easy, Expeditious And Inexpensive .............................................. 53

C.   The Relevant Public Interest Factors Also Favor Maintaining the Suit in the United States ...................................................... 54

1.   The United States has a Strong Interest in This Dispute ........... 54

2.   The Issue of Buren on this Court Does Not Weigh In Favor of Dismissal ................................................................. 56

VI.   THE DOCTRINE OF INTERNATIONAL COMITY DOES NOT REQUIRE DISMISSAL OF THE FAC ........................................... 57

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

1

# TABLE OF AUTHORITIES

2

## <u>Cases</u>

3

4

*Allstate Life Ins Co. v. Linter Group,* Ltd., 994 F. 2d 996 (2nd Cir. 1993) .............66

5

*Altmann v. Austria,* 317 F.3d 954, 972-73 (9th Cir.2002)................................ 54, 57

6

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ...................................................................3

7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)...............................................3

8

*Berg v. Chevron U.S.A.,* 759 F.2d 1425, 1429 (9th Cir. 1985) ................. 27, 30, 32

9

*Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1227-31 (3d Cir. 1995) .....38

*Blum v. GE,* 547 F.Supp.2d 717, 734 (W.D. Tex. 2008)........................................63

10

*Boston Telecomms. Grp. v. Wood,* 588 F.3d 1201, 1206-07 (9th Cir.2009) ..........41

11

*Campbell v. Parker-Hannifin Corp.* (1999) 69 Cal.App.4th 1534, 1542......... 41, 61

12

*Carijano v. Occidental Petroleum Corp.,* 643 F.3d 1216, 1231 (9th Cir.2011) ....42, 58

13

*Carolina Environmental Study Group v. United States*, 431 F.Supp. 203, 223(W.D. N.C. 1977) .................................................................................................18

14

15

*Christensen v. Georgia Pacific Corp.*, 279 F.3d 807, 815 n. 31(9th Cir. 2002) .....32

16

*Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F. Supp. 49 (S.D. Ohio 1986) .................................................................................................. 15, 18

17

*Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119(5th Cir. 1995) ....................32

18

*Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1449 (9th Cir.1990) ...................................................................................... 42, 43

19

20

*Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009).....................................31

21

*Doe v. Bakersfield City School District* (2006) 136 Cal.App.4th 556....................35

22

*Doe v. Bolton* (1973) 410 U.S. 179............................................................................34

23

*Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 899 (11th Cir. 2004) ......................33

24

*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531 .................................................35

25

Doe v. Saenz (2006) 140 Cal.App.4th 960 ................................................................35

26

East RiverSteamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986)...28

27

*Eastman Kodak Co. v. Kavlin,* 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) ............38

28

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

1  *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249 (1972)...............22

2  *Field v. Philadelphia Elec. Co.,* 388 Pa. Super. 400 (Pa. Super. 1989) ................17

3  *Ford Motor Co. v. Insurance Co. of No. America* (1995) 35 Cal.App.4th 604, 611
   ...................................................................................................................... 37, 57

4

5  *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984). ...................64

*General Public Utilities Corp. v. United States*, 551 F.Supp. 521, 526 (E.D. Pa.
6     1982) .................................................................................................... 15, 19

7  *Groll v. Shell Oil Co.*, 148 Cal.App.3d 444, 448 (1983) ........................................14

8  *Grubart v. Great Lakes Dredge & Dock Company et al.,* 513 U.S. 527, 534, 115
      S.Ct. 1043, 1048, 130 L.Ed.2d 1024 (1995)...................................................30
9

10 *Gruver v. Lesman Fisheries, Inc.,* 489 F.3d 978, 982 (9th Cir.2007......................32

*Gupta v. Austrian Airlines*, 211 F. Supp.2d 1078, 1088 (N.D. Ill. 2002) ..............58
11

12 *Herbstein v. Bruetman*, 743 F. Supp. 184, 189 (S.D.N.Y. 1990).........................63

*Hooper v. Deukmejian* (1981) 122 Cal.App.3d 987 .............................................36
13

14 Jane Doe 8015 v. Superior Court (2007) 148 Cal.App.4th 489 ............................35

Johnson v. Superior Court (2000) 80 Cal.App.4th 1050, 1072 .............................35
15

16 *Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998) ................................................67

17 *Kelly v. United States,* 531 F.2d 1144, 1147 (2d Cir. 1976)........................... 30, 31

*Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947 ..........................40
18

19 *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.,* 874 F.2d 283, 288 (5th Cir.1989)
      ......................................................................................................................22

20 *Landeros v. Flood,* 17 Cal.3d 399, 412 (1976).........................................................8

21 *Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008)........................................ 5, 6, 9

22 *Lazy Y Ranch LTD. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).................. 2, 13

23 *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)..............................................4

24 *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) ............................................64

*Malaysia International Shipping Corporation v. Sinochem International Co. Ltd.*
25    436 F.3d 349  (3d Cir.2006) *rev'd on other grounds,* 549 U.S. 422. ............24
26
*McManaway v. KBR, Inc.*, U.S. Dist. LEXIS 159341 (S.D. Texas 2012) ...............9
27

28 *Milkweed v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir. 1981) ...........................14

*Minahan v. Western Washington Fair Ass'n*, 117 Wn. App. 881 (Wash. 2003).....14

*Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989) .................4

*Neely v. Club Med Management Services, Inc.* 63 F.3d 166, 179 (3rd Cir. 1995).21, 23

*Nelson v. Superior Court*, 144 Cal.App.4th 689 (2006) ..........................................19

*Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121, 123 (1984 ...............................................................................................................................29

*Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1135 (CA9 1977) .......................................................................................................................28

*Papasan v. Allain*, 478 U.S. 265, 286 (1986) ...........................................................3

*Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) .............3

*Pierce v. United Gas and Electric Co.*, 161 Cal. 176, 188 (1911) .................. 17, 18

*Piper Aircraft Co. v. Reyno, 454 U.S. 235*, 241.................................... 37, 38, 40, 43

*Poe v. Ullman* (1961) 367 U.S. 497.......................................................................34

*Remington Rand Corp.-Delaware v. Business Sys., Inc.*, 830 F.2d 1260, 1266 (3 Cir.1987) ...................................................................................................................66

*Roe v. Wade* (1973) 410 U.S. 113........................................................................34

*Roulier v. Cannondale* (2002) 101 Cal.App.4th 1180, 1190........................... 41, 61

*Sawczyk v. United States Coast Guard*, 499 F. Supp. 1034, 1038 (W.D.N.Y. 1980) ..............................................................................................................................31

*Schneider v. TRW, Inc.*, 938 F.2d 986, 992-93(9th Cir. 1991) ...............................17

*Sears v. Morrison*, 76 Cal.App.4th 577 (1999) .......................................................18

*Sieracki v. Seas Shipping Co.*, 149 F.2d 98, 99-100 (CA3 1945) ..........................28

*Sisson v. Ruby,*497 U.S. 358 (1990)........................................................................32

*Solgaard v. Guy F. Atkinson Co.*, 6 Cal.3d 361, 368 (1971)........................... 15, 18

*Stangvik v. Shiley, Inc.* (1991) 54 Cal.3d 744, 751...................................... passim

Starbucks Corp. v. Superior Court (2008) 168 Cal.App.4th 1436 ........................34

*Starnes v. McGuire, 512 F.2d 918, 932 (D.C. Cir. 1974)* ......................................64

*Szumlicz v. Norwegian Am. Line, Inc.*, 698 F.2d 1192, 1195 (11th Cir. 1983).......33

*Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir.2005)................. passim

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

*Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 118-82(9th Cir. 2006).......60

*Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004) ....66, 67

*United States Supreme Court case Societe Nationale Industrielle Arerospatiale v United States District Court for the Sourthern District of Iowa* 482 U.S. 522, 543 n 27 (1987)...........................................................................................65

**White v. Sabatino** 526 F.Supp.2d 1143 (D.Hawai'i 2007).............................. 20, 24

<u>Statutes</u>

28 U.S.C. 1331(1); ............................................................................... 25, 28

42 USC § 2651 (a) .......................................................................................54

California Code of Civil Procedure section 367 .....................................29

Fed R. Civ. Pro. 8(a)(2) ................................................................................3

Fed. R. Civ. Pro 10(a) ................................................................................29

Fed. R. Civ. Pro 17 (a) (1) ..........................................................................28

The Admiralty Extension Act,46 U.S.C. App. 740 ......................... 25, 28

<u>Other Authorities</u>

Restatement (Second) of Torts § 402A...................................................28

Restatement (Second) of Torts § 449 ........................................... 8, 9, 11

U.S. CONST. art. III, § 2 ...........................................................................29

<u>Treatises</u>

Prosser and Keeton on the Law of Torts.......................................... 8, 18

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

# INTRODUCTION

The Plaintiffs, LINDSAY R. COOPER, JAMES R. SUTTON, KIM GIESEKING, A. G., AN INFANT BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, CHARLES A. YARRIS, ROBERT M. MILLER, CHRISTOPHER G. BITTNER, ERIK MEMBRILA, JUDY GOODWIN, JENNIFER L. MICKE, JOHN SEELBACH, MAURICE D. ENIS, JAIME L. PLYM, NATHAN J. PIEKUTOWSKI, CAROLYN A. WHITE, LOUIE VIERNES, MICHAEL L. SEBOURN, K. S., AN INFANT BY HIS FATHER AND NATURAL GUARDIAN, MICHAEL L. SEBOURN, CHRISTIAN M. EBUENG, PAUL J. ENCINIAS, DANIEL E. HAIR, ADAM W. KRUTZLER, DAVID K. MALONE, ROBERT SELIGMAN, ELOI A. WHITEMAN, JASON D. HENRY, NELLIE ALLEN-LOGAN, JAMI BESCHORNER, NATHAN CANCHE, NATHAN CRISWELL, JASON TROY FRIEL, OSCAR GONZALEZ, DAVID HAHN, JAMES JACKSON, D. J., A MINOR BY HIS FATHER AND NATURAL GUARDIAN JAMES JACKSON, JARRETT BRADY JOHNSTON, JOSEPH MEDINA, ADAM MINTZ, MALLORY K. MORROW, WILLIAM NETHERTON, MICHELLE ODEN, DONALD RAIRIGH, CHRISTOPHER RICKARD, ANDREW RIVERA, STEVEN RAY SIMMONS, AKEEM SMITH, JUSTIN SPENCER, ALAN SPURLING, ANGEL TORRES, and JOHN & JANE DOES" 1-70,000, at all times herein mentioned were among the members of the U.S. Navy crews of the U.S.S. RONALD REAGAN (CVN-76), with its home port in San Diego, California, or the crews of other vessels participating as part of the Reagan Strike Force, 7th Fleet, as well as land-based service personnel, and/or their dependents. All of the Plaintiffs were repeatedly exposed to ionizing radiation on or after March 11, 2011, off the coast of Fukushima prefecture, Japan, where the Fukushima Nuclear Power Plant (hereinafter, "FNPP") is located. All of the Plaintiffs were exposed during a mission known as "Operation Tomadachi."[1]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### STATEMENT OF FACTS

On March 12, 2011, as the USS Ronald Reagan and Carrier Strike Group 7 arrived two miles off the coast, Fukushima Unit 1 blew up. Unit 3 exploded on March 14, releasing plumes of hydrogen gases migrating through a shared vent, which destroyed the containment building at Unit 4, exposing the spent fuel pool to the air. Unit 2 exploded on March 15. Tokyo Electric Power Company (TEPCO) announced that most of the fuel in Units 1, 2, and 3 was intact. It was not intact. This was a false, misleading, conscious misrepresentation. The true facts were that the fuel in Units 1, 2, and 3 had fused into a molten mass and was oozing through the bottom of the destroyed reactors. TEPCO likewise hid, covered-up, concealed these facts and falsely represented the true facts to the U.S. Navy, leading the Navy to rely on the false representation that the levels of radiation were within safe levels. Plaintiffs suffered harms, damage and suffered, and continued to suffer, life threatening injuries as a result of TEPCO's conscious misrepresentations. (FAC ¶ 56)

At all relevant times, the Defendant, TEPCO, was aware that the U.S. Navy and its personnel would rely upon its representations as to the condition of FNPP and its environs in the performance of their efforts to provide humanitarian assistance during its relief mission to ferry food and water to the inhabitants of the ravaged city of Sendai, located within the prefecture of Fukushima, Japan, following the earthquake and tsunami on March 11, 2011. (FAC ¶ 56)

### LEGAL STANDARD

A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The Court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch LTD. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Even under the liberal pleading standard of Fed. R. Civ. Pro.

8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

In reviewing a motion to dismiss, the court may also consider documents attached to the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted). In addition, the court may consider a matter that is properly the subject of judicial notice, such as matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

//

//

123-cv-3032 JLS WMc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEGAL ARGUMENT**

**I.    THIS COURT HAS SUBJECT MATTER JURISDICTION**

    **A.    THE COURT NEED NOT STAND IN JUDGMENT OVER U.S. MILITARY'S DISCRETIONARY DECISION-MAKING IN ADJUDICATING PLAINTIFFS' TORT CLAIMS**

In reliance on the political question doctrine, Defendant essentially argues that in order to adjudicate Plaintiffs' claims, this Court will be forced to stand in judgment over the U.S. Military's ("Military") discretionary decision-making which, Defendants argue, superseded any alleged false representations made by Defendant TEPCO ("Defendant" & "TEPCO"). As such, Defendant argues that Plaintiffs' claims fall within the factors enunciated by the Supreme Court in *Baker v. Carr*, 369 U.S. 186, 198 (1962)[1] and thus should be barred under the political question doctrine. [2]

---

[1]   To aid courts in the "discriminating inquiry," the Supreme Court in Baker identified "formulations" that may help determine whether a particular case raises a political question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;(2) a lack of judicially discoverable and manageable standards for resolving it;(3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;(4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;(5) an unusual need for unquestioning adherence to a political decision already made;(6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker*, 369 U.S. at 217. Here, defendant relies on the first three *Baker* formulations.

[2]   To ensure that a *Baker* analysis is not merely one of "semantic cataloguing" of a particular matter as one implicating "foreign policy" or "national security," *Baker* demands a "discriminating inquiry into the precise facts and posture of the particular case" before a court may withhold its own constitutional power to resolve cases and controversies. The fact that the resolution of the merits of a case would have "significant political overtones does not automatically invoke the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In responding to similar arguments made by Defendants in *Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008), the Fifth Circuit crafted an analysis which Plaintiffs at bar rely upon as a template within which this Court may evaluate whether Plaintiffs' claims are non-justiciable political questions.

In *Lane,* Plaintiffs were non-military personnel who, while working in Iraq during war time, were guaranteed their safety when Defendant, a military contractor, knew that no such safety could be guaranteed. Plaintiffs alleged fraud and misrepresentation with respect to Defendants' promise of a safe work environment. The district court dismissed Plaintiffs' claims after determining that Defendant was merely operating under orders of the military and thus, was barred from making a judicial pronouncement as to the wisdom of the military's action. On appeal, the Fifth Circuit reversed and remanded. In so ruling, the Fifth Circuit concluded that, although the military was involved in Defendant's operations in Iraq, "Plaintiffs have presented a plausible set of facts as to the fraud and misrepresentation claims that might allow causation to be proven under a tort doctrine without questioning the Army's role." *Lane*, supra, 529 F.3d at 561-62.

Following *Lane*'s analysis, Plaintiffs argue that they too have presented a plausible set of facts to support their twelve causes of action such that the Court is able to apply well established "judicially managed standards" in its adjudication without having to evaluate the reasonableness of the Military's policy decisions. In facing arguments similar to those that TEPCO raises herein, i.e., the judiciary is without a manageable standard for assessing the reasonableness of the Army's professional discretionary judgments and would thus have to make a policy

political question doctrine." *Khouzam v. Attorney Gen. of U.S.*, 549 U.S. 235, 249-50 (3d Cir. 2008); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1998). Indeed, the Court must be vigilant to not construe a "political case" as a "political question." *Baker*, supra, 369 U.S. at 217.

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

determination reserved to the discretion of the executive branch. The court in *Lane* held that Plaintiffs' fraud and negligence claims, as traditional tort claims leveled only against Defendant, were uniquely suited for judicial resolution. As such, the Fifth Circuit looked to exactly what Plaintiffs had to prove, i.e., the particular elements of their claims and whether the military's conduct was a superseding cause.

Here, Plaintiffs have pled twelve causes of action, all of which clearly fall within the purview of the judiciary's power, as well as evoke established "judicially managed standards" to resolve them. With such well-established standards, Plaintiffs' claims do not require the court to evaluate the reasonableness of the Military's policy determinations.

For example, in Plaintiffs' First Cause of Action-Negligence, Plaintiffs have alleged that "TEPCO knowingly and negligently caused, permitted and allowed false and misleading information concerning the true condition of the FNPP to be disseminated to the public, including the U.S. Navy, Air Force and Marines." (FAC 53). TEPCO knew that Plaintiffs, as members of the rescue personnel, were in danger of being exposed to unsafe levels of radiation (FAC 55, 83, 84, 89) because they were aware that the fuel in Units 1, 2 and 3 was not intact although TEPCO represented that it was. (FAC 56). As a result of withholding facts and omitting to disclose a truthful account of the severity of the contamination in the area, while at the same time making false statements in order to minimize the actual risk of exposure, (FAC 76, 77, 85, 88) TEPCO effectively created an increased risk of radiation exposure to Plaintiffs.(FAC 67, 68, 75). Defendant, by engaging in ultra hazardous activities, had a duty to accurately inform Plaintiffs, as rescuers, of the true extent of the danger involved. (FAC 87). Due to Defendant's failure to exercise due care, Plaintiffs have been directly and harmfully impacted

1  such that they now must endure a lifetime of radiation poisoning and suffering
2  "which could have and should have been avoided." (FAC 92, 95, 96).
3       Thus, having sufficiently alleged facts supporting a claim for negligence, the
4  Court can adjudicate this claim by relying on well established standards that are
5  used in civil courts every day. The same holds true for all of Plaintiffs' claims
6  where each element has been sufficiently pled and can be adjudicated under tort
7  law without the Court having to judge the Military's decision making.

9  **B.    RESTATEMENT (SECOND) OF TORTS § 449 PERMITS**
10 **PLAINTIFFS' RECOVERY FOR TEPCO'S CONDUCT EVEN**
   **THOUGH MILITARY COMMAND ULTIMATELY MADE**
11 **DEPLOYMENT DECISIONS**

12      As for causation, Defendant argues that the U.S. military's deployment
13 decisions were an intervening cause as it was implausible that the military would
14 have relied upon Defendant's assurances rather than on its own sophisticated
15 equipment on board the USS Ronald Reagan. While it remains to be seen exactly
16 what the military relied upon in its decision making, this Court is not being asked
17 to stand in judgment over such policy decisions but rather being asked, like any
18 other negligence claim, to determine whether TEPCO, through its withholding of
19 the truth of the severity of contamination, could be held liable for its part in
20 causing Plaintiffs' harm. Plaintiffs rely on the well established formulation that
21 foreseeability may arise directly from the risk created by the original act of
22 negligence: "If the likelihood that a third person may act in a particular manner is
23 the hazard or one of the hazards which makes the actor negligent, such an act
24 whether innocent, negligent, intentionally tortious, or criminal does not prevent the
25 actor from being liable for harm caused thereby." Restatement (Second) of Torts §
26 449; *Ileto v. Glock Inc.*, 349 F.3d 1191, 1210 (9th Cir. 2003); *Landeros v. Flood*,
27 17 Cal.3d 399, 412 (1976); Prosser and Keeton on the Law of Torts, 44 at 303-

28

06(5th ed. 1987).Thus, Restatement (Second) of Torts §449 permits Plaintiffs' recovery for TEPCO's negligence and misrepresentation even though Military command otherwise intervened in what Defendants argue was in actuality the direct cause of Plaintiffs' injury.

Responding to similar arguments made by Defendants in *Lane*, i.e., Plaintiffs' harms were ultimately caused by military decisions made on the ground in Iraq, the Fifth Circuit, relying on Restatement (Second) of Torts §449, held that "if [defendants] tortiously guaranteed safety when it knew there was no such safety, it may be liable for resulting injuries despite that the immediate causes were determined attackers that could not be thwarted by the best efforts of American defenders." *Lane*, supra, 529 F.3d at 562. Thus, the court found that even though the military might have been responsible for making decisions that ultimately led to Plaintiffs' injuries, Defendant was liable. Plaintiffs at bar rely on the same well established formulation to hold Defendant TEPCO liable for its part in setting in motion and causing, i.e., through its initial and ongoing representation that the radiation levels surrounding the area of Fukushima FNPP were within safe limits, the harms that Plaintiffs ultimately incurred. [3]

---

[3]

See also, *McManaway v. KBR, Inc.*, U.S. Dist. LEXIS 159341 (S.D. Texas 2012). In McManaway, the court decided that where both the military and the military contractor shared the responsibility of detecting and responding to the hazards of a lethal chemical in a building complex, the first Baker factor did not bar plaintiff's claim as defendants role in assessing and responding to the hazard could be evaluated "without second guessing the military's decision to restore the building complex or the military's decision to carry out the restoration in the first instance." As the case concerned challenges to actions taken by a private corporation, rather than the U.S. military, the court held that plaintiff's claims did not implicate military decisions that were otherwise committed to the Executive branch. It also found that although the military was involved in the chemical's exposure, plaintiff was not required to show that their injuries were caused by defendants alone.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court at bar should likewise apply Restatement (Second) of Torts § 449 to the events leading up to Plaintiffs' injuries and find that it could not say that "all plausible sets of facts that would permit the recovery from defendants would also raise a political question." Lane, supra, 567. As did the Fifth Circuit, this Court can similarly resolve Plaintiffs'' tort claims under state tort law without second-guessing the acts and decisions of the military. This Court could very well determine whether Defendant made assurances to the Plaintiffs about the conditions in and around Fukushima FNPP that it knew or should have known were untrue. This determination could very well require a review of the information the Military received from TEPCO but would not require the Court to stand in judgment over what the military did after receiving the information, nor what it did in its own right to confirm or reject such information. Thus, despite Defendant's assertions to the contrary, the court would not have to inquire into the adequacy, and thereby stand in judgment of the military's intelligence, technology, assessment or decision-making to determine whether TEPCO made misrepresentations, engaged in fraud and otherwise breached its duty to Plaintiffs.

Based on the foregoing arguments, Defendant's assertion that this Court is without subject matter jurisdiction because of Plaintiffs' claims being non-judiciable and political issues is unfounded.

---

Rather, in reliance on Restatement (Second) of Torts § 449, court held that defendant may be found liable for a plaintiff's injury even if the military, in addition to the defendant can be causally linked to the injury.

### C.   COMMUNICATIONS BETWEEN THE JAPANESE AND U.S. GOVERNMENT, AS WELL AS CONFIDENTIAL MATTERS CONCERNING THE NAVY'S TECHNOLOGICAL CAPABILITIES ARE BEYOND WHAT IS REQUIRED FOR THE COURT TO ADJUDICATE PLAINTIFFS' TORT CLAIMS

In light of the above arguments, Defendant's assertions that dismissal is required due to the court's conceivable inquiry (1) into discussions and communications between the Japanese government and the U.S. Government and its Armed Forces and (2) confidential matters concerning the Navy's capabilities, are beyond what is required for the Court to adjudicate Plaintiffs' tort claims.

At this stage of the proceedings, the exact extent to which the Japanese government was involved in Defendant's fraud and misrepresentation needs further investigation which further discovery will undoubtedly provide. Although Plaintiffs have alleged that Defendant and the Government of Japan had conspired in their dual attempt to gain humanitarian assistance from the Military, there is no need for the court to inquire into the communications between the Government of Japan and the Military. Rather, what is at issue is exactly what and how much information Defendant had divulged to the Japanese government. As Defendant was both the controlling body and officiating overseer/coordinator of the FNPP, both prior to and during the disaster, it is the information that the Defendant TEPCO disclosed to the Japanese government that is at issue. As argued above, it is this misrepresentation that set the ball rolling. To what extent and how the Japanese Government communicated this information to the U.S. Government and the Military is to be determined, but nevertheless the Court need not stand in judgment over it. The Court's focus is on what exactly Defendant communicated to the Japanese government. Restatement (Second) of Torts § 449 makes it clear that Defendant is liable for its part in the misrepresentation. Whatever the Japanese government did to expand upon or reinforce Defendant's inaccurate claims does

not nudge Plaintiffs' claims into political question territory. The court may need to determine what exactly the Japanese government communicated to the U.S. Government, but it need not sit in judgment over it in order to adjudicate Plaintiffs' claims.

**D.   AS THE 'VERY SUBJECT MATTER OF THIS ACTION' IS NOT THE TECHNICAL CAPABILITY OF THE U.S.S. RONALD REAGAN, THE STATE SECRETS BAR IS NOT APPLICABLE TO THE FACTS AT BAR**

Similarly, Defendant argues that the Totten or state secrets bar should require the Complaint's dismissal. Defendant argues that 'the very subject matter of the action' is the extent of the technical capabilities of the U.S.S. Ronald Reagan and the decision making processes of its commanders in deciding to deploy Plaintiffs. As argued above, Plaintiffs' focus and thereby the Court's inquiry will not focus on the U.S.S. Reagan's capability to detect radiation nor the factors that led to the determination of whether and how to deploy ships and personnel. Rather, its focus will be on exactly what Defendant represented to the Military. As such, this court may inquire into what information the U.S.S. Reagan registered as to the levels of radioactivity in the surrounding area, as such information is merely factual and is to be used to confirm or refute Defendant's representations. Again, as such information is not the very 'subject matter of this case,' the state secrets doctrine does not apply. Additionally, were confidential information to arise during the proceeding, Federal District Courts are more than capable of taking appropriate measures to ensure that such information remains confidential during the pendency of the litigation.

## II.   PLAINTIFFS' CLAIMS STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED

### A.   PLAINTIFFS CAN STATE A CLAIM BECAUSE THEY CAN AND HAVE ALLEGED PROXIMATE CAUSATION

In its argument that Plaintiffs cannot allege proximate cause, Defendant asks this Court to go beyond the facts pled in the complaint and to rely on its assertions about the technological ability of the US Navy to detect radiation hundreds of miles away. In a motion to dismiss, the Court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch LTD. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Throughout the FAC, Plaintiffs allege that the military command relied on the misrepresentations by TEPCO regarding the condition of the power plant and the levels of radiation.  What is not clearly stated in the complaint, but can be added in an amendment, is that the USS Reagan was on its way to South Korea when it was redirected to Japan and ultimately came between 1 and 50 miles from the Fukushima Reactor. (See Declaration of Nathan A. Criswell ¶ 5.)  In other words, the USS Reagan was not positioned off the coast of Japan the entire time. In its motion to dismiss, Defendant asserts that it is "implausible" that the military command would rely on the representations of TEPCO. However, given that the ship was initially heading to South Korea, it is reasonable that command on board the U.S.S. Reagan would have relied upon defendant's representations.

Even as currently pled, the Plaintiffs' complaint alleges facts that establish the issue of causation as it relates to the Navy's ability to measure radiation.  On page three of the FAC in footnote 1, Plaintiffs address this very issue by stating the following: On March 14, 2011, the U.S. 7th Fleet, other U.S. Naval personnel, and aircraft aboard the vessels were repositioned away from Japan's FNPP after

detecting contamination in the air and on the helicopters returning to the U.S.S. Ronald Reagan (CVN-76) from ferrying supplies to the land. (See FAC 3: footnote 1.) Based on this representation, which the Court must assume is true, the information the Navy had when they first arrived in Japanese waters led them to get closer to Japan's FNPP than they later deemed safe.

In the FAC, Plaintiffs have pled facts sufficient to withstand motion to dismiss as to the issue of proximate cause. If this Court deems additional facts are necessary, Plaintiffs request the opportunity to amend and include additional facts.

### B.   PLAINTIFFS' CLAIMS, AS PLED, MEET THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE RULE 8

#### 1.   As Operator And Controller Of Extremely Hazardous Radioactive Materials That Were Leaking And Being Released Into The Environment, TEPCO Had An Absolute Duty To Warn Plaintiffs As Rescuers Providing Relief

Defendant argues that it did not owe Plaintiffs a duty to warn, as such warning was not necessary due to the sophisticated technology on board the U.S.S. Reagan. Contrary to its reasoning, TEPCO, as operator and controller of extremely hazardous radioactive materials that were leaking and being exposed to the environment, *Groll v. Shell Oil Co.*, 148 Cal.App.3d 444, 448 (1983) had an absolute duty to warn Plaintiffs, as the existence of such duty is not dependent on the amount of technology a potential invitee has on hand. See, *Minahan v. Western Washington Fair Ass'n*, 117 Wn. App. 881 (Wash. 2003)(every actor whose conduct involves an unreasonable risk of harm to another is under a duty to exercise reasonable care to prevent the risk from taking effect); *Milkweed v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir. 1981)(business of nuclear energy is an

intrinsically ultra hazardous activity); *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F. Supp. 49 (S.D. Ohio 1986) (application of ultra hazardous activity in the event of a nuclear catastrophe). Whether Defendant assumed that it was unnecessary to inform the Military of the hazardous radioactive conditions in the area is immaterial to fact that Defendant had a duty to warn on account of the nature of the materials involved, as well as its duty of care to Plaintiffs as rescuers under the rescue doctrine. See *Solgaard v. Guy F. Atkinson Co.*, 6 Cal.3d 361, 368 (1971); *General Public Utilities Corp. v. United States*, 551 F.Supp. 521, 526 (E.D. Pa. 1982)(Energy Reorganization Act of 1974 established that NRC had a duty to disseminate warning of defects in nuclear power plants).

### 2.    Plaintiffs Have Sufficiently Alleged Factual Basis For Common Law Fraud Claim

In support of their common law Fraud claim, Plaintiffs have alleged that Defendant made false statements of material fact, including that the fuel in Units 1, 2, and 3 was intact when it knew that this was patently false. FAC 56, 181. Defendant repeatedly reiterated the existence of safe levels of radioactivity in the immediate and surrounding areas. FAC 76, 85. Plaintiffs claim that the Navy relied upon such false representations in deciding to undertake relief missions for the city of Sendai, i.e. the Military relied upon Defendant's misrepresentations in that "the officers and crew of the U.S.S. Reagan and other vessels believed it was safe to operate within the waters adjacent to the FNPP without doing the kinds of research and testing that would have verified the problems known to the Defendant TEPCO at that time." FAC 57, 88, 193. The Military thus justifiably relied upon Defendant's representations, as Defendant effectively controlled all information on matters related to the area in which Plaintiffs were required to perform their duties. FAC 190, 191.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

At this stage of the proceeding, Plaintiffs have more than sufficiently pled a factual basis to support their claim for fraud. Whether or not it was reasonable for Defendant to justifiably rely on the USS Reagan's technical capabilities is an issue of fact that Defendant will be free to assert as the litigation proceeds. However, with respect to the pleading stage, Plaintiffs have sufficiently apprised Defendant of the conduct that they allege to be fraudulent.

### 3. Defendant's Intentional Misrepresentation Of The Existence Of Dangerous Levels Of Radiation Made To Plaintiff Rescuers Is Extreme And Outrageous Conduct

In arguing that the Price-Anderson Act is controlling over Plaintiffs' claim for Intentional Infliction of Emotional Distress, Defendant posits that in order for a cause of action to be valid, Plaintiff must allege an accompanying physical injury along with mental distress. Here, the majority of Plaintiffs claim physical injury in addition to their claims of mental distress. Thus, Defendant's concerns are unfounded.

Similarly, Defendant concludes that its intentional misrepresentation of the existence of dangerous levels of radiation to Plaintiffs, as providers of emergency relief assistance, does not rise to the level of "extreme and outrageous" conduct.  In addition to the fact that whether or not a Defendant's conduct rises to the level of "extreme and outrageous" is a factual determination which is not appropriate to resolve on a motion to dismiss, *Schneider v. TRW, Inc*., 938 F.2d 986, 992-93(9th Cir. 1991), one court has found that a power company's attempt to cover up Plaintiffs' exposure to radiation was extreme and outrageous. See, *Field v. Philadelphia Elec. Co.,* 388 Pa. Super. 400 (Pa. Super. 1989). Nevertheless, conduct consisting of a request for assistance while knowingly down playing and

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

misrepresenting the dangerousness of the situation is clearly conduct going beyond all 'possible bounds of decency.' *Schneider*, supra, 938 F.2d at 992.

### 4.  Firefighters Rule Is Unavailable To Defendant Who Heightened the Dangerous Conditions Plaintiffs Had To Face

Defendant further argues that Plaintiffs' strict liability claim for ultra-hazardous activity runs afoul of the so called "firefighter's rule" which otherwise prevents recovery by those who are adequately compensated for undertaking their hazardous work. Defendant construes this rule to apply to Plaintiffs, as members of the U.S. Military, responding to the crisis in Fukushima.

Although Plaintiffs, as members of the Armed Services, might be construed as "professional rescuers," the rationale underlying the firefighters rule does not envision preventing recovery from those whose very negligence places a party in danger. *Pierce v. United Gas and Electric Co.*, 161 Cal. 176, 188 (1911); *Sears v. Morrison*, 76 Cal.App.4th 577 (1999); Prosser, Torts (4th ed.) sec. 43, pp. 258-259, sec 44, pp. 277-278. As stated in *Pierce*, supra, 161 Cal. at 188, "Whether or not a recovery could be had [under rescue doctrine] . . . depends entirely…upon the question whether or not there was any negligence on the part of Defendant insofar as [the rescued person] was concerned. . . . [i.e.] the dangerous condition was due, in part at least, to Defendant's negligence." *Id*.

Here, Defendant was not only carrying out an ultra-hazardous activity, see, *Carolina Environmental Study Group v. United States*, 431 F.Supp. 203, 223(W.D. N.C. 1977)(business of nuclear energy is an intrinsically ultra-hazardous activity) but by withholding and misrepresenting the severity of the situation, Defendant effectively heightened the dangerous condition which Plaintiffs, as rescuers, had to face. When such negligence is combined with engaging in an ultra-hazardous

activity, the rationale for the firefighter rule is severely undermined and thus, cannot protect Defendant from what would otherwise be unequivocally strict liability. See *Cincinnati Gas & Electric Co.*, supra, 656 F. Supp. 49(kind of harm justifying strict liability is a nuclear explosion resulting in contamination of people and property); *Solgaard*, supra, 6 Cal.3d at 369 (if Defendant negligently created the peril which entrapped those men, Defendant would be liable under the rescue doctrine for the injuries Plaintiff suffered).

Thus, the firefighter rule does not require dismissal of Defendant's strict liability for carrying out an ultra-hazardous activity.

### 5. Strict Liability Exists For Design Defect Of FNPP Nuclear Power Plant Where Such Defect Could Not Be Readily Observed And Thereby Operated Without Inspection

Defendant challenges Plaintiffs' strict liability design defect claim on account that a nuclear reactor is not a product that is placed in the market. Indeed, unlike a common household hammer, nuclear reactors are neither manufactured en masse nor stocked in hardware stores until purchased. Nevertheless, the strict liability aspect of the claim derives not from whether it is a product placed in the market, but whether the defect is such that it cannot be readily observed or, in the case of a reactor, its design is too complex to inspect. Hence, the crux of the claim is element number (2) "there is knowledge that it will be used without inspection for defect." *Nelson v. Superior Court*, 144 Cal.App.4th 689 (2006); see also, *General Public Utilities Corp.*, supra, 551 F. Supp. at 526 (duty to disseminate warning of design defects in nuclear power plants). Despite Defendant's arguments to the contrary, Plaintiffs have sufficiently alleged a factual basis for alleging Strict Liability for Design Defect.

## III.   MARITIME LAW DOES APPLY

The United States Constitution provides that federal "judicial power" extends to "all cases of admiralty and maritime jurisdiction."  Article III

### A.   TEPCO'S TORT OF MISREPRESENTATION OCCURRED ON NAVIGABLE WATER

Defendant TEPCO argues that Plaintiffs' FAC does not fall under this Court's admiralty jurisdiction[4] …"because Plaintiffs' claims fail the 'connection' requirement". …"[T]he conduct of the alleged tortfeasor—TEPCO—bears no relationship to any maritime activity." Defendant TEPCO's argument is without merit, and its analysis is faulty.

"[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Grubart v. Great Lakes Dredge; Dock Company et al.,* 513 U.S. 527, 534 (1995). The test for locality is "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* The test for connection with a maritime activity, also called the "nexus test," involves two parts. First, a court is required to "assess the general feature of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce." *Id.* (quoting *Sisson v. Ruby,*497 U.S. 358, 363-64 n. 2, (1990)(internal quotations omitted)). Second, the court must determine "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime commerce." *Grubart,* 513 U.S. at 539, 115 S.Ct. at 1051 (quoting *Sisson,* 497 U.S. at 365, 364 n. 2)." ***White v. Sabatino*** 526 F.Supp.2d 1143 (D.Hawai'i 2007)

---

[4] Plaintiffs seek leave amend their FAC to reflect Admiralty Jurisdiction pursuant to 28 U.S.C. 1333.(1)

In, *Sisson v. Ruby* 497 U.S. 358, 362 (1990) the court, rejected the "argument that a substantial relationship with *commercial* maritime activity is necessary to a finding of maritime jurisdiction", recognizing "that protecting commercial shipping is at the heart of admiralty jurisdiction". *Id.*  The court also noted that "interest cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity. This interest can be fully vindicated only if all operators of vessels on navigable waters are subject to uniform rules of conduct." *Id.*  The Court went on to say "[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction, but that, when a potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, as does the navigation of boats in this case, admiralty jurisdiction is appropriate." *Id.*

 "In the second *Sisson* enquiry, we look to whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. We ask whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand. Navigation of boats in navigable waters clearly falls within the substantial relationship". *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.* 513 U.S. 527 (1995), 93-762.

In this case, Plaintiffs' FAC shows that the "general character of the activity giving rise to the incident" *Neely v. Club Med Management Services, Inc*. 63 F.3d 166, 179 (3rd Cir. 1995) are Defendant TEPCO's torts of Misrepresentation and Fraud. FAC ¶¶ 155-159; 161-163; 178-194.

1

### 1.    The Location Test

2   "In determining whether the tort occurred on navigable waters, we consider

3   the meaning of "tort" as used in the locality test.  In other words, is the tort only the

4   alleged tortious act itself (here, the making of the alleged misrepresentations), or is

5   it the alleged tortious act as well as the resulting injury? The Supreme Court has

6   indicated the latter. In *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S.

7   249 (1972), the Court noted that "[u]nder the locality test, the tort `occurs' where

8   the alleged negligence took effect...." *Id* at 266. Some courts have adopted what the

9   Fifth Circuit has termed an "impact analysis," *Kuehne & Nagel (AG & Co.) v.*

10  *Geosource, Inc.*, 874 F.2d 283, 288 (5th Cir.1989), for determining where a tort

11  occurred under the location test. Under that analysis, the place where a tort occurs

12  is the place where the injury occurs.  *Id*

13  The Ninth Circuit in *Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th

14  Cir.2005),  rejected the argument that the location test was not satisfied where the

15  Coast Guard's alleged failure to act occurred entirely on land, but the resulting

16  injury occurred on navigable waters, because it "ignore[d] the clear law of [that]

17  circuit that the situs of a tort for the purpose of determining admiralty jurisdiction

18  is the place where the injury occurs." *Id.*

19  Accordingly, for purposes of the location test, a tort occurs where the

20  alleged tortious act takes effect. Here, the impact or injury to Plaintiffs flowing

21  from TEPCO' misrepresentations and fraud was the "location" on board of several

22  U.S. Naval vessels of the 7th Fleet, including the USS Ronald Reagan. Thus, in this

23  case the "Location Test" for Admiralty Jurisdiction is satisfied.

### 2.    TEPCO's Misrepresentation Has Direct Relationship To Maritime Activity.

24

25  *"Connection" with Maritime Activity Test*

26

27

28

"[W]hether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity" is not a concept cabined narrowly or rigidly. *Neely v. Club Med Management Services, Inc*. 63 F.3d 166, 179 (3rd Cir. 1995); *see also Sisson v. Ruby,* 497 U.S. 358, 364. ("Our cases have made clear that the relevant 'activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose.")

The Connection with the Maritime Activity Test of the admiralty jurisdiction for tort claims has two components: (1) "whether the incident involved was of a sort with the potential to disrupt maritime commerce"; and (2) whether there is a substantial relationship to traditional maritime activity, i.e., "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying admiralty rules would apply in the suit at hand." *Grubart*, 513 U.S. at 538-40.

### a. *"Incident involved" Potential Disruptive Effect on Maritime Commerce*

"The Ninth Circuit has taken a relatively inclusive view of what type of activity, defined with an "intermediate level of generality," has a potentially disruptive effect on maritime commerce. *Gruver v. Lesman Fisheries, Inc.,* 489 F.3d 978, 982 (9th Cir.2007)(quoting *Grubart,* 513 U.S. at 538, 115 S.Ct. 1043). For example, in *Gruver,* the court held that an employer's assault on a crewman on a fishing vessel was deemed to have a potentially detrimental effect on maritime commerce by depriving the vessel of a deckhand due to his injuries. *Gruver,* 489 F.3d at 983." *White v. Sabatino* 526 F.Supp.2d 1154 Similarly in *Taghadomi v. United States,* the Coast Guard's allegedly negligent search-and-rescue operation of kayakers on a pleasure excursion was deemed to satisfy the first prong of the nexus test because "[s]earch-and-rescue operations also affect the vessels themselves:

insofar as the rescuer can preserve the vessel, it prevents economic loss to the vessel's owner." *Taghadomi v. United States* 401 F.3d 1080, 1087 (9th Cir.2005).

TEPCO''s Tortious Misrepresentations  and Fraud comprise  the "incident" and  "relevant activity" as it was in *Malaysia International Shipping Corporation v. Sinochem International Co. Ltd.* 436 F.3d 349  (3d Cir.2006) *rev'd on other grounds,* 549  U.S.  422. "We believe that  the  incident  before  us  is  better characterized as Sinochem's alleged misrepresentations to the Chinese Admiralty Court that led to the arrest of the Vessel at port. Yet, we agree that, no matter how we define the incident, it had the potential to disrupt maritime commerce-and in fact did so, as the alleged misrepresentations resulted in the Vessel's seizure. "*Id* at 356.

Likewise,  TEPCO's  misrepresentations  to  the  U.S.  Navy  caused  major disruptions in the rescue operation. The U.S. Navy service personnel are the reliable responders to rescue operation at sea. Misrepresentations and fraud regarding dangerous radiation levels during TEPCO's request for rescue in this case not only caused injury, damage and harm to the personnel, but also caused damage and radiation contamination to rescue equipment, including helicopters. This harm and damage to equipment removed the navy service men and women, as well as the equipment, from a position to rescue others in the maritime commerce who might be in emergent need at sea. Thus, TEPCO's "activity" had the potential to disrupt maritime commerce, satisfying the first part of the two pronged test of "*Potential Disruptive Effect on Maritime Commerce"*

Thus, the first component of the connection with maritime activity inquiry is met.

### b. Substantial Relationship to Traditional Maritime Activity

The second inquiry within the nexus test requires us to decide whether the "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart,* 513 U.S. at 534, 115 S.Ct. 1043 (internal quotation marks omitted). A preliminary question arises: what constitutes the "activity giving rise to the incident" *Taghadomi v. United States*, supra, at 1086. The Court held in *Grubart* that "we need to look only to whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as one of the putative tortfeasors was engaged in traditional maritime activity, the allegedly wrongful activity will "involve" such traditional maritime activity and will meet the second nexus prong. *Grubart* 513 U.S. at 541.

In Taghadomi the court stated, "the activity at issue then is not merely the event immediately surrounding the injury; it is the behavior of any 'putative tortfeasor[]' (here, the Coast Guard) that is an "arguably proximate cause[]" of the injury. In this case, then, the relevant question is whether the Coast Guard's search-and-rescue operation shows a substantial relationship to traditional maritime activity." *Taghadomi ,* supra*,* 1087  S*ee also Sisson,* 497 U.S. at 367, 110 S.Ct. 2892 ("The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial.").

As the facts of Plaintiffs' FAC allege, "[t]he efficacy of search-and-rescue operations has a direct effect on the health and lives of seamen. …("[T]he relevant 'activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose."). Search-and-rescue operations also affect the vessels themselves: insofar as the rescuer can preserve the vessel, it

prevents economic loss to the vessel's owner" *Taghadomi v. United States*, supra, at 1086.

The Supreme Court emphasized in *Grubart* that the nexus test is not meant to exclude broad swathes of activity; **it wrote approvingly of the notion that "virtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime jurisdiction."** *Grubart* 513 U.S. at 542. (Emphasis added)

TEPCO's alleged misrepresentations and fraud gave rise to Plaintiffs' injuries, damages and harm sustained while on the Vessel. "Looked at narrowly, it may seem that the act of making representations (or misrepresentations, as the case may be) to a court has no connection with maritime activity." But looking at TEPCO's alleged conduct broadly it was clearly undisputed that TEPCO's conduct, the misrepresentations and fraud, was undertaken with the purpose of having the 7th Fleet Vessels respond to the rescue in the Pacific in the "Operation Tomadachi".

As in the Coast Guard case *Taghadomi,* in this case the relevant question is whether the U.S. Navy search-and-rescue operation shows a substantial relationship to traditional maritime activity. *Taghadomi,* supra, 1087. This question must be answered as it was in *Taghadomi* : "It assuredly does. *See Berg v. Chevron U.S.A.,* 759 F.2d 1425, 1429 (9th Cir. 1985) ("The law of admiralty has always sought to encourage and induce men of the sea to go to the aid of life and property in distress." (citations and internal quotation marks omitted)); *Kelly v. United States,* 531 F.2d 1144, 1147 (2d Cir. 1976) ("[R]escue operations of the Coast Guard conducted on navigable waters do in fact bear a significant relationship to traditional maritime activities for purposes of admiralty jurisdiction.")

1     Therefore, since the "Locality Test" and both sub-prongs of the "Nexus

2 Test" are satisfied in this case, it follows that all of Plaintiffs' claims fall within

3 federal admiralty jurisdiction.

4     Contrary to Defendant TEPCO's assertion, Admiralty law incorporates the

5 general principles of tort law, including the doctrine of strict liability for defective

6 products. *East RiverSteamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858

7 (1986). In *East River Steamship Corp*, The Supreme Court explained: "The Courts

8 of Appeals sitting in admiralty overwhelmingly have adopted concepts of product

9 liability, based both on negligence, *Sieracki v. Seas Shipping Co.*, 149 F.2d 98, 99-

10 100 (CA3 1945), aff'd on other grounds, 328 U.S. 85 (1946), and on strict liability,

11 *Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.,* 565 F.2d 1129, 1135

12 (CA9 1977) (adopting Restatement (Second) of Torts § 402A (1965)). Indeed, the

13 Court of Appeals for the Third Circuit previously had stated that the question

14 whether principles of strict products liability are part of maritime law "is no longer

15 seriously contested." *Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp*.,

16 726 F.2d 121, 123 (1984) (citing cases). We join the Courts of Appeals in

17 recognizing products liability, including strict liability, as part of the general

18 maritime law."

19     Thus, Admiralty jurisdiction applies to Plaintiffs' claims of strict liability

20 and product liability, as well as to all of Plaintiffs' tort claims.

    **B.   ADMIRALTY JURISDICTION IS APPLICABLE AS A U.S.**
21          **NAVY RESCUE MISSION CONSTITUTES TRADITIONAL**
22          **MARITIME ACTIVITY**

23     In rejecting Plaintiffs' reliance on admiralty jurisdiction pursuant to 28

24 U.S.C. 1333(1)5, Defendant argues that Plaintiffs' claims fail to satisfy the

25

26 ───────────────

27 [5] Federal district courts have original jurisdiction over "[a]ny civil case of
admiralty or maritime jurisdiction." 28 U.S.C. 1331(1); *see also* U.S. CONST. art.

28

1    connection requirement. In arguing such, Defendant has construed its own conduct

2    too narrowly, as well as which activities constitute traditional maritime activity.

3    Primarily, the connection test raises two issues. A court, first, must assess the

4    general features of the type of incident involved, to determine whether the incident

5    has a potentially disruptive impact on maritime commerce, and then, whether the

6    general character of the activity giving rise to the incident shows a substantial

7    relationship to traditional maritime activity. *Grubart v. Great Lakes Dredge*, 513

8    U.S. 527, 534 (1995).

9        Primarily, Defendant construes its tortious conduct, i.e., misrepresentation,

10   fraud and negligence as having exclusively taken place on land and thus, bears no

11   relationship to any maritime activity.

12       Defendant, however, is mistaken, as courts have construed conduct relating

13   to circumstances surrounding a rescue as clearly bearing a strong relationship to

14   traditional maritime activity. For example, in *Taghadomi v. United States*, 401

15   F.3d 1080, 1086-187 (9th Cir. 2005), the court construed a potential rescuer's

16   negligence in carrying out a rescue operation as having a potential disruptive

17   impact on maritime commerce. More broadly, the Ninth Circuit declared that the

18   efficacy of search-and-rescue operations has a direct effect on the health and lives

19   of sea-men and thus, both impact maritime commerce as well as having a strong

20   relationship to traditional maritime activity. See also, *Berg v. Chevron U.S.A.,* 759

21   F.2d 1425, 1429 (9th Cir. 1985)(the law of admiralty has always sought to

22

23   III, § 2. The Admiralty Extension Act, 46 U.S.C. App. 740 which was enacted by

24   Congress in 1948 and provides that the admiralty and maritime jurisdiction of the

25   United States shall extend to and include all cases of damage or injury, to person or

26   property, caused by a vessel on navigable water, notwithstanding that such damage

     or injury be done or consummated on land. *Grubart*, 513 U.S. at 534-36.

27

28

encourage and induce men of the sea to go to the aid of life and property in distress); *Kelly v. United States*, 531 F.2d 1144, 1147 (2d Cir. 1976)(rescue operations of the Coast Guard conducted on navigable waters do in fact bear a significant relationship to traditional maritime activities for purposes of admiralty jurisdiction.).

In *Kelly*, the Second Circuit held that rescue operations of the Coast Guard do in fact bear a significant relationship to traditional maritime activities for purposes of admiralty jurisdiction. *Id*. at 1147. In so holding the court discussed the integral role of the Coast Guard in maritime activity, and the "federal interest in providing a forum and a uniform body of law for the adjudication of claims against the Coast Guard concerning its rendering of aid to persons and vessels in distress on navigable waters." *Id*. at 1148. See, also, *Sawczyk v. United States Coast Guard*, 499 F. Supp. 1034, 1038 (W.D.N.Y. 1980)( Coast Guard's alleged duty to enforce its jurisdiction and its safety regulations is closely related to traditional maritime activity and fact that wrongful acts took place on land is not relevant).

Here, Plaintiffs, as service members of the Navy and Marines, were engaged in rescue missions that took place directly off shore in Fukushima. Like the Coast Guard, the Navy engages in emergency rescue missions both on and off the water. See, *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009)(when Hurricane Katrina struck the coasts of Louisiana and Mississippi, the President authorized U.S. Navy to perform search and rescue missions for stranded survivors). As such activities are part of its stated mission and purpose, the Navy, like the Coast Guard, engages in traditional maritime activity when, like here, it engages in a rescue mission that takes place directly on the coast, the site of the FNPP nuclear reactor.

Thus, the "general character of the activity giving rise to the incident," i.e., Defendant's request for emergency relief and its misrepresentation to the Navy as to the severity of radioactive exposure in the area, shows a substantial relationship

to the traditional maritime activity of engaging in emergency rescue missions. See, *Berg*, 759 F.2d at 1429(law of admiralty has always sought to encourage and induce men of the sea to go to the aid of life and property in distress). As Defendant's tortious activity directly pertained to its request for rescue relief located directly on the coast, Defendant's activity invoked the Navy's duty to undertake the well established maritime activity of rescue. *Sisson v. Ruby*, 497 U.S. 358, 362-64 (1990)(court's examination of the torfeasor's activity should be given a broad perspective).

Similarly, Defendant's negligence in requesting rescue relief, and the likelihood that such a request would cause (and which actually did) harm to Plaintiffs as rescuers, had a potentially disruptive impact on maritime commerce. See, *Taghadomi*, 401 F.3d at 1086-1087; *Gruver v. Lesman Fisheries, Inc.*, 489 F.3d 978 (9th Cir. 2007)(commercial impact exists where a crew member is rendered unable to perform his duties while engaging in maritime duties; *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119(5th Cir. 1995)(worker injuries . . . can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel); *Christensen v. Georgia Pacific Corp.*, 279 F.3d 807, 815 n. 31(9th Cir. 2002)(the commercial impact prong considers whether the general features of the incident could hypothetically have an effect on maritime commerce. It does not require that any impact actually occurred.").

Thus, the facts and circumstances at bar are such that Plaintiffs can sufficiently invoke admiralty jurisdiction pursuant to 28 U.S.C. 1331(1) and the Admiralty Extension Act, 46 U.S.C. App. 740.

Likewise, as Plaintiffs have sufficiently invoked Admiralty jurisdiction, it is well established that a case should not be dismissed on forum non conveniens grounds in a case brought under the Court's admiralty jurisdiction. See *Szumlicz v. Norwegian Am. Line, Inc.*, 698 F.2d 1192, 1195 (11th Cir. 1983) ("'[I]f United

States law is applicable, the American court should retain jurisdiction rather than relegate the controversy to a foreign tribunal.'" (quoting *Fisher v. Agios Nicolaos V*, 628 F.2d 308, 315 (5thCir. 1980); *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 899 (11th Cir. 2004). Thus, as admiralty jurisdiction is proper, Defendant's claim for dismissal based upon forum non conveniens should be denied.

## IV.   THE CLAIMS ON BEHALF OF THE "DOE" PLAINTIFFS SHOULD NOT BE DISMISSED

Although Fed. R. Civ. Pro 17 (a) (1) states: "An action must be prosecuted in the name of the real party in interest." This rule is tempered by section "(3): Joinder of the Real Party in Interest. The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."

Fed. R. Civ. Pro 10(a) requirement that the "complaint must name all the parties" is likewise not subject to strict judicial construction and is the exception rather than the rule. Courts liberally interpret Rule 10(a) and recognize that Doe Plaintiffs are specific aggrieved individuals and real "parties in interest", with the standing to bring their claims before the court.  For example Doe Plaintiff Number 1, Susan Ash will be added to the complaint at the next opportunity.  See Declaration of Susan Ash.

The United States Supreme Court has endorsed the use of pseudonyms (See, e.g., *Roe v. Wade* (1973) 410 U.S. 113 [abortion]; *Doe v. Bolton* (1973) 410 U.S. 179 [abortion]; *Poe v. Ullman* (1961) 367 U.S. 497 [birth control].)

California Code of Civil Procedure section 367 states that "[e]very action must be prosecuted in the name of the real party in interest, except as otherwise

provided by statute." However, California courts have recognized and likewise, endorsed the use of "Doe Plaintiff" to maintain and prosecute an action. In *Starbucks Corp. v. Superior Court* (2008) 168 Cal.App.4th 1436, the California Court of Appeal noted: "The judicial use of 'Doe plaintiffs' to protect legitimate privacy rights has gained wide currency, particularly given the rapidity and ubiquity of disclosures over the World Wide Web.

In *Jane Doe 8015 v. Superior Court* (2007) 148 Cal.App.4th 489, a patient of a clinical laboratory sued the laboratory after it was determined one of its phlebotomists had reused needles to draw blood and the plaintiff had acquired HIV as a result. See also *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531 [former Boy Scouts sued under pseudonyms based on allegations that city police officer sexually assaulted them while they were teenagers]; *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1072 [parents entitled to depose sperm donor with family history of kidney disease, but donor's name protected from disclosure to outsiders through an appropriate order 'which maintains the confidentiality of John Doe's identity '"

In *Doe v. Bakersfield City School District* (2006) 136 Cal.App.4th 556, a former student who alleged sexual abuse by a former guidance counselor was permitted to pursue his action under a fictitious name.  In *Doe v. Saenz* (2006) 140 Cal.App.4th 960, three convicted felons were permitted to pursue legal actions under fictitious names challenging a decision by the Department of Social Services to classify their offenses as non-exemptible, thereby precluding them from working in licensed community care facilities. In *Hooper v. Deukmejian* (1981) 122 Cal.App.3d 987, an individual convicted on a plea of maintaining a place for selling or using a narcotic was permitted to sue under a fictitious name on behalf of himself *and all others similarly situated* to determine whether they were entitled to the benefits and protections of marijuana reform legislation.

Therefore, Plaintiffs' FAC ¶ 29 properly states claims on behalf of "JOHN & JANE DOES 1-70,000" and the "[C]ourt may not dismiss [this] action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. 17 (a) (3)

## V.   THE COMPLAINT SHOULD NOT BE DISMISSED ON THE GROUNDS OF FORUM NON CONVENIENS

Defendant's argument that this court should dismiss this action based on the doctrine of *forum non conveniens* paints an unrealistically complicated picture of what will be required if this court retains jurisdiction. Moreover, Defendant attempts to argue that Japan is a more convenient forum based on issues of convenience that ultimately only impact the Plaintiffs. At the same time, the Defendant paints an unreasonably simplistic view that dismisses how inconvenient it would be for the 51 service men and women who are the Plaintiffs in this action to go to Japan to prosecute their claims.

Defendant's argument that this court should dismiss for *forum non conveniens,* boiled down to its essence, is that it will be difficult to get witness testimony and documents before this Court, either in discovery or in trial.  What this argument fails to take into consideration is that this mass action brought on behalf of 51 service personnel is a far more efficient and convenient way to address Plaintiffs' claims than individual actions in Japan.  While Plaintiffs may have to jump through some hoops to obtain depositions and documentary evidence, they will have to do it only once and will obtain evidence to apply in 51 cases. The Defendant's position contemplates 51 individuals filing 51 different actions in Japan, requiring an unreasonable amount of duplicative effort and redundancy. Moreover, many of the 51 service personnel are far too sick from their exposure to

radiation to travel to Japan multiple times to prosecute their cases, in addition to having to carry an undue financial burden of overseas travel at the same time of suffering physically and mentally from their exposure.

The issue of *forum non conveniens* is not jurisdictional, but "an equitable doctrine invoking the discretionary power of the court to decline the exercise of jurisdiction (to stay or dismiss) it has over a transitory cause of action when it believes that the action may be more appropriately and justly tried elsewhere." *Stangvik v. Shiley, Inc*. (1991) 54 Cal.3d 744, 751. The inquiry is not whether another jurisdiction provides a better forum, but whether California is a ***seriously inconvenient forum***. *Ford Motor Co. v. Insurance Co. of No. America* (1995) 35 Cal.App.4th 604, 611.

It should be noted at the outset that a Plaintiff's choice of forum should rarely be disturbed. *Piper Aircraft Co. v. Reyno, 454 U.S. 235,* 241. Dismissal is proper when the chosen forum would "establish . . . oppressiveness and vexation to **a Defendant** . . . out of all proportion to Plaintiff's convenience." *Id.* (emphasis added)  Moreover, when a domestic Plaintiff initiates litigation in its home forum, it is presumptively convenient.  *Id.* at 255-56.

The first inquiry is whether or not there is a "suitable" alternative forum available, meaning one in which a valid judgment may be obtained against the Defendant. *Stangvik v. Shiley, Inc., supra*, 54 Cal.3d at 752. In the case at bar, there is no dispute that within the meaning of the law, California is not only a "suitable" forum, but also the most convenient.

### A.     Japan Is Not an Adequate Alternative Forum

Courts have found that where large amounts of partiality or inefficiency exist, an alternative forum is inadequate. See, e.g., *Eastman Kodak Co. v. Kavlin,* 978 F. Supp. 1078, 1084 (S.D. Fla. 1997)(evidence of partiality in Bolivia rendered that forum inadequate); *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220,

1227-31 (3d Cir. 1995) (Indian forum was inadequate where delays of up to 25 years were possible).

   Here, the highly politicized nature of this litigation warrants that this Court retain jurisdiction. In the aftermath of the collapse of Fukushima FNPP, TEPCO has been effectively absorbed by the Government of Japan. For approximately one year, TEPCO has been under state control, with the Government of Japan most recently pledging to take complete control, both financial and otherwise, over the efforts to halt radioactive contaminated water from discharging into the sea.

See Tepco Under State Control, http://www.bloomberg.com/news/2012-07-31/tepco-under-state-control-as-government-gets-shares-for-cash.html; Japan Says Fukushima Leak Worse Than Thought-

http://www.reuters.com/article/2013/08/08/us-japan-fukushima-pm-idUSBRE97601K20130808. (See Exhibits 1 and 2 to Declaration of Charles A. Bonner)

   Although Plaintiffs initially sued TEPCO as a separate entity, distinct from the Japanese government, they are now effectively suing the Government of Japan. Therefore, Plaintiffs hold a reasonable belief that they will be denied a fair and impartial proceeding, due to the highly sensitive and politicized circumstances surrounding TEPCO, and the continued frustration arising from its inability to stop further contamination. If Plaintiffs' case were to be transferred to a Japanese forum, it is likely that the Japanese government would vehemently defend TEPCO, both in the court of public opinion, as well as in the judiciary. It is likely that Plaintiffs' claims would be viewed as "salt in the wounds" in an already traumatized and deeply frustrated venue. See, Frustrated Nuke Evavuees Take Harder Line v. TEPCO: www.blogs.wsj.com/japanrealtime/2012 /04/03/frustrated-nuke-evacuees-take-harder-line-vs-tepco. (See Exhibit 3 to Declaration of Charles A. Bonner)

It is thus reasonable that Plaintiffs are duly concerned with their ability to obtain a fair and impartial proceeding in a Japanese forum. See, *Sangeorzan v. Yangming Marine Transp. Corp.*, 951 F. Supp. 650, 654 (S.D. Tex. 1997)(the plaintiff may not be treated fairly by Taiwanese courts because the defendant was owned in part by Taiwanese government); *BP Chemicals*, 2004 U.S. Dist. LEXIS 27855, at * 34-35(finding Chinese courts inadequate for claims against defendants owned by Chinese government).

### 1.    TEPCO Is Subject to Jurisdiction in the United States

In its 58-page motion, TEPCO does not raise a defense of lack of personal jurisdiction. This is obviously because TEPCO is subject to suit in the United States and in California.  Accordingly, the District Court for the Southern District of California is an appropriate forum which has both personal and subject matter jurisdiction over the current case.

### 2.    The United States Will Provide a Superior Forum

The United States will provide a superior forum to Japan for all the reasons set out in the following sections.

### B.    The Relevant Private Interest Factors Favor Maintaining the Suit in the United States

Once "suitability" is removed as an issue, the analysis turns to a balancing of private and public factors to determine the motion to dismiss or stay the proceeding for *forum non conveniens. Stangvik v. Shiley, Inc., supra*, 54 Cal.3d at 758. However, in weighing the relevant factors, Defendant has a heavy burden of showing that the Southern District of California as a forum results in **"oppressiveness and vexation a Defendant...out of all proportion"** to the **Plaintiff's convenience**. *Piper Aircraft Co. v. Reyno, 454 U.S. 235*, 241 (quoting *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947)

(emphasis added)).

The factors relating to the private interests of the litigants include: " (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Boston Telecomms. Grp. v. Wood,* 588 F.3d 1201, 1206-07 (9th Cir.2009)

Public interest factors arise where actions involve multiple parties or are complex, and may add to the congestion of a particular court. *Campbell v. Parker-Hannifin Corp*. (1999) 69 Cal.App.4th 1534, 1542; *Roulier v. Cannondale* (2002) 101 Cal.App.4th 1180, 1190. Other public interest factors may include weighing the competing interests of the jurisdictions over the subject matter of the jurisdiction or the involvement of their citizens. *Stangvik v. Shiley, Inc., supra*, 54 Cal.3d at 751.

In its argument, Defendant TEPCO overly complicates what will be involved in the litigation if this Court retains the case in California District Court. At the same time, it overly simplifies and distorts the prospects of the 51 service personnel Plaintiffs each finding representation in Japan, filing individual actions in Japan, and successfully prosecuting their claims in Japan.

### 1. The Residence Of The Parties And The Witnesses

The residence of the Parties and the witnesses strongly favors the Plaintiffs' choice of forum. The Plaintiffs are 51 service personnel who were all repeatedly exposed to ionizing radiation during Operation Tomadachi.  Defendant TEPCO is a foreign corporation which does business in the United States.  In fact, on its website, TEPCO lists its Washington DC office second only to its Tokyo headquarters.  (See Exhibit 4 to Declaration of Charles A. Bonner)

Defendant relies on *Carijano v. Occidental Petroleum Corp.,* 643 F.3d 1216, 1231 (9th Cir.2011) for the proposition that the large numbers of Plaintiffs is not important to the private factor analysis. This reliance on *Carijano* is misplaced. The court in *Carijano* reversed a District Court's dismissal of Plaintiffs' case for *forum non conveniens* holding that the district court "erroneously afforded reduced deference" to the sole domestic plaintiff's chosen forum. *Id* at 1236.

In *Carijano* the Plaintiffs consisted of 25 members of the Achuar indigenous group of Peru and Amazon Watch, a California corporation. *Id* at 1222. The Achuar indigenous group was dependent for their existence upon the rainforest lands and waterways along the Rio Corrientes in the northern region of Peru.

In *Carijano* the district court abused its discretion by failing to give the proper deference to the sole domestic plaintiff's chosen forum. The court stated the following:

> Amazon Watch, therefore, was entitled to a **strong presumption** that its choice of forum was convenient. See *Contact Lumber Co. v. P.T. Moges Shipping Co*., 918 F.2d 1446, 1449 (9th Cir.1990) ("[W]hile a U.S. citizen has no absolute right to sue in a U.S. court, great deference is due plaintiffs because a showing of convenience by a party who has sued in his home forum will usually outweigh the inconvenience the defendant may have shown." ). The district court abused its discretion by recognizing Amazon Watch as a domestic plaintiff but then erroneously affording reduced deference to its chosen forum. *Id* at 1229.

Given the court's reasoning in *Carijano,* where the lack of deference afforded to the sole domestic plaintiff's choice of forum resulted in a reversal of the District Court's dismissal for *forum non conveniens,* the fact that all 51 Plaintiffs reside in the United States strongly weighs in favor of retaining jurisdiction in this Court.

In addition to the 51 Plaintiffs and all DOE Plaintiffs, key liability witnesses reside in the United States, namely the command structure of the USS Reagan and

123-cv-3032 JLS WMc

other military vessels who responded to Operation Tomadachi. The gravamen of Plaintiffs' complaint is misrepresentation regarding the level or radiation and the risks associated with responding to Operation Tomadachi. The liability witnesses to this are both the TEPCO employees and the Military commanders. While it may be true that the TEPCO employees who made the representations reside in Japan, all of the individuals who took action based on the representations are in the United States. What they heard and if they reasonably relied on the information is just as important to liability as what was said.

Further, in its motion to dismiss for *forum non conveniens*, Defendant totally fails in its burden to show that litigation in the United States would be *oppressive* and *vexing* to the Defendant. See *Piper Aircraft Co.* supra *454 U.S. at* 241.  At best, the Defendant's motion and its attached declaration seek to establish that it will be difficult for Plaintiffs to prosecute their case from the District Court in California.

With respect to the fact that critical witnesses reside in Japan, Defendant fails to establish that this fact will oppress or vex the Defendant. The critical witnesses Defendant discusses in its motion, who reside in Japan, are "TEPCO directors and employees" Def Memo Ps and As 38:24-25. TEPCO will not be required to take depositions of its own directors and employees. Such directors and employees will simply provide declarations for any pretrial issues. If their testimony is critical to Plaintiffs' case, it will be the Plaintiffs, not the Defendant who will face the inconvenience of having to compel their testimony in a deposition or at trial. The same will be true for Japanese officials. Given the Japanese government's current stake in TEPCO it is unreasonable for TEPCO to assert that it will have difficulty obtaining witness information from Japanese officials. As with the TEPCO directors and employees, it will be the Plaintiffs, not the Defendant who will be inconvenienced by having to compel testimony.

The inconvenience to Plaintiffs, not Defendant, is also the case for taking Depositions in Japan. Defendant outlines a veritable gauntlet the parties will have to run to take the depositions of individuals who reside in Japan.  But this only applies to Plaintiffs, as discussed above. It will be the Plaintiffs who have to arrange for the depositions in the U.S. Consulate, the Plaintiffs who will have to provide translation, and the Plaintiffs who will have to deal with the deposition backlog.  These issues will not inconvenience TEPCO since TEPCO has unfettered access to the individuals at issue. This fact is evidence by this very motion which includes declarations of TEPCO employees translated into English.

The same is true for compelling testimony of former employees. If there is a former employee whose testimony is critical to the Plaintiffs' case, it will be Plaintiffs' issue as to whether they can compel the testimony. This will not be an issue for TEPCO since it will likely be able to obtain information from current and past employees as they deem necessary. It would be preposterous for TEPCO to assert that it would have to compel the testimony of its own former employees and directors.

Accordingly, while the Defendant's motion paints a daunting picture of litigating in Japan a case venued in the United States District Court, Defendant fails to meet its burden that it will be seriously inconvenienced by the process of trying the case in California.

## 2.    The Forum's Convenience To The Litigants

Plaintiffs' Choice of Forum is Entitled to Substantial Deference In *Wiwa v. Royal Dutch Petroleaum Co.*, 226 F.3d 88, 100 (2d Cir. 2000), the Second Circuit held that a "plaintiff's choice of forum is entitled to substantial deference and should only be disturbed if the factors favoring the alternative forum are compelling." Id. at 226 F.3d at 101.The Second Circuit went on to explain that while all plaintiffs are entitled to some degree of deference, this deference

increases when the plaintiffs are citizens or residents. See *Id* at 101-02. The court assured that the rule that United States citizens and residents are entitled to greater deference in their forum choice is not based on "chauvinism or bias" but on the fact that United States residents and plaintiffs have greater ties to the United States and therefore would be more inconvenienced by a requirement that they file suit in another jurisdiction. *Id*. at 102.

Such deference is further justified by the fact that few dismissed cases are actually litigated to a judgment in the alternative forum. David R. Robertson, *Forum Non Conveniens in America and England: "A Rather Fantastic Fiction"*, 103 L.Q. Rev. 398, 419 (1987)(few dismissed cases are actually litigated to a judgment in the alternative forum) and thus, a forum non conveniens dismissal is often a complete victory for the defendant). Thus, by dismissing a U.S. citizen's case, the court is effectively granting a complete victory to the Defendant and foreclosing a citizen's right to have his or her claims heard.

Given the condition of many of the Plaintiffs due to radiation related injuries, prosecuting their cases in Japan is simply impossible. As evidenced by the declarations of the Plaintiffs, they are suffering from a variety of very serious maladies, as illustrated below.[6]

**NATHAN PIEKUTOWSKI**

Plaintiff NATHAN PIEKUTOWSKI currently suffers from Acute AML Leukemia diagnosed by Doctor Anjali Lyengar on December 26, 2012 at Banner Estrella hospital in Arizona.  Upon his return from "Operation Tomodachi" Nathan began losing his eyesight. He lost all vision in his left eye and most vision in his right eye. He is unable to read street signs and can no longer drive. Prior to

---

[6] Given the page limitations, only a select sample of plaintiffs are included with this motion.

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

"Operation Tomodachi", he had 20/20 eyesight, wore no glasses, had no corrective eye surgery. Additionally, he knows of no family members who have had Leukemia.

Nathan has had 5 treatments of chemotherapy for AML Leukemia. Each treatment has required a hospital stay of 7-10 days. His treatments started on December 26, 2012 and ended May 2013. In addition he has had 4 bone marrow biopsies; the most recent one in June 2013.

Given his current medical condition and his need for ongoing medical treatment for AML Leukemia, Nathan would simply be unable to prosecute his case, were this Court to grant Defendant's motion to dismiss for *forum non conveniens*.

See Declaration of NATHAN PIEKUTOWSKI

**JUDY GOODWIN**

Since returning from "Operation Tomodachi", Plaintiff **JUDY GOODWIN** has suffered from ulcers, Pylori infections, stomach issues, severe nausea, weight loss, terrible migraines, and has had her gall bladder removed. She has trouble eating and has to limit the amount of food that she eats. She was initially treated at the Veteran's Administration Clinic, during 2011 and 2012, by Dr. Bynnm. She is currently being treated by her family physician, Dr. Karassa Yeamans, in Farmington, NM, where she has been receiving treatment for the past two years.

Ms. Goodwin's doctor told her that she has never before seen a gall bladder functioning at two percent (2 %). It is the lowest number the doctor can remember. Ms. Goodwin's gall bladder had to be removed because of the severe pain she was experiencing and because it was not functioning. She has requested and received a 30 % disability from the Veteran's Administration.

Ms. Goodwin is currently working full time and, as of August, 2013, will be attending college full time.  Due to these obligations, as well as financial reasons, she could not afford to quit her job or leave school for any period of time.

Finally, Ms. Goodwin does not want to be exposed to and is mortally afraid of any more radiation, and therefore cannot return to Japan, a country that has stated it has radiation contamination.

See Declaration of **JUDY GOODWIN**

**JAMES JACKSON**

Plaintiff JAMES JACKSON's son, Darius Jackson, who is just fourteen (14) years old, was diagnosed with ALL, "Acute Lymphoblastic Leukemia," in January of 2013.  His symptoms began in September 2012.  He is currently on a three and one half year rigorous Chemotherapy Treatment Program, which requires him to go to the hospital three (3) times a week. ALL is much more difficult for children than adults. His doctor is Dr. Ralph Pene at The Balboa Department of Pediatrics in San Diego, CA.  He is being home schooled because it is very difficult for him to move around.  Mr. Jackson's family is currently in the process of moving from a second story home to a single level home because Darius needs to be able to come in and out of the house without having to climb stairs.

Due to Mr. Jackson's son's medical condition and his treatment program, it would be impossible for Mr. Jackson to prosecute his case or his son's case were this Court to grant Defendant's motion to dismiss for forum *non conveniens*.

Financially, Mr. Jackson could not afford to travel or stay elsewhere for trial. In addition, the U.S. military would not give Mr. Jackson enough time to travel outside of the U.S. to prosecute his case.

Lastly, Mr. Jackson would not want to go back to Japan, a country that has high levels of radiation, and be exposed to that radiation for a second time.

See Declaration of **JAMES JACKSON**

**JENNIFER L. MICKE**

Plaintiff **JENNIFER L. MICKE** learned that she had injures resulting from her radiation exposure during "Operation Tomodachi" when, in April and May of 2012, she lost consciousness on two separate occasions, resulting in a fall to the ground which broke her nose. After the second fall, Ms. Micke went to the ER on Lemoore Air Base and had a CT scan which identified a cancerous tumor. She was then sent to a Navy Neurologist in San Diego, who diagnosed her with Oligoastrocytoma Brain Cancer. The doctor identified a two centimeter by three centimeter (2 cm by 3 cm) brain tumor in her left frontal lobe; it was grade two.

Ms. Micke's first surgery was performed on June 4th, 2012, when the cancerous tumor was removed. Unfortunately, the tumor returned, and on August 27, 2012, she had to have a second surgery in order to remove the tumor, again. Since this second surgery, Ms. Micke has had lingering issues, such as ringing in her ears, fatigue, headaches (migraines), and dizziness.

Ms. Micke is still being treated by Dr. Wendell Lake in Madison, WI doing follow-up treatments and MRIs in order to insure that the tumor has not, again, returned. Dr. Lake informed Ms. Micke that he deliberately chose not to use radiation in her case because it could cause further issues. Dr. Lake also told Ms. Micke that her form of cancer is caused by high levels of radiation to the head.

Ms. Micke's medical conditions, as well as the continuous follow-up treatment that she must receive, make it simply impossible for her to prosecute her case were this Court to grant Defendant's motion to dismiss for forum non conveniens. She would also not be able to afford to pay for the trip to Japan.

In addition, Ms. Micke is currently acting as a care giver to her great uncle who has "Multiple System Atrophy," which is a progressive disease. Not only would her aunt and uncle be unable to afford to pay someone for the required

assistance, they are both getting older and would be unable to take care of the family farm, another task that Ms. Micke has taken on since her discharge.

Finally, Ms. Micke does not want to go back into a radiated area and expose herself to the same type of radiation that caused her cancerous tumor.

See Declaration of **JENNIFER L. MICKE**

**JOHN W. SEELBACH**

After Plaintiff JOHN W. SEELBACH returned home from "Operation Tomodachi," in September of 2011, he began to experience pains up and down the right side of his body.  He began having terrible pains in his left testicle, as if he had been hit with something.  He also began getting generally weaker and losing strength.  He almost failed his PT (Physical Training) test. The day after the test, Mr. Seelback decided to go to the base hospital. The doctors conducted tests and identified a mass in his testicle. The base hospital then sent Mr. Seelback to the Hanford Regional Hospital, which conducted MRI and blood tests. These tests determined that Mr. Seelback had cancerous tumors in his blood and testicle; they determined that it was "Seminoma Cancer."

On October, 18, 2011 the surgeons removed his left testicle. Mr. Seelback was placed on Radiation Therapy for six (6) months, and all the while he was very tired and very weak. Mr. Seelback's testosterone level is very low and he has been on Testosterone supplements and DHEA for over a year. Mr. Seelback will probably always have to take them.

Given Mr. Seelback's medical condition, he does not want to travel away from his doctor or his treatments. This will prevent Mr. Seelback from being able to prosecute his case were this Court to grant Defendant's motion to dismiss for forum non conveniens.

In addition to his medical conditions, Mr. Seelback cannot financially afford to pay his way or stay in Japan, nor can he leave because of his military

commitment. Finally, Mr. Seelback does not want to be exposed to the same radiation that caused his terrible current medical condition.

See Declaration of **JOHN W. SEELBACH**

### JAMI L. BESCHORNER

During "Operation Tomodachi", Plaintiff **JAMI L. BESCHORNER** began having irregular menstrual cycles and "Dysfunctional uterine bleeding". In addition, she started having migraine and asthma issues immediately after being exposed to the radiation. Ms. Beschorner was treated by 6 different doctors trying to identify the problem with her uterine bleeding. Ms. Beschorner now suffers from Vertigo along with migraines and sinus issues. Ms. Beschorner is being treated by Doctor Stewart at Balboa Navy Medical Center for the vertigo, migraines and sinus problems. She is being treated by Lt. Cr. Chan for dysfunctional bleeding (Mirena), at Balboa Navy Medical Center and she is being treated by Lt. Doctor Kenney on the USS Reagan for Anxiety.

Given her current medical condition and her need for ongoing medical treatment for uterine bleeding, her anxiety and her migraines, vertigo and sinus issues, Ms. Beschorner would simply be unable to prosecute her case, were this Court to grant Defendant's motion to dismiss for forum non conveniens.

In addition to her physical and medical conditions, Ms. Beschorner is not financially able to pay for multiple trips to Japan. Further Ms. Beschorner could not get enough time off from the U.S. Navy to make numerous trips to a foreign country for a personal matter. Finally, Ms. Beschorner cannot return to Japan because she physically, mentally and emotionally cannot subject herself to any additional radiation.

See Declaration of **JAMI L. BESCHORNER**

### MICHAEL L. SEBOURN

Plaintiff MICHAEL L. SEBOURN is currently a full time student at ITT Technical Institute in Oceanside, CA, where he is taking three (3) classes requiring 15 hours a week on the GI Bill.  Mr. Sebourn had to resign from his last job, where he was employed for four (4) months, at Mobile SD in San Diego, CA because his back, neck, and entire right side of his body were cramping up and hurting from sitting in a chair too long.  Mr. Sebourn is being treated by Dr. Beasley at the VA facility located in Oceanside, CA.  His doctor requested an MRI for his back and referred him to a sports therapist for therapy. Mr. Sebourn's doctor has also requested Ionization for Radiation damage from the VA in order help identify any radiation bone or disk damage. However, no testing has been authorized by the VA as of this date, July 13, 2013.

Due to the medical ailments that have resulted since Mr. Sebourn's deployment to Japan, he has developed PTSD anxiety of being around earthquakes in Japan and could mentally not handle going back, and it is for this reason would be unable to prosecute his case were the Court to grant Defendant's motion to dismiss for forum non conveniens.

Also, Mr. Sebourn cannot financially afford to pay to travel to Japan or to stay there during a trial.  In addition he will not be able to take the time off from his classes to travel to Japan. Lastly, Mr. Sebourn does not want to expose himself to any further radiation by returning to Japan.

See Declaration of **MICHAEL L. SEBOURN**

**NATHAN A. CRISWELL**

Plaintiff NATHAN A. CRISWELL currently suffers from a medical problem with his knee. The problem is so severe he is in the process of filing for disability. It would be difficult for him to travel and get his medication in Japan. His medical condition would prevent him from being able to prosecute his case were this Court to grant Defendant's motion to dismiss for forum non conveniens.

In addition to his medical condition, having to travel to Japan, as well as stay in Japan for the trial, would be a significant financial burden for him. Finally, Nathan is a full-time student at Colorado State University and could not afford to miss a significant amount of school to travel to Japan for the trial.

See Declaration of **NATHAN A. CRISWELL**

### LINDSAY COOPER

Plaintiff LINDSAY COOPER is still experiencing many of the symptoms that began upon her return from Japan such as: thyroid issues, stomach cramps, irregular menstrual cycles, diarrhea, severe headaches, and digestive issues, constant vomiting. Her current medical condition and her need for ongoing medical treatment would prevent her from prosecuting her case were this Court to grant Defendant's motion to dismiss for forum non conveniens.

In addition to her physical and medical conditions, she is not financially able to pay for multiple trips to Japan. She is also a single parent of a very young child. She simply would not and could not expose her child to the radiation that has been released in Japan. She herself cannot return to Japan because she physically, mentally and emotionally cannot subject herself to any additional radiation. Finally, she is a full time student and could not miss school for any extended period of time.

See Declaration of **LINDSAY COOPER**

### MAURICE D. ENIS

Plaintiff MAURICE D. ENIS, after his radiation exposure, developed a lump on his jaw, and shortly after, another lump developed on his thigh, and then yet another between his eyes. In addition, his whole body shakes.  His current medical condition and his need for ongoing medical treatment would make it impossible to prosecute his case were this Court to grant Defendant's motion to dismiss

In addition to his medical and physical conditions, Mr. Enis is not financially able to pay for any trips to Japan. He is a full time student living on

limited resources. Finally, he cannot return to Japan because he physically, mentally and emotionally cannot subject himself to any more exposure to radiation.

See Declaration of **MAURICE D. ENIS**

**JAIME L. PLYM**

Plaintiff JAIME L. PLYM is suffering from Dysfunctional Urinal Bleeding, as well as migraine and asthma issues.  She has been placed on a waiting list to see a special doctor for each of her medical issues, due to the failure to identify her condition by numerous doctors. The current medical conditions and her need for ongoing medical treatment would make prosecution of her case impossible, were this Court to grant Defendant's motion to dismiss.

Additionally, she is not financially able to pay for any trips to Japan for she is a full time student living on limited resources. Finally, she cannot return to Japan because she physically, mentally and emotionally cannot subject herself to any more exposure to radiation.

See Declaration of **JAIME L. PLYM**

Given the medical conditions of the many of the Plaintiffs, the convenience of this Court weighs heavily in favor of retaining jurisdiction in California. The condition of the Plaintiffs and their ability to travel is a proper consideration in the private interest balancing test for *forum non conveniens*. See *Altmann v. Austria*, 317 F.3d 954, 972-73 (9th Cir.2002), *aff'd on other grounds*, 541 U.S. 677 (2004)

*Altmann* is compelling authority that the current case should not be dismissed for *forum non conveniens*. In *Altmann* the plaintiff filed an action in the United States District Court for the Central District of California against the Republic of Austria and the state-owned Austrian gallery, for the recovery of paintings stolen by the Nazis in violation of international law. *Id.* Defendants

sought to have the matter dismissed for *forum non conveniens* arguing that the "evidentiary sources, the witnesses, and the paintings are all located in Austria and a United States district court would be required to apply Austrian law." *Id* at 973. In upholding the District Court's denial of the defendants' motion to dismiss for *forum non conveniens*, the *Altmann* court held:

> We do not agree that these factors outweigh Altmann's choice of forum. Maria Altmann is an elderly United States citizen, who has resided in this country for over sixty years. The requisite foreign travel, coupled with the significant costs of litigating this case in Austria, weigh heavily in favor of retaining jurisdiction in the United States. *Id* 973-974.

The current case demands a similar finding. Even though key documents, witnesses and evidence may be in Japan, the condition of the 51 Plaintiffs and their choice of forum outweigh the discovery issues raised by Defendant. In this case, just as in *Altmann*, the cost of flying 51 Plaintiffs, many of whom have serious, life threatening illnesses as a result of radiation exposure, and their treating health care providers to Japan to prosecute the Plaintiffs' cases far outweighs any of the inconvenience issues raised by Defendant.

Additionally, TEPCO has a history of doing business in the United States and in California. As discussed above, on its website TEPCO lists its Washington DC office second only to its Tokyo headquarters. (See Exhibit 4 to Declaration of Charles A. Bonner) Additionally, according to the California Secretary of State website, on May 16 2003, TEPCO filed articles of incorporation with the Secretary of State. (See Exhibit 5 to Declaration of Charles A. Bonner) While Defendant may have surrendered its California corporate status, it has a history of doing business in California and is likely familiar with the State and the State's court system.

Additionally, as discussed by Mitsutoshi Hinata in his declaration, English translation attached as Exhibit D to the declaration of Kayoko Imori, Defendant TEPCO has a history of sending employees to California.

Accordingly, given TEPCO's current and past relationship in California, it will not be inconvenient for it to defend and act in the current jurisdiction.

### 3.   Whether Unwilling Witnesses Can Be Compelled To Testify

Although the availability of compulsory process is properly considered when witnesses are unwilling, it is less weighty when it has not been alleged or shown that any witness would be unwilling to testify. See, *Peregrine Myanmar v. Segal*, 89 F.3d 41, 47 (2d Cir. 1996). Here, Defendant has only speculated as to whether third party witnesses, i.e., U.S. Military commanders and Japanese Government officials will consent to testify. When no witnesses' unwillingness has been alleged or shown, a district court should not attach much weight to the compulsory process factor. *Peregrine*, 89 F.3d at 47; *Clark v. Bucyrus Int'l*, 634 F.Supp.2d 814, 820 (E.D. Ky. 2009)(finding that where the defendants "have failed to allege, much less carried their burden to show, that any witness would be unwilling to testify and that compulsory process would be required," the court would not "attach much weight to the compulsory process factor").

Additionally, the necessity of depositions obtained through letters rogatory does not mandate dismissal. The need to resort to videotaped depositions, obtained through letters rogatory, should not mandate dismissal. *DiRienzo v. Philip Services Corp.*, 232 F.3d 49, 59-60 (2d Cir. 2000)(the use of international letters rogatory is a viable alternative to forum non conveniens dismissal); *In re Corel Corp. Inc. Sec. Litig.*, 147 F. Supp.2d 363, 366 (E.D. Pa. 2001)(the need to resort to videotaped depositions, obtained through letters rogatory, should not mandate dismissal).

Although Defendant provides a detailed account of the potential challenges Plaintiffs face in order to conduct depositions in Japan, such challenges should not

be taken as dispositive but rather viewed as steps that can be worked through during the course of the proceeding.

### 4.      Access To Physical Evidence And Other Sources Of Proof

As discussed above, the crucial issues in this case are the misrepresentations by TEPCO. The bulk of this evidence will come from depositions of the commanding officers who received the information regarding radiation levels during Operation Tomadachi.  Any evidence associated with what US commanders received will likely only be accessible to Plaintiffs through a District Court subpoena.

As for documents in the possession of TEPCO, the relevant inquiry is not where the documents are located, but access to those documents.  TEPCO does not challenge that the Court has personal jurisdiction of them for the purposes of this suit. If that is the case, then Defendant would be required to produce documents in its possession and control that are relevant to the litigation. Given the prevalence of electronic documents, producing these documents would be no more difficult in this case than in any other complex litigation.

Additionally, as discussed above, the location of the physical evidence does not outweigh issues related to the conditions of the Plaintiffs.  See *Altmann* supra.

Defendant's argument that documents and witnesses not in control of TEPCO are likely unavailable in a US court, is similarly unconvincing. Plaintiffs did not sue the Japanese government and do not need testimony or documents from the Japanese government to make their case.

Additionally, Defendant's argument in this case is wholly speculative, stating that documents or witnesses are "likely to be unavailable." This type of vague speculation as to the availability of documents or witnesses does not meet the high burden placed on Defendant when trying to disturb Plaintiffs' choice of venue. On a motion for forum non conveniens, the Defendant, as the moving party,

bears the burden of proving that this State is an inconvenient forum. *Stangvik v. Shiley Inc.*, (1991) 54 Cal. 3d 744, 751. In exercising its discretion, the court must bear this burden of proof in mind. Thus, there must be evidence—not merely bald assertions—to support the trial court's determination. *Ford Motor Co. v. Insurance Co. of North America* (1995) 35 Cal.App.4th 604, 610.  In this case, Defendant's equivocal assertions about the availability of witnesses and documents simply do not meet their considerable burden. For example, in its motion on page 44 at lines 21 through 24, Defendant states the following: "But while some governmental witnesses and documents *could* be made available in a Japanese court, it is exceedingly *unlikely* that the Japanese Government would voluntarily make witnesses or documents available in litigation in this Court." In other words, Defendant does not know what the Japanese Government will do with respect to responding to this lawsuit.  Believing that something is unlikely is not sufficient evidence to meet Defendant's burden.

The Defendant does not show, nor does it even represent, that any witness is unwilling to testify. See *Carijano, 643* F.3d at 1231. Instead, Defendant makes assertions about what it believes individuals and entities, outside of its control, will do.

Further, Defendant has not sufficiently asserted the extent to which documents will need translation. In order for the court to give consideration to the ease or difficulty of having to translate from another language, Defendant must support its assertions with an explanation as to the scope or volume of potentially discoverable information and how the accompanying translation costs would be burdensome. *Gupta v. Austrian Airlines*, 211 F. Supp.2d 1078, 1088 (N.D. Ill. 2002) (finding that defendants failed to show this factor weighed in favor of dismissal where they "furnish[ed] no details regarding the quantity or relevancy of documents and testimony needing translation into English"). Here, Defendant has

not sufficiently articulated the specifics, i.e., volume as to how translations will have an impact on the adjudication of this case.

### 5.    The Cost Of Bringing Witnesses To Trial

The cost of bringing witnesses to trial weighs heavily in favor of retaining jurisdiction in District Court. Assuming the ticket costs provided by the Defendant are accurate, the 51 Plaintiffs would each have to pay $2,040 for their tickets, not including hotel fare. The Plaintiffs themselves would have to bear this cost, which totals $104,040.  Additionally, out of their own pockets, the Plaintiffs would have to pay for their treating physicians to fly to Japan. Assuming for the sake of argument that there are only 30 testifying treating physicians, that is another $61,200. Additionally, Plaintiffs would have to pay for any third party witness who might testify as to the impact of the radiation exposure on the Plaintiffs. Assuming that each Plaintiff needs only one individual to testify, that is another 51 individuals and another $104,040. Defendant does not even suggest that it would have to fly more than 130 individuals to the United States for trial. This does not even take into consideration the costs of lodging and food, much less the physical and psychological toll it would take on the Plaintiffs.

Moreover, the costs to TEPCO would not be borne by the TEPCO employees themselves, but rather the company. TEPCO is a multi-billion dollar company who can afford to fly its employees to California when it suits its needs. See Declaration of Imori, Exhibit D Translation of Declaration of Kayoko Imori where he states the following:

> In the last five years, five TEPCO employees have studied at
> California universities and have resided in the State during the
> course of their studies. One TEPCO employee is presently seconded
> at the Electric Power Research Institute, Inc. ("EPRI") research
> facility in Palo Alto, California. The employee's primary task at
> EPRI is research regarding the improvement of EPRI's nuclear

reactor accident analysis program. The employee's secondment to EPRI began in July 2012 and is expected to last for 2- 3 years.

If TEPCO can send six employees to California for years at a time to study, it can certainly send a few individuals to testify in a court case.

### 6.    The Enforceability Of The Judgment

Since TEPCO has not challenged that this Court has personal jurisdiction over it, it cannot claim that this Court could also exert personal jurisdiction over any of its assets in the United States. Since TEPCO clearly does business in the United States and lists their Washington DC office second only to their Tokyo headquarters, Plaintiffs will be able to enforce a judgment rendered by this Court. (See Exhibit 1 to Declaration of Charles A. Bonner)

### 7.    All Other Practical Problems That Make Trial Of A Case Easy, Expeditious And Inexpensive

Translation of witness testimony is not a conclusive ground for Dismissal. The fact that there will be many Japanese witnesses whose testimony will need translation is not a sufficient ground for dismissal. Even if the proceeding were to take place in Japan, said testimony would also require English translation in order to apprise and include Plaintiffs in the proceeding. Additionally, testimony from third party witnesses from the U.S. Military would also in turn have to be translated into Japanese were the proceeding transferred to Japan. Contrary to Defendant's assertions, the quantum of translation would be equally required of English and Japanese testimony, no matter which forum is chosen.

Regardless, District courts and the fact-finders thereof routinely address subjects that are totally foreign to them, ranging from the foreign language of patent disputes to cases involving foreign companies, foreign cultures and foreign languages. See, *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 118-82(9th Cir. 2006). Therefore, as this Court is well equipped at adjudicating claims that

involve foreign parties, the associated cost of translation is not a consideration for dismissal but is rather an expected cost of litigating in a global world.

### C.  The Relevant Public Interest Factors Also Favor Maintaining the Suit in the United States

Public interest factors arise where actions involve multiple parties or are complex, and may add to the congestion of a particular court. *Campbell v. Parker-Hannifin Corp.* (1999) 69 Cal.App.4th 1534, 1542; *Roulier v. Cannondale* (2002) 101 Cal.App.4th 1180, 1190. Other public interest factors may include weighing the competing interests of the jurisdictions over the subject matter of the jurisdiction or the involvement of their citizens. *Stangvik v. Shiley, Inc., supra*, 54 Cal.3d at 751.

### 1.  The United States has a Strong Interest in This Dispute

The United States interest in this case far outweighs the Japanese interest in the case. All of the Plaintiffs except the minors are members of various branches of the United States Armed services. They represent the United States government and its people. As a class, there are few groups whose concerns outweigh those of the United States Military. Policy makers consistently seek to establish ways for those who have served to receive benefits for that service. Programs such as the GI bill and the VA are only a few of the many benefits provided to the men and women who serve in the United States Military. To suggest that the United States District Court does not have strong interest in this dispute is patently absurd.

Additionally, for any of the Plaintiffs receiving treatment from the VA, the United States has a direct financial stake in the outcome of the litigation.  42 USC § 2651 (a) Conditions; exceptions; persons liable; amount of recovery; subrogation; assignment gives the United States the right to recover amounts paid as benefits to individuals injured by third parties.  42 USC § 2651 (a).  This statute

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

entitles the United States to subrogate any recovery by the Plaintiffs in this action to be reimbursed for amounts paid as benefits, such as VA benefits.  Accordingly, the United States has a strong interest in making sure the service men and women who were injured by TEPCO are fully compensated for said injuries, and therefore this judicial branch of the United States has strong interest in this case.

Moreover, the Southern District of California has a strong interest in this case since many of the Plaintiffs reside in the Southern District of California and seek out treatment from medical facilities in the Southern District of California. To the extent that Plaintiffs' medical treatment is a burden on the California health care system, it will be the citizens of California who will suffer as a consequence.

Defendant argues that Japan has a strong interest in resolving Plaintiffs' claims as the Government of Japan has created overseeing bodies who are administering funding for harms incurred as a result of the devastating tsunami in March 2011. Of course, from the Defendant's perspective, it makes economic sense that Plaintiffs should be merely lumped in with the thousands of Japanese victims who have been forced to slowly make their way through the maze and bureaucracy of local government relief programs. However, it is abundantly clear that Plaintiffs are not simply seeking damages for harms relating to the tsunami, but for harms caused by Defendant's negligence, misrepresentation and fraud. If liability were not at issue and it were merely a case of Plaintiffs being situated on the island at the time of the earthquake, then maybe they would be similarly situated as other Japanese residents who were innocently harmed as a result of a natural catastrophe. Here, however, Plaintiffs are American citizens who were not Japanese residents, nor in Fukushima at the time of the earthquake. Rather, Plaintiffs were on American military vessels whose presence in Japan was requested in order to provide emergency relief. In the first instance, Plaintiffs' injuries did not derive from the happenstance of being in Fukushima during the

onslaught of the earthquake, but rather as a result of the Defendant's misrepresentation, fraud, and negligence. Therefore, the Defendant's suggestion that Plaintiffs simply line up with thousands of Japanese citizens and face bureaucratic delays and insufficient reparations would allow the Defendant to effectually sidestep the true extent of its liability.

Similarly, due to the Government of Japan's inextricable enmeshment with Defendant TEPCO, both administratively and financially, a glaringly clear conflict exists to such an extent that whatever public interest Japan has in resolving Plaintiffs' claims is severely diminished due to partiality and self-interest.

As such conflict is absent in the United States. U.S. courts have an interest in ensuring that Plaintiffs, as U.S. citizens and representatives of the U.S. government, be provided with a forum where their traditional tort claims can be heard in an impartial and conflict free manner.

When coupled with the fact that Plaintiffs' claims call into question the U.S. Military's role in causing their harm, see *Blum v. GE*, 547 F.Supp.2d 717, 734 (W.D. Tex. 2008) as well as raising a fraud allegation against foreign Defendants, *Herbstein v. Bruetman*, 743 F. Supp. 184, 189 (S.D.N.Y. 1990)(interest exists where fraud perpetrated against U.S. residents), the U.S. District court has a strong interest in retaining jurisdiction. In particular, the Southern District of California has a particularly strong interest in presiding over Plaintiffs' case as they are U.S. servicemen and women who are predominately based in and around San Diego.

### 2. The Issue of Burden on this Court Does Not Weigh In Favor of Dismissal

With respect to Defendant's assertion that Plaintiffs' action would contribute to court congestion, the issue is not whether a dismissal will reduce a court's congestion but whether a trial may be speedier in another court because of its less

crowded docket. *See Starnes v. McGuire, 512 F.2d 918, 932 (D.C. Cir. 1974).* Here, as the number of people seeking relief for damages incurred during the earthquake is large, it is undeniable that Plaintiffs' claims might be delayed. Even if they were, however, it is unfair for a court to subject United States service men and women to the courts of another country merely because Plaintiffs' home country courts are congested. The *forum non conveniens* doctrine should not be used as a solution to court congestion; other, less severe remedies exist. *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984).  Additionally, as stated in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 408 (1975) "Congestion in the courts cannot justify a legal rule that produces unjust results in litigation simply to encourage speedy out-of-court accommodations".

Courts often indicate that the Plaintiff's choice of forum is entitled to "great weight" or "substantial weight" in the analysis. *See Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)  (noting that "great weight is generally accorded the plaintiff's choice of forum")

## VI.    THE DOCTRINE OF INTERNATIONAL COMITY DOES NOT REQUIRE DISMISSAL OF THE FAC

Defendant TEPCO is again incorrect in its argument that the doctrine of international comity warrants dismissal of Plaintiffs' action. As support for its position, Defendant cites dictum a footnote in *United States Supreme Court case Societe Nationale Industrielle Arerospatiale v United States District Court for the Sourthern District of Iowa:* "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *United States Supreme Court case Societe Nationale Industrielle Arerospatiale v United States District Court for the Sourthern District of Iowa* 482 U.S. 522, 543 n 27 (1987).

1      As in *Societe*, *Supra*, "[t]he concept of comity requires, in this context, a

2  more particularized analysis of the respective interests of the foreign and

3  requesting nations than a blanket "first resort" rule would generate" *Societe, Supra*

4      The cases Defendant TEPCO relies on for its failed argument are not

5  compelling for this Court to exercise its irreversible discretion, absent abuse, to

6  decline to apply the doctrine of international comity to this case.  "[S]ince the

7  extension or denial of comity is within the court's discretion, we will reverse the

8  court's decision only when we find an abuse of discretion. *Remington Rand Corp.-*

9  *Delaware v. Business Sys., Inc.*, 830 F.2d 1260, 1266 (3 Cir.1987).

10     "Applied prospectively, federal courts evaluate several factors, including the

11  strength of the United States' interest in using a foreign forum, the strength of the

12  foreign governments' interests, and the adequacy of the alternative forum."

13  *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)

14  However, unlike *Allstate Life,* cited by the Defendant, where the court upheld the

15  extension of comity in favor of Australian insolvency proceedings, stating

16  "("American courts have long recognized the particular need to extend comity to

17  foreign bankruptcy proceedings" *Allstate Life Ins Co. v. Linter Group,* Ltd., 994 F.

18  2d 996 (2nd Cir. 1993)" this case at bar does not involve a bankruptcy proceeding

19  in Japan, with a procedure for equal and fair treatment of creditors.

20     Likewise, here the Plaintiffs do not have "an alternative forum, established

21  in part by the United States government" where they can seek redress. In applying

22  the doctrine of international comity in *Ungar-Benages*, *Supra*, the court

23  specifically recognized the American's Government involvement in creating a

24  forum for American Citizens to seek redress of claims. The court stated: "Although

25  it may not be her forum of choice, the plaintiff should pursue her claim through the

26  Foundation, which was established by the American and German governments to

27

28

MEMO OF POINTS & AUTHS. IN OPPOSITION TO MOT. TO DISMISS

1  address exactly these types of claims from the Nazi era." *Ungar-Benages*, *Supra*

2  379 F.3d at 1241.

3       The United States have a very strong interest in assuring that its military

4  men and women receive comparable due process from Japan's forum as they

5  would in America. The jury system is a basic right for an American pursuing a

6  civil claim. This is not the case in Japan.[7]   TEPCO and government officials

7  repeated denied the meltdown at the time of the incident, which, as of last May

8  2012, TEPCO admitted.  See Exhibits, 7 American  interest in integrity, openness

9  and fairness for the heavy sacrifices of it service men and women are stronger than

10 any interest in Japan. TEPCO and the Japanese Government have not been

11 forthcoming regarding the Fukushima meltdown. See Exhibits 8, and 9 This fact,

12 and the other compelling public policy reasons outlined under the *forum non-*

13

14 [7] For over sixty years, Japan lagged in terms of citizen participation in the judicial

15 process. As part of a historic internal transformation of Japan's legal system,
   however, this drastically changed on May 21, 2009, as Japan revived citizen

16 participation in certain criminal trials pursuant to the "Saiban-in ho" or Act

17 Concerning Participation of Lay Assessors in Criminal Trials. Japan now
   conscripts registered voters to serve on mixed criminal tribunals comprised of lay

18 citizens and professional judges. By design, the Lay Judge Act purposefully limits

19 lay participation in its new quasi-jury system to involvement in certain serious
   criminal cases only.

20

21 Now that lay participation in serious criminal trials has apparently taken root in

22 Japanese society, it is an ideal time to expand lay participation into the civil realm.
   By implementing jury trials in select contexts involving civil and administrative

23 litigation; ***Japan can foster more accountability, enhance democratic***

24 ***engagement, generate positive change in society, and fully achieve the objectives***
   ***of its recent monumental legal reforms***. [Emphasis added] ***Error! Main***

25 ***Document Only.****Benefits of Adopting Civil Jury Trials in Japan and Lessons from*

26 *the United States* May 30, 2013 Matthew J. Wilson, Associate Professor,
   University of Wyoming - College of Law (See Exhibit 6 to Declaration of Charles

27 A. Bonner)

28

*conveniens discussion* above, are equally applicable here as the grounds why this Court should decline to extend the doctrine of comity in this case. "(*See Jota v. Texaco, Inc.,* 157 F.3d 153 (2d Cir.1998*)* (noting that *forum non conveniens* analysis on the adequacy of the foreign forum is equally pertinent to international comity analysis); *see also Ford v. Brown,* 319 F.3d 1302, 1304 n. 3 (11th Cir 2003) (finding that the international comity analysis and the *forum non conveniens* calculus were intertwined)" *Ungaro-Benages*, Supra, 1238

Defendant admits that *The Convention on Supplementary Compensation For Nuclear Damage* ("Convention") is not law. It has not been ratified by the requisite five countries. See Defendants Memo of Points & Authorities 55:12-13 " Although the Convention will not formally take effect until it is ratified by one more country…"

Therefore, Defendant's motion to dismiss Plaintiffs' FAC must be denied

**CONCLUSION**

For the foregoing reasons the Court should deny Defendant's motion to dismiss in its entirety. Should this court conclude that there is merit to any of Defendant's arguments, Plaintiffs request the opportunity to amend the complaint to address any legal deficiencies.

DATED:  August 23, 2013    RESPECTFULLY SUBMITTED,


By:   */s/ CHARLES A. BONNER*
    CHARLES A. BONNER
    Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I, CHARLES A. BONNER, am an attorney at Law Offices of Bonner & Bonner counsel of record for Plaintiffs in this action. I certify that on August 2, 2013, I caused the attached document to be served via this Court's Electronic Filing System on JOHN B. OWENS, DANIEL P. COLLINS, GREGORY P. STONE, RONALD L. OLSON, and BRYAN HECKENLIVELY counsel for Defendant, who are registered users of that system. *See* Local Civil Rule 5.4.

DATED: August 23, 2013

**BY:** ***/S/ CHARLES A. BONNER***
CHARLES A. BONNER
ATTORNEY FOR PLAINTIFFS