**PAUL C. GARNER, ESQ.** (#132524)
**C/O LAW OFFICES OF BONNER & BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
Mail to: P.O. Box 232472
Encinitas, CA 92024
Tel: (760) 600-0081
Fax: (760) 918-1984
pcg@garnerlaw.com

**CHARLES A. BONNER, ESQ.  SB# 85413**
**A. CABRAL BONNER, ESQ. SB# 247528**
**LAW OFFICES OF BONNER & BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFFS

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SAN DIEGO DIVISION

| | |
|---|---|
| LINDSAY R. COOPER, JAMES R. SUTTON, KIM GIESEKING, A. G., AN INFANT BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, CHARLES A. YARRIS, ROBERT M. MILLER, CHRISTOPHER G. BITTNER, ERIC MEMBRILA, JUDY C. GOODWIN, JENNIFER L. MICKE, JOHN W. SEELBACH, MAURICE D. ENIS, JAIME L. PLYM, NATHAN J. PIEKUTOWSKI, CAROLYN A. WHITE, LOUIE VIERNES, MICHAEL L. SEBOURN, K. S., AN INFANT BY HIS FATHER AND NATURAL GUARDIAN, | Case No.: 12-CV-3032-JLS-WMc<br><br>A CLASS ACTION COMPLAINT Fed. Rule 23(a)<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br>1.  NEGLIGENCE<br>2.  STRICT LIABILITY FAILURE TO WARN<br>3.  STRICT LIABILITY FOR DESIGN DEFECT<br>4.  PUBLIC NUISANCE<br>5.  PRIVATE NUISANCE<br>6.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>7.  STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES |

MICHAEL L. SEBOURN, CHRISTIAN M. EBUENG, PAUL J. ENCINIAS, DANIEL E. HAIR, ADAM W. KRUTZLER, DAVID K. MALONE, ROBERT SELIGMAN, ELOI A. WHITEMAN, JASON D. HENRY, NELLIE ALLEN-LOGAN, JAMI BESCHORNER, NATHAN CANCHE, NATHAN CRISWELL, JASON TROY FRIEL, OSCAR GONZALEZ, DAVID HAHN, JAMES JACKSON, D. J., A MINOR BY HIS FATHER AND NATURAL GUARDIAN JAMES JACKSON, JARRETT BRADY JOHNSTON, JOSEPH MEDINA, ADAM MINTZ, MALLORY K. MORROW, WILLIAM NETHERTON, MICHELLE ODEN, DONALD RAIRIGH, CHRISTOPHER RICKARD, ANDREW RIVERA, STEVEN RAY SIMMONS, AKEEM SMITH, JUSTIN SPENCER, ALAN SPURLING, ANGEL TORRES, ANTHONY GARCIA AND "JOHN & JANE DOES" 1-70,000,

        Plaintiffs,

     vs.

TOKYO ELECTRIC POWER COMPANY, INC. aka TEPCO, and Does 1 through 200, inclusive

        Defendants

8. NEGLIGENCE PER SE: RES IPSA LOQUITUR
9. PRESUMPTION OF NEGLIGENCE PER SE

JURY TRIAL DEMANDED

Plaintiffs, by their attorneys, PAUL C. GARNER, ESQ**.** and CHARLES A. BONNER ESQ. as and for their Second Amended Complaint, respectfully allege, upon information and belief, on behalf of themselves and others similarly situated and for their Second Amended Complaint, state as follows:

At all relevant times, 70,000 plus CLASS PLAINTIFFS were members of

the armed forces, their dependents, and support personnel, who served in a variety of capacities, and who are and were, at all times mentioned, citizens of the United States of America.

One or more members of PLAINTIFFS' CLASS may sue as representative parties on behalf of the class because all the following requirements are met: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

## JURISDICTION

1.      The jurisdiction of this Court over the subject matter in this action is predicated upon Diversity Jurisdiction, 28 U.S.C. §1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.[1] **(2)** The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—**(A)** any member of a class of plaintiffs is a citizen of a State different from any defendant;**(B)** any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or **(C)** any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.[2]

## PARTIES

2.  The Plaintiffs, LINDSAY R. COOPER, JAMES R. SUTTON, KIM

---

[1] Diversity jurisdiction is currently codified at 28 U.S.C. §1332, http://www.law.cornell.edu/uscode/28/1332thmll;  also see Ghotra v. Bandila Shipping, Inc., 713 F3d 1050, 1054, 9th Cir. 1997

[2]  28 U.S.C. §1332

GIESEKING, A. G., AN INFANT BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, CHARLES A. YARRIS, ROBERT M. MILLER, CHRISTOPHER G. BITTNER, ERIK MEMBRILA, JUDY GOODWIN, JENNIFER L. MICKE, JOHN SEELBACH, MAURICE D. ENIS, JAIME L. PLYM, NATHAN J. PIEKUTOWSKI, CAROLYN A. WHITE, LOUIE VIERNES, MICHAEL L. SEBOURN, K. S., AN INFANT BY HIS FATHER AND NATURAL GUARDIAN, MICHAEL L. SEBOURN, CHRISTIAN M. EBUENG, PAUL J. ENCINIAS, DANIEL E. HAIR, ADAM W. KRUTZLER, DAVID K. MALONE, ROBERT SELIGMAN, ELOI A. WHITEMAN, ARAMIS A. BERRIOS, RYAN S. BROWN, COURTNEY R. CARMICHAEL, WILLIAM V. CHAPMAN, JOHN D. DAVIS, KYLE W. FELT, KATE M. GRACE, SHANE Q. GALLAGHER, ROBERT C. HARTAGE, CHRISTIAN A JESSUP, DANIEL B. LAWVER, THOMAS L. McCANTS, BENITO G. SERENTAS, KELLI D. SERIO, MICHAEL B. SHANNON, KRISTIAN R. WILLIAMS, WILLIAM J. ZELLER, CORA E. HILL, GUNNAR W. BORTHICK, JASON D. HENRY, NELLIE ALLEN-LOGAN, JAMI BESCHORNER, NATHAN CANCHE, NATHAN CRISWELL, JASON TROY FRIEL, OSCAR GONZALEZ, DAVID HAHN, JAMES JACKSON, D. J., A MINOR BY HIS FATHER AND NATURAL GUARDIAN JAMES JACKSON, JARRETT BRADY JOHNSTON, JOSEPH MEDINA, ADAM MINTZ, MALLORY K. MORROW, WILLIAM NETHERTON, MICHELLE ODEN, DONALD RAIRIGH, CHRISTOPHER RICKARD, ANDREW RIVERA, STEVEN RAY SIMMONS, AKEEM SMITH, JUSTIN SPENCER, ALAN SPURLING, ANGEL TORRES, DAGAN P. HONDA, RONALD E. WRIGHT, TREVOR BECK, ASHLEY RAMIREZ, OSVALDO VERA, BRANDON SMITH, LETICIA MORALES, SKYLER WARNOCK, WYATT BINDERUP, DANIEL PRETTO, MICHAEL WARNEZPONTON, ANTHONY GARCIA and JOHN & JANE DOES" 1-70,000, at all times herein mentioned were among the members of the U.S. Navy

**SECOND AMENDED COMPLAINT FOR DAMAGES**            12-CV-3032-JLS-WMc

crews of the U.S.S. RONALD REAGAN (CVN-76), with its home port in San Diego, California, the crews of other vessels participating as part of the Reagan Strike Force, 7th Fleet, land-based service personnel, and/or their dependents. All of the Plaintiffs were repeatedly exposed to ionizing radiation on or after March 11, 2011, due to the release of radioisotopes from the Fukushima Nuclear Power Plant (hereinafter, "FNPP"). All of the Plaintiffs were exposed during the mission known as "Operation Tomadachi."[3]

3. Plaintiff, LINDSAY R. COOPER, born July 12, 1989, who served as an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned herein a citizen of the State of California.

4. Plaintiff JAMES R. SUTTON, born June 10, 1987, who served as a boatswain's mate and was aircraft director on the flight deck, is and was at all times mentioned a citizen of the State of Washington.

5. Plaintiff KIM GIESEKING, born January 28, 1989, who served as a boatswain's mate on the flight deck, is and was at all times mentioned a citizen of the State of California.

6. Plaintiff A. G., BY HER MOTHER AND NATURAL GUARDIAN, KIM GIESEKING, born October 15, 2011, is and was a citizen of the State of California.

7. Plaintiff CHARLES A. YARRIS, born December 3, 1988, who served as a boatswain's mate as a director on the flight deck, is and was at all times mentioned a citizen of the State of Ohio.

---

[3] On March 14, 2011, the U.S. 7th Fleet, U.S. Naval personnel, and aircraft aboard the vessels were repositioned away from Japan's FNPP after detecting contamination in the air and on the helicopters returning to the U.S.S. Ronald Reagan (CVN-76) from ferrying supplies to the land on aircraft deployed by the U.Sed.

8. Plaintiff ROBERT M. MILLER, born April 19, 1986, who served as a boatswain's mate handler in the air department, is and was at all times mentioned a citizen of the State of California.

9. Plaintiff CHRISTOPHER G. BITTNER, born July 21, 1985, who served as an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned a citizen of the State of New Mexico.

10. Plaintiff ERIC MEMBRILA, born July 28, 1974, who served as a specialist in air decontamination, is and was at all times mentioned a citizen of the State of California.

11. Plaintiff JUDY C. GOODWIN, born January 9, 1988, was an aviation boatswain's mate stationed on the flight deck, is and was at all times mentioned a citizen of the State of New Mexico.

12. Plaintiff JENNIFER L. MICKE, born October 14, 1990, who served as an aviation structural mechanic, is and was at all times mentioned a citizen of the State of Wisconsin.

13. Plaintiff JOHN W. SEELBACH, born October 19, 1985, who served as an aviation electronics troubleshooter, is and was at all times mentioned a citizen of the State of California.

14. Plaintiff MAURICE D. ENIS, born October 8, 1987, who served as a navigation quartermaster, is and was at all times mentioned a citizen of the State of Florida.

15. Plaintiff JAIME L. PLYM, born October 26, 1984, who served as a navigator-plotter, is and was at all times mentioned a citizen of the State of Florida.

16. Plaintiff NATHAN J. PIEKUTOWSKI, born February 15, 1991, who served as a marine aboard the USS Essex, is and was at all times mentioned a citizen of the State of Illinois.

17. Plaintiff CAROLYN A. WHITE, born October 16, 1979, who served as expedition division chief on the USS Ronald Reagan, is and was at all times mentioned a citizen of the State of California.

18. Plaintiff LOUIE VIERNES, born April 4, 1987, who served as a deck seaman on the U.S.S. Cowpens, is and was at all times mentioned a citizen of the State of California.

19. Plaintiff MICHAEL L. SEBOURN, born August 24, 1974, who served as a decontamination coordinator, is and was at all times mentioned a citizen of the State of California.

20. Plaintiff K. S.[4], born November 10, 2002, by his father and natural guardian, MICHAEL L. SEBOURN, is and was at all times mentioned a citizen of the State of California.

21. Plaintiff CHRISTIAN EBUENG, born January 20, 1988, who served as an aviation life-support technician on the USS Reagan, is and was at all times mentioned a citizen of the State of California.

22. Plaintiff PAUL J. ENCINIAS, born March 10, 1984, who served as plane captain, launch and recovery aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

23. Plaintiff DANIEL E. HAIR, born September 13, 1984, who served as an administrator aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

---

[4] Infants are most vulnerable due to their more rapidly growing cells, and when the maternal host is exposed to radioactive isotopes, this can be fatal or highly damaging to the fetus. It has been reported that by one year post Fukushima (by May, 2012), up to 35% of Japan's monitored children have been found with cysts or other unnatural developments on their thyroid glands.  This indicates there are both increased and unsafe levels in their environment and that they should have been evacuated to far more than only 12-20 miles beyond the FNPP site.

24. Plaintiff ADAM W. KRUTZLER, born December 18, 1989, who served as an aircraft electrician, plane captain and flight deck supervisor aboard the USS Reagan, is and was at all relevant times a citizen of Oklahoma.

25. Plaintiff DAVID K. MALONE, born April 12, 1985, who served as an aircraft engine mechanic, aviation machinist mate, is and was at all times mentioned a citizen of the State of Washington.

26. Plaintiff ROBERT SELIGMAN, born August 26, 1985, who served as an aircraft fuel technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Arizona.

27. Plaintiff ELOI A. WHITEMAN, born December 1, 1949, who served as a technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

28. Plaintiff ARAMIS A. BERRIOS, born September 15, 1987, who served as a USN-E5- YN/WCS/ Engineering Department aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

29.Plaintiff RYAN S. BROWN, born May 12, 1982, who served as a USN-E5- Second Class Petty Officer, Hull Maintenance Technician  aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Louisiana.

30. Plaintiff COURTNEY R. CARMICHAEL, born October 6, 1982, who served as a USN-E1- Aviation Structural Mechanic aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

31. Plaintiff WILLIAM V. CHAPMAN, born August 24, 1970, who served as a USN-E8- Flight Deck Coordinator aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

32. Plaintiff JOHN D. DAVIS, born March 6, 1977, who served as a USN-E-7- HTC/Repair-CPO stationed on the USS Essex, and is and was at all times mentioned a citizen of the State of Maryland.

33. Plaintiff, KYLE W. FELT, born March 4, 1987, who served as a  USN-E5-

Engineering Department while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

34. Plaintiff, KATE M. GRACE, born July 16, 1979, who served as a USN-E1-Aviation Ordinance while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Washington.

35. Plaintiff, SHANE Q. GALLAGHER, born June 8, 1987, who served as a USMC-E5-Reconnaissance while aboard the USS Essex, is and was at all times mentioned a citizen of the State of Massachusetts.

36. Plaintiff, ROBERT C. HARTAGE, born March 11, 1985, who served as a USN-E4-Yeoman while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of South Carolina.

37. Plaintiff, CHRISTIAN A JESSUP, born July 18, 1978, who served as a USN-E-6-Tomahawk Administrator, while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Florida.

38. Plaintiff, DANIEL B. LAWVER, born June 15, 1992, who served as a USN-E-1-Gunners Mate, while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Wisconsin.

39. Plaintiff, THOMAS L. McCANTS, born September 29,, 1984, who served as a USN-E-5- Electronics technician, while aboard the USS Germantown, is and was at all times mentioned a citizen of the State of Washington.

40. Plaintiff, BENITO G. SERENTAS, JR., born June 5, 1959, who served as a USN-Contractor Tarp Representative for Lerdos Corporation while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

41.Plaintiff, KELLI D. SERIO, born July 24, 1989, who served as a USN-E-2-Quartermaster while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

42. Plaintiff, MICHAEL B. SHANNON, born September 4, 1981, who served

as a USN-E-5-Electronic technician while aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Oklahoma.

43.  Plaintiff, KRISTIAN R. WILLIAMS, born April 1, 1970, who served as a USN-05-Commander-Pilot assigned to Atsugi, Japan, is and was at all times mentioned a citizen of the State of Texas.

44. Plaintiff, WILLIAM J. ZELLER, born April 12, 1987, who served as a USN-E-3-Security Force (SF-2), is and was at all times mentioned a citizen of the State of California.

45. Plaintiff, CORA E. HILL, born August 29, 1983, who served as a USN-E-5-Electronic technician, is and was at all times mentioned a citizen of the State of California.

46. Plaintiff DANIEL E. HAIR, born September 13, 1984, who served as an administrator aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

47. Plaintiff, GUNNAR W. BORTHICK, born April 18, 1987, who served as a USN-E-5-Maintenance Man aboard the USS Chancellorsville, is and was at all times mentioned a citizen of the State of Texas.

48.Plaintiff, JAMI L. BESCHORNER, born January 23, 1986, who served as a USN-E-5-Avionics Electronics Technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

49.Plaintiff, NATHAN A. CRISWELL, born July 26, 1988 who served as a USN-E-4-Avionics Electronics Technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Colorado.

50.Plaintiff, JASON T. FRIEL, born July 2, 1980 who served as a USN-E-6-Sonar Technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

51.Plaintiff, OSCAR J. GONZALEZ, born December 19, 1984 who served as a

USN-E-3 Aviation Ordinance Technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of New Jersey.

52. Plaintiff, DANIEL J. HAHN, who served as a USN-LT. Commander aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Arizona.

53. Plaintiff, D. J. J. born July 3, 1999, a minor, by his father and natural guardian James E. Jackson was residing at Yokosuka, Japan, is and was at all times mentioned a citizen of the State of California.

54. Plaintiff, JAMES E. JACKSON, born September 22, 1977 who served as a USN-E-6-IT-LPO assigned to the Yokosuka, Japan, is and was at all times mentioned a citizen of the State of California.

55. Plaintiff, JARRETT B. JOHNSTON, born December 5, 1985 who served as a USN-E-Senior Airman, Avionics Electronics Technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Alabama.

56. Plaintiff, JOHNATHAN MEDINA, born November 7, 1972 who served as a USN-E-6 Supervisor Aircraft Mechanic aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

57. Plaintiff, ADAM J. MINTZ, born April 23, 1991 who served as a USN-E-3 Avionics Technician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

58. Plaintiff, MICHAEL R. MORROW, born July 6, 1983who served as a USN-E-6 Avionics Electronics Technician aboard the USS Reagan, is and was at all times a citizen of the State of Arkansas.

59. Plaintiff, WILLIAM O. NETHERTON, born April 18, 1987, who served as a USN-E-4 Air Frame Technician assigned to NAS, Atsugi, Japan, is and was at all times mentioned a citizen of the State of California.

60. Plaintiff, MICHELLE R. ODEN, born March 26, 1981, who served as a

USN-E-6 Aviation Electronics Technicians aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

61. Plaintiff, RONALD A. RAIRIGH, born May 8, 1974, who served as a USN-E-6 Electrician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

62. Plaintiff, CHRISTOPHER S. RICKARD, born October 10, 1985, who served as a USN-E-5 Security assigned to NAS, Atsugi, Japan, is and was at all times mentioned a citizen of the State of Florida.

63. Plaintiff, ANDREW T. RIVERA, born December 21, 1986, who served as a USN-E-4 – Avionics Machinists Mate aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Washington.

64. Plaintiff, STEVEN R. SIMMONS, born December 15, 1977, who served as a USN-LT.JG/02E- aboard the USS Reagan, is and was at all times mentioned a citizen of the State of  Maryland.

65. Plaintiff, AKEEM R. SMITH, born June 6, 1986, who served as a USN-E-4-Culinary Specialist aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

66. Plaintiff, ALAN W. SPURLING, born May 16, 1986, who served as a USN-E-4- Security Specialist aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

67. Plaintiff, ANGEL L. TORRES, born February 15, 1970, who served as a USN-CN02 Officer aboard the USS Reagan, is and was at all times mentioned a citizen of the State of California.

68. Plaintiff, DAGAN P. HONDA, born December 28, 1983, who served as a USN-E-6-Aviation Boatswain Mate aboard the USS Reagan, is and was at all times mentioned a citizen of the State of Washington.

69. Plaintiff, RONALD E. WRIGHT, born January 5, 1990, who served as a

**SECOND AMENDED COMPLAINT FOR DAMAGES**

USN-E-4- Aviation Structural Mechanic aboard the USS Reagan, is and was at all times a citizen of the State of Washington.

70. Plaintiff, NELLI ALLEN-LOGAN who served aboard the USS Reagan, is and was at all times mentioned a citizen of the United States.

71. Plaintiff, NATHAN CANCHE who served aboard the USS Reagan, is and was at all times mentioned a citizen of the United States.

72. Plaintiff, JUSTIN SPENCER, who served aboard the USS Reagan, is and was at all times mentioned a citizen of the United States.

73. Plaintiff, TREVOR BECK, born January 19, 1990, who served as an ElectronicsTechnician aboard the USS Reagan, is and was at all times mentioned a citizen of the State of the State of California.

74. Plaintiff ASHLEY RAMIREZ, born April 17, 1990, who served as Logistics Specialist, aboard the USS George Washington, is and was at all times mentioned a citizen of the State of California.

75. Plaintiff, OSVALDO VERA, born October 14, 1987, who served on board of the USS Ronald Reagan as an Electronics technician, is and was at all times mentioned a citizen of Bremerton, Washington.

76. Plaintiff, BRANDON SMITH, born January 1, 1990, who served on board the USS Reagan as an Electronics Technician, is and was at all times mentioned a citizen of the State of California.

77. Plaintiff, DANIEL B LAWVER, born September 20, 1984, who served on board the USS Reagan as an Electronics Technician, is and was at all times mentioned a citizen of the State of California.

78. Plaintiff, LETICIA  MORALES, born 10 July 1979, was on board the USS Reagan who served as an Quality Assurance on the flight deck during all aircraft launches and recoveries, during maintenance, and as an inspector, is and was at all times mentioned a citizen of Mount Vernon, WA.

79. Plaintiff, MICHAEL ZITELLA, who served on the USS Ronald Regan, is

**SECOND AMENDED COMPLAINT FOR DAMAGES**

and was at all times mentioned a citizen of the State of California.

80. Plaintiff, JONATHAN COLBY ZAVITZ, born February 16, 1983, was stationed aboard the USS Fitzgerald as a SPY Fire control-man responsible for the ships phased array air search radar, is and was at all times mentioned a citizen of the State of California.

81. Plaintiff, JEDEDIAH IRONS, born October 8, 1986, was on the USS Ronald Reagan, is and was at all times mentioned a citizen of the State of New York.

82. Plaintiff, ANTHONY GARCIA, born November 9,1988, served as a USN-personnel aboard the USS Chancellorsville. GARCIA is and was at all times a citizen of the state of Wyoming.

83. Plaintiffs have only recently, within all the relevant statutes of limitation periods, discovered the facts pertaining to the nature and extent of their injuries, as well as the facts that show DEFENDANTS' conduct, including DEFENDANTS' negligent conduct in the construction, maintenance, management, and operation before, during and after the March 11, 2011 earthquake and tsunami. Within all the relevant statutes of limitation periods, Plaintiffs discovered the facts which prove that DEFENDANT TEPCO is the actual and proximate cause of their injuries, damages and harm. This delayed discovery tolls, both in equity and in law, the expiration of the statutes of limitation.

84. Plaintiffs "JOHN & JANE" DOES 1-70,000, are class members of the armed forces, their dependents, and support personnel, who served in a variety of capacities, and who are and were, at all times mentioned, citizens of the United States of America.

85. The DEFENDANT, TOKYO ELECTRIC POWER COMPANY, INC. aka TEPCO, (hereinafter, "TEPCO"), at all times herein mentioned, was and still is a foreign corporation, organized and existing under the laws of Japan, with its principal place of business situated at 1-1-3 Uchisai wai-Cho, Chiyoda-Ku, in the

city of Tokyo, Japan, and with offices located at Suite 720, 1901 L Street N.W., Washington, D.C. 20036.   In 2003, TEPCO registered as a California foreign corporation with the California Secretary of State. TEPCO is the largest electric utility in Japan and the 4th largest electric utility in the world. TEPCO enjoys billions of dollars in Revenue from electricity sales. During all times relevant, TEPCO conducted business as a foreign Corporation registered in the State of California. Hence, TEPCO is subject to the jurisdiction of this United States Federal District Court, which is empowered to enforce any Judgment against DEFENDANT.

86. The DEFENDANT, TEPCO, is a wholly owned public benefit corporation, and the government of Japan is its principal shareholder, charged with the responsibility to provide electric power to the people of Japan.

87. At all times herein mentioned, DEFENDANT TEPCO derived substantial revenue from its activities via goods used or consumed in the United States of America, and its several States, including the State of California, through its operation of the FNNP.

88. At all times herein mentioned, DEFENDANT TEPCO expected or should reasonably have expected its acts to have consequences in the State of California and elsewhere within the United States of America.

89. At all times herein mentioned the DEFENDANT TEPCO derived substantial revenue from interstate or international commerce.

90. At all times herein mentioned the DEFENDANT TEPCO owned the premises where the FNPP was situated, within the prefecture of Fukushima, Japan.

91. At all times herein mentioned the DEFENDANT TEPCO was one of the owners of the FNPP.

92. At all times herein mentioned the DEFENDANT TEPCO was a lessee of the FNPP.

**SECOND AMENDED COMPLAINT FOR DAMAGES**
12-CV-3032-JLS-WMc

93. At all times herein mentioned the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or DEFENDANT'S employees operated the FNPP.

94. At all times herein mentioned the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees constructed, maintained, operated, and controlled the FNPP.

95. At all times herein mentioned the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees managed the FNPP.

96. At all times herein mentioned the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees controlled the FNPP.

97. At all times herein mentioned the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees supervised the FNPP.

98. On or before March 10, 2011 the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees negligently attempted to perform repairs at the FNPP.

99. On or before March 10, 2011 the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees negligently inspected the FNPP.

100.    On or before March 10, 2011 the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees negligently constructed the FNPP.

101.    More than 40 years ago, the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees negligently designed and built the FNPP.

## DOE DEFENDANTS

102.    Plaintiffs do not know the true names and capacities, whether individual, corporate, associate, or otherwise of DEFENDANT Does 1 through 200 inclusive, and therefore sue these DEFENDANTS by such fictitious names. Plaintiffs will amend their complaint to allege their true names and capacities when this has been ascertained.

**RESPONDEAT SUPERIOR**

103.     All of the described conduct, acts, and failures to act are attributed to agents and employees under the direction and control, and with the permission, consent and authorization of DEFENDANTS. Said acts, conduct and failures to act were within the scope of such agency and/or employment, and each of the DEFENDANTS ratified the acts and omissions of each of the other DEFENDANTS. Each of these acts and failures to act is alleged against each DEFENDANT, whether acting individually, jointly, or severally. At all times relevant herein, each DEFENDANT was acting within the course and scope of his or her employment.

**STATEMENT OF FACTS**

104.     ON MARCH 11, 2011, before the PLAINTIFFS arrived, off the coast of Fukushima prefecture, TEPCO was negligent as revealed on December 12, 2013 by the former Prime Minister of Japan, Naoto Kan, who was in-office when the Fukushima disaster took place, admitted for the first time: "People think it was March 12th [2011] but the first meltdown occurred 5 hours after the earthquake." Tepco negligently hid this information from the public, including the U.S. Sailor First Responders who arrived during the afternoon on March 12, 2011 to provide, and did provide humanitarian aid to the victims of the earthquake and tsunami disaster. TEPCO was fully aware that the American responders would be exposed to hazardous levels of radiation, yet did not communicate this to the ships and to other responders. TEPCO had a duty to inform any and all persons who were, or would soon be in the vicinity of the FNPP, of the radiological hazards created by the meltdowns which had occurred and were in progress. TEPCO breached this duty, negligently causing injuries, damages and harm to PLAINTIFFS.

105.     On MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent, as revealed on Thursday 5, July 2012, when a Japanese Parliamentary Panel, The Fukushima Nuclear Accident Independent Investigation Commission, concluded that TEPCO was negligent in creating a meltdown that "occurred 5 hours after the earthquake":" The Commission accused TEPCO of negligently failing to take adequate precautions, despite evidence that the area was susceptible to powerful earthquakes and tsunamis. The Commission concluded that "the accident was clearly 'man-made'. "We believe that the root causes were the organizational and regulatory systems that supported faulty rationales for decisions and actions…"

106.     On MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent, as determined by the Commission, which found that Tepco showed a negligent "disregard for global [safety] trends and a disregard for public safety." The commission's chairman, Kiyoshi Kurokawa, a professor emeritus at Tokyo University, said in a scathing introduction that TEPCO's managers' "cultural traits had caused the disaster. He said: "What must be admitted-very painfully-is that this was a disaster Made in Japan". The 10-member commission is the panel which is investigating the Fukushima Daiichi accident. The report follows a six-month investigation involving more than 900 hours of hearings, and interviews with more than 1,100 people." [5]

107.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent as detailed in the report by the Fukushima Nuclear Accident Independent Investigation Commission. The Commission outlines TEPCO'S "errors and willful negligence" at the FNPP before

---

[5]  http://www.theguardian.com/environment/2012/jul/05/fukushima-meltdown-manmade-disaster

the earthquake and tsunami which devastated swaths of northeastern Japan on March 11, bluntly stating that TEPCO negligently created a "man-made disaster".[6]

108.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent as detailed in the report by the Fukushima Nuclear Accident Independent Investigation Commission, finding that the Fukushima plant operators: "…weren't prepared for nuclear accident." And the Commission concluded that TEPCO failed to properly prepare for the earthquake and tsunami, and that "the direct causes of the accident were all foreseeable prior to March 11, 2011."[7]

109.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO negligently "failed to correctly develop the most basic safety requirements-such as assessing the probability of damage, preparing for containing collateral damage from such a disaster, and developing evacuation plans."[8]

110.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent as evidenced by the "lack of training and knowledge of the TEPCO workers at the facility [which] reduced the effectiveness of the response to the situation at a critical time"[9]

111.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO'S managers were ineffective in "preventing or limiting the consequential damage" at Fukushima Daiichi.[10]

---

[6]  http://www.cnn.com/2012/07/05/world/asia/japan-fukushima-report/

[7]  Id

[8]  Id.

[9]  Id.

[10]  Id.

**SECOND AMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

112.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent, as admitted by TEPCO, which stated it "was not fully prepared for the nuclear disaster." TEPCO's final report on the disaster said it "did not have sufficient measures to prevent the accident. TEPCO's final report also acknowledged criticism that TEPCO took too long to disclose information."[11]

113.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent, as revealed by former Prime Minister Naoto Kan, who said, "TEPCO and the nuclear safety agency had hidden key details from him in the days after March 11, adding that he had been as open as possible with the public, based on the information he had been given. Kan said he feared further meltdowns that could result in the evacuation of Tokyo–a metropolitan area of more than 30 million people. Deserting the capital, he added, would have brought the government to a standstill and led to "a collapse of the nation's ability to function".[12]

114.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO operators of the Fukushima Daiichi nuclear power plant negligently ignored warnings that the complex was at risk of damage from a tsunami of the size that hit north-east Japan in March, negligently dismissing the need for better protection against seawater flooding. Tokyo Electric Power (TEPCO) officials rejected "unrealistic" estimates made in a 2008 internal report that the plant could be threatened by a tsunami of up to 10.2 meters. The tsunami that crippled backup power supplies at the plant on the afternoon of 11 March, leading to the meltdown of three (3) reactors, was more

---

[11]Id.

[12]  http://www.theguardian.com/world/2012/may/29/fukushima-inquiry-naoto-kan?guni=Article:in%20body%20link

than 14 meters high.[13]   The meltdown was caused by catastrophic "Loss of Coolant Accidents", resulting from the reactors' piping failing, breaking, splitting apart and cracking due to the earthquake.

115.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because the "Assessments of the aftermath of Fukushima tell a story of confusion at the site, and a lack of communication between TEPCO and safety officials. The Plant's manager, Masao Yoshida, took early retirement last year after being diagnosed with cancer.[14]

116.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because the company repeated its denial mantra to the public, including to the foreseeable rescuers such as the PLAINTIFFS: "There has been no meltdown," TEPCO repeated in the days after 11 March. "It was an unforeseeable disaster," TEPCO'S then president Masataka Shimizu famously and improbably said later. We now know that the meltdown was already occurring as TEPCO'S president spoke. The true facts are that, far from being unforeseeable, the disaster had been repeatedly forewarned since 2008 by industry critics.

117.     ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because Problems with the fractured, deteriorating, poorly repaired pipes and the cooling system had been pointed out for years. In September 2002, Tepco admitted covering up data about cracks in critical circulation pipes. In their analysis of the cover-up, The Citizen's Nuclear Information Centre writes: "The records that were covered up had to do with cracks in parts of the reactor known as recirculation

---

[13]  http://www.theguardian.com/world/2012/may/29/fukushima-inquiry-naoto-kan?guni=Article:in%20body%20link

[14]  Id.

pipes. These pipes are there to siphon off heat from the reactor. If these pipes were to fracture, it would result in a serious accident in which coolant leaks out."

118.    ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because on March 2, nine days before the meltdown, the government watchdog, the Nuclear Industrial Safety Agency (NISA), warned TEPCO regarding its failure to inspect critical pieces of equipment at the plant, including recirculation pumps. TEPCO was ordered to make the inspections and perform repairs if needed.[15]

119.    ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because Kei Sugaoka, who conducted on-site inspections at the plant and was the first to blow the whistle on TEPCO'S data tampering, says he was not surprised by what happened. In a letter to the Japanese government, dated 28 June, 2000, he warned that TEPCO continued to operate a severely damaged steam dryer in the plant 10 years after he pointed out the problem. "I always thought it was just a matter of time," he says of the disaster. "This is one of those times in my life when I'm not happy I was right."[16]

120.    ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent as explained by Katsunobu Onda, author of TEPCO: The Dark Empire.  Mr. Onda explains it this way: A government or industry admission "raises suspicions about the safety of every reactor they run. They are using a number of antiquated reactors that have

---

[15]  http://www.independent.co.uk/news/world/asia/the-explosive-truth-behind-fukushimas-meltdown-2338819.html

[16]  Id.

the same systematic problems, the same wear and tear on the piping." Earthquakes, of course, are commonplace in Japan.[17]

121.    ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent as uncovered by Mr. Onda's research. Mr. Onda spoke with several engineers who worked at the TEPCO plants. One told him that often piping would not match up to the blueprints. In that case, the only solution was to use heavy machinery to pull the pipes close enough together to weld them shut. Inspection of piping was often cursory and the backs of the pipes, which were hard to reach, were often ignored. Repair jobs were rushed.[18]

122.    ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because Mr. Onda adds: "When I first visited the Fukushima Power Plant it was a web of pipes. Pipes on the wall, on the ceiling, on the ground. You'd have to walk over them, duck under them-sometimes you'd bump your head on them. The pipes, which regulate the heat of the reactor and carry coolant are the veins and arteries of a nuclear power plant; the core is the heart. If the pipes burst, vital components don't reach the heart and thus you have a heart attack, in nuclear terms: meltdown. In simpler terms, you can't cool a reactor core if the pipes carrying the coolant and regulating the heat rupture-it doesn't get to the core."[19]  This is precisely what happened when the earthquake struck the FNPP.

123.    ON OR BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent as admitted by Tooru Hasuike, a Tepco employee from 1977 until 2009, and former general safety

---

[17] Id.

[18] Id.

[19] Id.

manager of the Fukushima plant, who stated: "The emergency plans for a nuclear disaster at the Fukushima plant had no mention of using seawater to cool the core. To pump seawater into the core is to destroy the reactor. The only reason you'd do that is that no other water or coolant was available"[20]

124.    ON OR BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because before dawn on March 12, 2011, as the water levels at the reactor began to plummet and the radiation began rising, a TEPCO press release published just past 4am stated: "The pressure within the containment vessel is high but stable." This was willfully false information, negligently deceiving the public, including first responders such as PLAINTIFFS.[21]

125.    ON OR BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent as evidenced by the fact that at 9:51pm, under the chief executive's orders, the inside of the reactor building was declared a no-entry zone. At around 11pm, radiation levels for the inside of the turbine building, which was next door to the reactor, reached levels of 0.5 to 1.2 mSv per hour. In other words, the meltdown was already underway.[22] The reactors were already melted or deeply involved in melting down.

126.    ON OR BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because seawater was not pumped in until hours after a hydrogen explosion occurred, at roughly 8pm.  Sometime between 4 and 6am, on March 12, Masao Yoshida, the

---

[20]  Id.

[21]  Id.

[22]  Id.

plant manager, decided it was time to pump seawater into the reactor core. By then, it was already too late.[23]

127.     ON OR BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO hid from the public, including PLAINTIFFS, **TEPCO'S Triple Meltdown, in Reactor 1, 2, and 3.** As the numbers indicate, Fukushima Daiichi 1 was the first plant to be built. All of the problems that are presently happening on that site, as well as all of the problems that happened with the tsunami, were created when they built Fukushima Daiichi 1 a hundred-foot drop that engineers built a road down to the water. And those power plants weren't there. They removed about 100 feet of dirt over the top of those power plants. So the decision to put Fukushima Daiichi near the water was designed and constructed by TEPCO in conjunction with General Electric and EBASCO, American Corporations. TEPCO negligently constructed Reactor 1, 2, and 3 down at sea level in the path of the known tsunami area. That negligent construction was a leading cause of the problem with the groundwater flooding the FNPP. The high area has a lot of groundwater in it, and water flows downhill, right into the basement of these power plants. The decision to cut away the bank that was made in 1965 by TEPCO and General Electric and EBASCO is a fundamental problem on this site because it is causing the basements to flood. In the 60's, there was a large, steep drop-off to the ocean which was leveled by engineers. The design decisions on Fukushima Daiichi 1, 2, 3 and 4 were made by TEPCO in conjunction with American engineers at GE and EBASCO. On the other side of the site are Fukushima Daiichi 5 and Fukushima Daiichi 6. They are further away from the water and they're physically higher. Obviously Tokyo Electric recognized that the General Electric decisions on Daiichi 1, 2, 3 and 4 were wrong, and when they built more reactors on the site

---

[23]  Id.

after the first 4 which were essentially carbon copies of each other, Daiichi 5 and Daiichi 6 were built far enough away from the ocean and high enough-they were another 10 feet higher-that when the tsunami hit, it didn't do anywhere near as much damage. [24]

128.    ON OR BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because in 1967, TEPCO chopped 25 meters off the 35-meter natural seawall where the reactors were to be located, according to documents filed at the time with Japanese authorities. That little-noticed action was taken to make it easier to ferry equipment to the site and pump seawater to the cooling components in the steam plant (the steam condensers) of the reactors. It was also seen as an efficient way to build the complex atop the solid base of bedrock needed to better protect the plant from earthquakes. But the razing of the cliff also placed the reactors five meters below the level of 14-to15-meter tsunami hitting the plant March 11, 2011, exacerbating the major nuclear disaster, specifically triggering a major nuclear disaster, resulting in the meltdown of three (3) reactor cores.[25]

129.    The DEFENDANT TEPCO created an increased risk of radiation exposure to the Plaintiffs by failing to provide them with warning of the actual increased risk of exposure resulting from the meltdown.  This failure to inform of the true risk of exposure also extended to the general public, public officials, persons and entities engaged in the humanitarian effort known as Operation Tomadachi, which dealt with the humanitarian consequences following the earthquake and the tsunami.  Plaintiffs were responding to provide humanitarian

---

[24]  http://www.globalresearch.ca/japans-triple-meltdown-tour-of-fukushima-daiichi-nuclear-power-plant/5353516

[25]  http://www.washingtonsblog.com/2013/11/tepco-destroyed-the-natural-seawall-which-would-have-protected-fukushima-from-the-tsunami.html

**SECOND AMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

aid necessitated by the earthquake and the tsunami.  They were NOT responding to the meltdowns. TEPCO did not warn Plaintiffs of any meltdown, nor the triple meltdown. TEPCO negligently created an illusory impression that the extent of the radiation that had leaked from the site of the FNPP was at levels that would not pose a threat to the Plaintiffs. They did so in order to promote their own interests, knowing that the information they disseminated was defective, incomplete and untrue, while failing to disclose the extraordinary risks posed to the Plaintiffs who were carrying out their assigned duties and humanitarian mission aboard the U.S.S. Ronald Reagan and other vessels of the 7th Fleet of the U.S. Navy, or elsewhere.

130.     ON OR BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because Naomi Hirose, president of the Tokyo Electric Power Company (TEPCO), admitted negligence: "After I became president [in 2012], we formed a nuclear safety review committee. We focused mainly on what we could do, what we could learn. We had a lot of data by then. Three other reports, one from the Diet [Japan's parliament], one from government. We had a lot of information. TEPCO'S own report, too. We concluded that we should have avoided that catastrophic accident, and we could have. We could see what we should have done. Preventative measures included fitting waterproof seals on all the doors in the reactor building, or placing an electricity-generating turbine on the facility's roof, where the water might not have reached it. In addition, wrong assumptions were made."[26]

131.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because they failed to have 12 volt batteries on the premises at FNPP to provide auxiliary power. TEPCO negligently failed nuclear power plant operation LESSON NO. 1: Emergency generators

---

[26] http://www.theguardian.com/environment/2013/nov/19/uk-government-new-plant-fukushima-nuclear-disaster-warning

**SECOND AMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

should be installed at high elevations or in watertight chambers. The isolation condenser (IC), which relied on convection and gravity to perform its cooling function, should have helped keep the water level high in unit 1's core through the crisis. But operators had turned off the system just before the tsunami by closing its valves-and there was no electric power to reopen them and let steam and water flow. Workers struggled to manually open the valves on the IC system.[27].

132.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO was not prepared with backup power. In the plant's parking lots, workers raised car hoods, grabbed the batteries, and lugged them back to the control rooms. They found cables in storage rooms and studied diagrams. If they could connect the batteries to the instrument panels, they could at least determine the water levels in the pressure vessels.[28]

133.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO failed nuclear power plant operation LESSON NO. 2: If a cooling system is intended to operate without power, make sure all of its parts can be manipulated without power. TEPCO did have a backup for the emergency generators: power supply trucks outfitted with high-voltage dynamos. That afternoon, emergency managers at TEPCO's Tokyo headquarters sent 11 power supply trucks racing toward Fukushima Daiichi, 250 km distant. They promptly got stuck in traffic. The roads that hadn't been damaged by the earthquake or tsunami were clogged with residents fleeing the disaster sites.[29]

134.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast

---

[27]  http://spectrum.ieee.org/energy/nuclear/24-hours-at-fukushima

[28]  Id.

[29]  Id.

**SECOND AMENDED COMPLAINT FOR DAMAGES**

of Fukushima prefecture, TEPCO was negligent because TEPCO failed nuclear power plant operation LESSON NO. 3: Keep power trucks on or very close to the power plant site. The containment vessel, which surrounds the pressure vessel, is a crucial line of defense: It is a thick steel hull meant to hold in any tainted materials that have escaped from the inner vessel. At 11:50 p.m., operators in the control room finally connected car batteries to the pressure gauge for the primary containment vessel. But the gauge revealed that the containment vessel had already exceeded its maximum operating pressure, increasing the likelihood that it would leak, crack, or even explode.[30]

135.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO failed nuclear power plant operation LESSON NO. 4: Install independent and secure battery systems to power crucial instruments during emergencies. In their initial, improvised response, the fire crew pumped water into the trucks' storage tanks, then drove close to the side of the reactor building and injected the water into the fire protection system's intake lines. It was 5:46 a.m. on 12 March when the first drops of water sprayed across the molten fuel. Then the workers drove back to the water tanks and began the slow, arduous operation all over again. Eventually workers managed to use the fire engine's hoses to connect the water tanks directly to the intake lines and established a steady flow of water. By midafternoon, they had injected 80,000 liters of water into the pressure vessel using this makeshift system. But it was too little, too late.[31]

136.    ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO failed nuclear power plant operation LESSON NO. 5: Ensure that catalytic hydrogen recombiners

---

[30]  Id.

[31]  Id.

(power-free devices that turn dangerous hydrogen gas back into steam) are positioned at the tops of reactor buildings where gas would most likely collect. The workers in charge of the venting operation took iodine tablets. It was a feeble attempt at protection against the radiation they'd soon encounter, but it was better than nothing. They gathered protective head-to-toe suits and face masks connected to air tanks. At 3:45 a.m., the vent crew tried to measure the radiation dose inside the reactor building, which had been off limits for 6 hours. Armed with handheld dosimeters, they opened the air lock, only to find a malevolent white cloud of some "gaseous substance" billowing toward them. Fearing a radiation steam bath, they slammed the door shut. They didn't get their reading, but they had a good indication that things had already gone seriously wrong inside the reactor[32]

137.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent, because TEPCO failed nuclear power plant operation LESSON NO. 6: Install power-free filters on vent lines to remove radio-active materials and allow for venting that won't harm nearby residents. The failure of reactor 1 made efforts to stabilize the other reactors exponentially more difficult: Now workers would be laboring in a radioactive hot zone littered with debris. In addition, when work crews returned to the power truck sometime after the explosion, they couldn't get the power flowing. So the disaster continued.[33]

138.     ON MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO had a history of negligently causing other nuclear accidents including, but not limited to, the following:

_____

[32] Id.

[33] **Id.**

a.   1981: almost 300 workers were exposed to excessive levels of radiation after a fuel rod ruptured during repairs at the Tsuruga Nuclear Power Plant.[34]

b.   December 1995: the fast breeder Monju Nuclear Power Plant sodium leak. State-run operator Donen was found to have concealed videotape footage that showed extensive damage to the reactor.[35]

c.   March 1997: the Tokaimura nuclear reprocessing plant fire and explosion, northeast of Tokyo. 37 workers were exposed to low doses of radiation. Donen later acknowledged it had initially suppressed information about the fire.[36]

d.   In 1999: A fuel loading system malfunctioned at a nuclear plant in the Fukui Prefecture and set off an uncontrolled nuclear reaction and explosions.[37]

e.   September 1999: the critical accident at the Tokai fuel fabrication facility. Hundreds of people were exposed to radiation, three workers received doses above legal limits, two of whom later died.[38]

f.   In 2000: Three Tokyo Electric Power Co. executives were forced to quit after the company in 1989 ordered an employee to edit out footage showing cracks in nuclear plant steam pipes in a video being submitted to regulators.[39]

---

[34]  http://en.wikipedia.org/wiki/Nuclear_power_in_Japan

[35]  **Id**.

[36]  **Id.**

[37]  **Id**

[38]  **Id**.

[39]  **Id**.

**SECOND AMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

g. August 2002: a widespread falsification scandal started, which led to the shutdown of all Tokyo Electric Power Company's 17 nuclear reactors; Tokyo Electric's officials had falsified inspection records and attempted to hide cracks in reactor vessel shrouds in 13 of its 17 units.[40]

h. In 2002: Two workers were exposed to a small amount of radiation and suffered minor burns during a fire at Onagawa Nuclear Power Station in northern Japan.[41]

i. In August 2004: four workers were killed after a steam explosion at the Mihama-3 station; the subsequent investigation revealed a serious lack in systematic inspection in Japanese nuclear plants, which led to a massive inspection program.[42]

j. In 2006: A small amount of radioactive steam was released at the Fukushima Dai-ichi plant and it escaped the compound.[43]

k. On July 16, 2007: a severe earthquake (measuring 6.8 on the Richter scale) hit the region where Tokyo Electric's Kashiwazaki-Kariwa Nuclear Power Plant is located and radioactive water spilled into the Sea of Japan; as of March 2009, all of these reactors remain shut down for damage verification and repairs; the plant with seven units was the largest single nuclear power station in the world.[44]

139. ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because

---

[40] **Id**.

[41] **Id**.

[42] **Id**.

[43] **Id**.

[44] **Id**.

Tepco's spokesman, Masayuki Ono, admitted that "up to 300 tons of highly contaminated water from the FNPP site were seeping into the sea and  had been leaking radioactive matter since the plant suffered a triple meltdown on 11 March 2011." One PLAINTIFF declared: "**ship was still taking in sea water - but obviously the ship can't filter out the radiation. Water we all showered with, drank, brushed our teeth, and had our food cooked with…**"

140. ON AND BEFORE MARCH 11, 2011, before the PLAINTIFFS arrived off the coast of Fukushima prefecture, TEPCO was negligent because TEPCO Minister Yoshihiko Noda is admitting that TEPCO created a man-made diaster, admitting liability and fault: "Tepco must compensate those affected with sincerity and generosity as well as carry out a thorough reorganization," and he wants Tepco to "speedily" pay compensation to victims of the Fukushima nuclear disaster."[45]

141. On March 14, 2011, the Navy published: "The U.S. 7th Fleet has temporarily repositioned its ships and aircraft away from the Fukushima Dai-Ichi Nuclear Power Plant after detecting contamination in the air and on its aircraft operating in the area. The source of this airborne radioactivity is a radioactive plume released from the Fukushima Dai-Ichi Nuclear Power Plant. Using sensitive instruments, precautionary measurements of three helicopter aircrews returning to USS Ronald Reagan after conducting disaster relief missions near Sendai identified [measureable] levels of radioactivity on 17 air crew members."[46]

## FIRST CAUSE OF ACTION
### (Negligence)
### Against all DEFENDANTS

142. Plaintiffs hereby incorporate the allegations contained in the preceding

---

[45]  http://www.nuc.berkeley.edu/node/5833

[46]  http://www.navy.mil/submit/display.asp?story_id=59065

paragraphs, as though fully set forth herein.

143. At all times herein mentioned, it was the duty of the DEFENDANT TEPCO, DEFENDANT'S servants, agents and/or employees to maintain said FNPP in a reasonably safe and suitable condition, and in good repair.

144. At all relevant times herein mentioned, the DEFENDANT, TEPCO, knowingly and negligently caused, permitted and allowed false and misleading information concerning the true condition of the FNPP to be disseminated to the public, including the U.S. Navy, Air Force, and Marines.

145. Prior to March 12, 2011, TEPCO knew that the U.S. Navy rescue mission personnel were in danger of being irradiated by spreading radiation from Unit 1 at the six-reactor, Fukushima-Daiichi nuclear complex. At least three other reactors were in danger of failing, including the spent fuel pool of reactor Unit 4, holding 1,535 bundles of irradiated fuel.

146. On March 11, 2011, before the USS Ronald Reagan and Carrier Strike Group 7 arrived two miles off the coast, Fukushima Unit 1 blew up. Then Unit 3 exploded, releasing plums of hydrogen gases migrating through a shared vent, which destroyed the containment building at Unit 4, exposing the spent fuel pool to the air. Unit 2 followed suit. Tokyo Electric Power Company (TEPCO) announced that most of the fuel in Units 1, 2, and 3 were intact. They were not intact. This was a false, misleading, a conscious negligent act and omission. The true facts were that the fuels in Units 1, 2, and 3 had fused into a molten mass and were oozing through the bottom of their destroyed reactors. TEPCO likewise hid, covered up, and negligently concealed these facts and falsely represented the true facts to the U.S. Navy. Plaintiffs suffered harms, damage and suffered, and continue to suffer, life threatening injuries as a result of TEPCO's negligence.

147. At all relevant times, DEFENDANT TEPCO was aware that the U.S. Navy and its personnel would provide rescue and humanitarian relief operations, including performance of their efforts to provide humanitarian assistance during its

**SECOND AMENDED COMPLAINT FOR DAMAGES**

relief mission to ferry food, blankets and water to the inhabitants of the ravaged city of Sendai, located within the prefecture of Fukushima, Japan, following the earthquake and tsunami on March 11, 2011.

148. At all relevant times herein mentioned the radiation produced at the FNPP does not occur naturally. Rather, the radiation releases were admittedly TEPCO'S negligent "man-made disaster."

149. The radiation, which was produced as a result of nuclear fission, was utilized to boil water in order to produce steam generated power.

150. At all relevant times the DEFENDANT, TEPCO, was aware that exposure to even a low dose of radiation creates danger to people's health, and was also aware of the importance of accurately reporting actual levels.[47]

151. As a consequence of the TEPCO'S negligence, the reactors were damaged and power to the cooling mechanism of the FNPP was interrupted, resulting in a meltdown of the fuel and reactors themselves, thereby triggering the release of high levels of ionizing radiation, including radioactive cesium.[48]

152. Nuclear radiation is a known human carcinogen that is linked to

---

[47] Numerous studies indicate that even low dose radiation poses a severe danger to health; see eg., "No Safe Dose - Japan's Low -Dose Radiation Disaster," http://rense.com/general95/no-safe-dose.htm; "Even Low-level radioactivity is damaging.  Broad analysis of many radiation studies finds no exposure threshold that precludes harm to life," http://www.sc.edu/news/newsarticle.php?nid=5214#.UKljmkvma6X; Meta-Review of 46 Studies: Even the Lowest-Level Radiation is Damaging to Human Health,

 http://www.washingtonsblog.com/2012/11/meta-review-of-42-studies-even-the-lowest-level-radiation-is-damaging-to-human-health.html

[48] At Fukushima, large releases of radioactivity apparently came from the concrete pools, where spent fuel rods, clad with a special alloy, were placed to cool down after their use in the reactors.  These spent fuel rods were extremely hot – up to 2,000 degrees Fahrenheit – and needed a constant circulation of cold water to keep them from burning up.

many human health problems. The U.S. Environmental Agency ("EPA") classifies it as a human carcinogen.[49]

_____

[49] According to experts, "[t]here is a near universal acceptance that epidemiological data demonstrates an excess risk of delayed cancer incidence above a dose of 0.1 sieverts.  All who met with Fukushima's radioactive fallout are probably to have some problem with the thyroid."  See http://enenews.com/watch-all-people-met-fukushimas-radioactive fallout-problem-thyroid-many-tokyo-already-developing-problems-video;

Nuclear expert Claudia French, who was professor emeritus of molecular and cell biology at UC Berkeley, who worked on the "Manhattan Project" on uranium effects, and established the Biomedical Research Division of the Lawrence Livermore National Laboratory, wrote in his 1990 book that "by any reasonable standard of biomedical proof" there is no threshold level (no harmless dose) of ionizing radiation with respect to radiation mutagenesis and carcinogenesis – a conclusion supported in 1995 by a government-funded radiation committee.

"The results of surveys and biological monitoring of children and adults of Chernobyl point unambiguously to a steady, rapid and dramatic deterioration of health of all victims of the impact of the Chernobyl accident," wrote Drs. E.B. Burlakova and A.G. Nazarov of the Emanuel Institute of Biochemical Physics, Russian Academy of Sciences, Moscow.  Most interesting, the go on to say, "The dose dependence of the radiation effect may be non-linear, non-monotonic and polymodal in character.  Over certain dose ranges, low-level irradiation is more devastating with regard to the results of its action on an organism or a population than acute high-level radiation."

Moreover, Dr. Ernest J. Sternglass, professor emeritus of radiation physics at the University of  the Pittsburgh School of Medicine, in his book, Secret Fallout – Low-Level Radiation From Hiroshima To Three-Mile Island, indicated that the risk increased with each additional picture.  This clearly suggests that there was no significant healing of the damage and thus that the cancer-causing effects of radiation were cumulative.

Exposure to radiation causes a cascade of free radicals that wreak havoc on the body.  Radiation also decimates the body's supply of glutathione, which allows free radicals to run rampant through the body's tissues and organs.

153. When radiation from a reactor is spilled or leaks, it contaminates the environment and poses a serious health threat to humans and other species. The greater the concentration of radiation that escapes from the reactor or fuel rods, the higher the risk to humans, creating an enhanced threat to human health.

154. Radiation does not readily break down and does not biodegrade in the ground or water or apparatus exposed to it. Research shows that it will persist in the environment for decades, since it has a half-life in excess of 77 years, far longer than the life expectancy of humans exposed to it.

155. The FNPP was constructed at Fukushima more than 40 years ago. According to a local labor commission, low-skilled workers, illegally recruited in Japan's poorest areas, were used in building the nuclear power plant in the 1960s. The poor quality of construction, as well as structural defects and personnel negligence eventually triggered the disastrous consequences on March 11, 2011.

156. During their lifetimes before March 12, 2011, the Plaintiffs, and each of them, had never been exposed to harmful levels of radiation, including the time they served aboard the U.S.S. Ronald Reagan (CVN-76), aboard other vessels within the strike force, on land or air or sea, or at any other times or places.

157. As a direct and proximate result of the wrongful acts and negligence of TEPCO, as described above, Plaintiffs suffered damages as alleged herein.

158. DEFENDANT TEPCO controlled all of the activities at the FNPP, and therefore is solely responsible for the enhanced threat of radiation exposure and for causing the damages alleged in this Complaint.

159. Only due to concerned nuclear whistle blowers whose information

was considered by outside experts after March 11, 2011, does the public, including the Plaintiffs herein, now not have to rely upon the glib and technically inaccessible reports from DEFENDANT herein.[50]

---

[50] Web sites such as "enews.com"; "fukushima-diary.com" and "rense.com" have operated as information clearing houses for mainstream news, academic studies and independent sources of publication about the nuclear crisis in Japan.

Professor Jeff Kingston of Temple University in Tokyo has presented a thorough chronology of the Fukushimka nuclear crisis from the political perspective and also opines that the disaster "was preceded by a series of mishaps, cover-ups, irresponsible practices, close calls and ignored warnings . . . it was an accident waiting to happen."  As he explains in "Mismanaging Risk":

So who is to blame for the three meltdowns at Fukushima?  The nuclear village tried to shift the blame onto PM Kan, spreading erroneous information about his visit to Fukushima Daiichi to the effect that he forced TEPCO to stop venting and subsequently alleging he ordered the halt of pumping of seawater to cool the reactors and spent fuel rods in adjacent pools . . . but this was TEPCO's responsibility and had nothing to do with the Kan's visit on March 12 . . . TEPCO retracted its allegations against Kan, but not before damaging Kan's reputation . . . Scapegoating Kan served many purposes, especially diverting attention away from TEPCO's, NISA's and METI's responsibility and for the accident and woeful crisis response. . . .

The third party panel that investigated the nuclear crisis . . . was harshly critical of TEPCO and the government, pointing out that the utility was ill-prepared for a crisis and that its' workers made critical errors . . . workers and their managers were inadequately trained to cope with an emergency situation. . . . Their mishandling of emergency procedures contributed to the crisis.

The investigators also pilloried TEPCO and the government's mishandling of the evacuation of residents living near the plant, in many instances evacuating people to places where levels of radiation were higher than those where they had left. . . .

The panel confirmed that data generated by the System for Prediction of Emergency Dose Information (SPEEDI) on radiation dispersal was available and could have been used to evacuate residents at greatest risk to safer areas, but this information was not provided to the Prime

160. Such reports were widely circulated within the DEFENDANT TEPCO's organization at the time it was published, despite the fact that the DEFENDANT knew that much higher levels of radiation existed within the area where the Plaintiffs and their vessels or rescue missions were operating.[51]

161. DEFENDANT TEPCO's management publicly claimed that there was no danger to persons, including the Plaintiffs, who were carrying out their assigned mission during "Operation Tomadachi."

162. Privately, however, the DEFENDANTS were aware of the true and

Minister's crisis management center until March 23. . . . [O]ne month after the original evacuation, the government used this SPEEDI data to move evacuees out of harm's way, meaning that many had been subjected to substantial doses of avoidable radiation exposure.

TEPCO and its regulators . . . failed to act on fresh and compelling evidence about tsunami risk, a blind spot that left the plant needlessly vulnerable. . . . Telltale warnings began accumulating over the decade prior to 3/11 tsunami. . . . Clearly there is no basis to TEPCO's claim that the scale of the 3/11 tsunami was inconceivable; the utility chose to ignore centuries of geological evidence and repeated 21st century warnings from modern scientists, including in-house researchers. . . . Inexcusably, TEPCO did not make safety its ethos while lax oversight by the government allowed this culture of complacency to persist long after it was obvious that TEPCO was cutting corners to cut costs."

Mismanaging Risk and the Fukushima Nuclear Crisis, http://japanfocus.org/-Jeff-Kingston/3724

[51] Shortly after the nuclear accident on March 11, 2011, it became apparent that Japan's "downplaying" of the disaster was leading to "informational uncertainty." "It is absolutely imperative that Japanese officials become more transparent in their crisis communication.  It is equally imperative, as this present crisis makes clear, that officials around the world realize the severe harm that can be inflicted by the obfuscation and distortion of critical information in the wake of catastrophe."

Downplaying Disaster, Informational Uncertainty in the Wake of Japan's Nuclear Crisis,

dangerous condition of the zone in which the Plaintiffs were operating.

163. Belatedly, after March 12, 2011, DEFENDANT TEPCO prepared and circulated a memo that stated: "We agree that radiation is greater within the zone and that "[b]ecause of its levels subsequent to the tsunami's occurrence, from an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to remedial requirements."

164. DEFENDANT TEPCO was also aware that the potential health risk was far greater than its agents were reporting.

165. DEFENDANT's acts, including those of its agents within the government of Japan, amounted to negligent acts and omission regarding the safety of those operating within the zone of radiation. Communications from TEPCO demonstrate the difference between DEFENDANT's actual knowledge of the true properties and condition of the area around the FNPP, and their public posture and pronouncements regarding the levels of exposure, and are evidence of DEFENDANT's misconduct at the time.

166. Despite the duty arising from such unsupported assurances of safety, DEFENDANT TEPCO breached said duty to properly disclose its knowledge of the true risks of the levels of radiation within the area subsumed in "Operation Tomadachi."

167. Despite having knowledge of the inevitability of radiation exposure to the PLAINTIFFS and others in the area, DEFENDANT TEPCO chose not to warn the PLAINTIFFS, the U.S. Navy, public officials, or the general public.

168. DEFENDANT TEPCO intentionally and knowingly made misleading environmental claims with knowledge that these claims of environmental safety were untrue, to the PLAINTIFFS' detriment.

169. The intentional and tortious conduct of the DEFENDANT TEPCO was

aimed at and encompassed the entire area surrounding the FNPP, including the waters, land and air adjacent to the Fukushima FNPP, where the PLAINTIFFS were employed and operating.

170. DEFENDANT TEPCO knew or, in the exercise of due care, should have known that the PLAINTIFFS, among several thousand other crewmen aboard the U.S.S. Ronald Reagan (CVN-76), as well as others, would be directly and harmfully impacted by DEFENDANT TEPCO's conduct.

171. Honesty and fair-dealing is a basic and most precious resource, as well as a fundamental commodity of incalculable value. The PLAINTIFFS and the U.S. Navy had the right to know the actual conditions they would confront during "Operation Tomadachi."

172. Upon information and belief, based upon currently available data, through its conduct, the DEFENDANT TEPCO rendered the PLAINTIFFS infirm and poisoned their bodies.

173. The PLAINTIFFS must now endure a lifetime of radiation poisoning and suffering which could have and should have been avoided.

174. Upon information and belief, the DEFENDANT TEPCO failed to timely and adequately test the water to which the PLAINTIFFS were exposed in order to detect contamination.

175. Upon information and belief, the DEFENDANT TEPCO, its agents, servants and/or employees failed to perform proper and adequate testing within the theater of their operation of the radiation levels to which the PLAINTIFFS and/or their vessels would be exposed, to the PLAINTIFFS' detriment.

176. On or about March 11, 2011 and thereafter, the DEFENDANT TEPCO never warned the PLAINTIFFS, or the general public about the actual or potential level of radioactive contamination there and then existing.

177. Upon information and belief, the DEFENDANT TEPCO constructed and

**SECOND AMENDED COMPLAINT FOR DAMAGES**

operated the FNPP with the knowledge that the nuclear fuel had a potential to leak, or in reckless disregard of knowledge as to whether or not the FNNP could leak radiation into the environment.

178. As owner, operator and/or promoter of nuclear power, DEFENDANT TEPCO had a duty to the PLAINTIFFS arising from, among other things, its: (a) vastly superior knowledge and resources than those of the PLAINTIFFS; (b) material negligent representations and/or omissions concerning the levels of radiation contamination; and (c) marketing, promotion and sales of power generated by nuclear fission, without warning of the foreseeable adverse impact it would have on the environment in which PLAINTIFFS were operating.

179. DEFENDANT's duties included, but are not limited to, the duty: (a) to reasonably protect PLAINTIFFS' health and well-being; (b) to timely inform public officials and the PLAINTIFFS of the level of actual or potential spills from the FNPP and its storage tanks and reactors; (c) to timely warn public officials and the PLAINTIFFS of the nature and risks they would confront; (d) to warn public officials and PLAINTIFFS of the properties that make radiation a threat to their health and well-being; (e) to timely warn all persons, including the PLAINTIFFS, who relied upon their representations, despite the propensity of radiation from the FNPP to move great distances upon being released into the environment, as well as its potential health risks and noxious properties and the need for timely and adequate testing; and (f) such other duties as may be shown during discovery and at trial.

180. DEFENDANT TEPCO breached its duties, causing damages, including damages to the PLAINTIFFS, caused by contamination of their bodies with radiation, with dire consequences to their physical and emotional well-being.

181. DEFENDANT TEPCO also knew or should have known that the system it was using for storing spent fuel rods and for the containment of radiation and utilization of nuclear material at the FNPP was faulty, inadequate and leaking.

182. DEFENDANT TEPCO also knew or should have known that the radiation released at the FNPP is remarkably recalcitrant to natural degradation and, once dispersed into the environment, is extremely difficult to clean up.

183. According to data existing at that time, and uniquely known to the DEFENDANT at the time, the PLAINTIFFS' consequent exposure to radiation within their zone of operation indicated that radiation levels had already reached levels exceeding the levels of exposure to which the people living the same distance from Chernobyl experienced, and who subsequently developed cancer.[52]

184. Consequently, the potential for the development of cancer in the PLAINTIFFS

has also been dangerously heightened, due to the levels of exposure experienced by them during "Operation Tomadachi."

185. The kind of misleading communication engaged in by the DEFENDANT utterly failed to alert public officials, including the U.S. Navy, the PLAINTIFFS, and the general public to the danger of coming too close to the FNPP, and completely omitted the kind of detailed directions and precautions that would have been required to avoid the contamination of PLAINTIFFS with radiation.

186. The conduct of the DEFENDANT TEPCO was extreme and outrageous and/or so reckless and/or wantonly negligent as to be the equivalent of a conscious disregard of the rights of the Plaintiffs, entitling them to recover punitive damages.

---

[52] The nuclear community has now created a special rating system for Fukushima – assigning it to a new category, above Chernobyl, as a no. 8 level nuclear disaster. Fukushima is a "[m]ulti-source major nuclear accident requiring international assistance and monitoring.  See Nuclear incident scales: http://www.coasttocoastam.com/pages/portzline-images;
Measured as quadrillions or petabecquerals (10 to the 15th Power) See, Becqueral: http://www.//wikipedia.org/wiki/Becquerel , the radiation was comparable to Chernobyl, being well over half, if not equivalent in volume.  See, Chernobyl: Assessment of Radiological and Health Impact 2002 Update of Chernobyl: Ten Years On, http://www.oecd-nea.org/rp/chernoble/c02.html

This conduct includes, but is not limited to: (1) manufacturing and marketing power from the FNPP causing radiation exposure despite specific actual knowledge of a serious defect that led inevitably to the contamination of PLAINTIFFS' bodies; (2) intentionally misrepresenting and concealing the true levels of radiation existing at and around the FNPP between March 10-11, 2011 and thereafter; (3) marketing and promoting power generated at the FNPP as environmentally safe and beneficial, despite specific knowledge to the contrary; (4) storing and continuing to store radioactive fuel rods at the FNPP, despite knowledge that the cooling tanks were leaking; (5) failing to issue any warnings to the PLAINTIFFS as to the health dangers of their continued exposure to the air and water adjacent to the FNPP; (6) conducting inadequate testing and inaccurately representing and reporting to the PLAINTIFFS that their presence aboard the U.S.S. Reagan at the locations where they were operating was safe, in disregard of the true facts; (7) failing to accept financial responsibility for damages caused to the PLAINTIFFS who rely upon their physical and mental well-being in order to perform their assigned duties and provide for their families, which is now compromised due to excessive radiation contamination.[53]

187. As manufacturer, distributor, seller, supplier, marketer and, promoter of nuclear power, DEFENDANT TEPCO had a duty to ensure that the product when used as intended was reasonably safe to property, air and water upon which the PLAINTIFFS relied, and DEFENDANT failed to exercise due care and caution.

188. DEFENDANT had the clear duty and the financial means to determine

---

[53] The purposes of punitive damages are to punish a defendant and to deter similar acts in the future.

Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law. Ninth Circuit Manual of Model Jury Instructions Civil: 5.5 Punitive Damages.

whether any latent defects existed at the FNPP, including its storage facilities, and to warn PLAINTIFFS and public officials of the latent defects known to them, their agents and employees.  The DEFENDANT breached this duty.

189. DEFENDANT TEPCO breached its duty to warn the PLAINTIFFS who relied

upon TEPCO'S expertise and pronouncements.

190. DEFENDANT TEPCO affirmatively and voluntarily undertook to conduct and report research related to the environmental hazards and benefits of the continued operation of the FNPP, and failed to exercise due care and caution in connection with said undertaking.

191. DEFENDANT TEPCO, its agents, servants and/or employees breached their duties and committed acts of negligence toward the PLAINTIFFS in the design, manufacture, marketing and/or sale of nuclear power, including but not limited to failing or failing to adequately ensure the integrity of their reactors and/or storage tanks at the FNPP before the earthquake and tsunami; failing to provide warnings or adequate warnings of the enhanced risk to health posed by supplying and storing nuclear fuel to the FNPP; and intentionally, recklessly and/or negligently concealing and/or omitting to disclose the true facts  about the levels of radiation at and near the FNPP, and of the true facts of the condition of the roof storage tanks and reactors at said location.

192. DEFENDANT TEPCO, its agents, servants and/or employees knew, or in the exercise of reasonable care should have known that the levels of radiation at the FNPP posed a greater and enhanced hazard to land, air and water as described above, that contact with and/or ingestion of radiation posed a threat to the health and well-being of the PLAINTIFFS and those  persons utilizing sea water in an effort to decontaminate the U.S. Reagan (CVN-76), its attached helicopters, and otherwise potable water, that they contained radiation at a level of concern as a human carcinogen, and that the PLAINTIFFS would suffer injury to body and

mind, property damage, and other hardship from the contamination and loss of their air and water supply.[54]

193. DEFENDANT's negligence proximately caused widespread contamination of PLAINTIFFS' environs, including their air and water supply.

194. PLAINTIFFS have suffered and been damaged, all as described above and herein, as a direct and proximate result of DEFENDANT's negligence.

195. Upon information and belief, as a further direct and proximate result of DEFENDANT's negligence, PLAINTIFFS have been and will be required to undergo further medical testing, evaluation and medical procedures, including but not limited to chelation therapy, bone marrow transplants and/or genetic re-programming for leukemia, in an effort to seek cure, and will be required to employ extraordinary means to achieve cure.

196. As a further direct and proximate result of DEFENDANT's negligence, the PLAINTIFFS incurred losses and damages for personal injury and property damage, loss of use and enjoyment of life and their property, the need for periodic medical examination and treatment, and economic losses, including wage loss, and the expenditure of time and money, and will continue to incur losses and damages in the future.

197. PLAINTIFFS also face additional and irreparable harm to their life expectancy which has been shortened and cannot be restored to its prior condition.

---

[54] TEPCO has admitted that "a total of about 10 becquerals per hour of radioactive cesium was being emitted from the No. 1 to No. 3 reactors as of June.  That is about one-80 millionths of the level that was being spewed immediately after the accident."  After 500 days, Fukushima No. 1 Plant Not Out of the Woods,

 http://ajw.asahi.com/article/0311disaster/fukushima/AJ201207240087

While the worst Chernobyl had to offer was pretty much over after it had blown its lid, Fukushima still releases vastly greater amounts of harmful radiation due to the nuclear fuel that remains at the site.

**SECOND AMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

198. Solely as a result of the DEFENDANT's negligence, carelessness and recklessness, the PLAINTIFFS suffered severe and serious personal injuries to mind and body, and further, the PLAINTIFFS were subjected to great physical pain and mental anguish.

199. By reason of the foregoing, the PLAINTIFFS were severely injured and damaged, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are believed to be permanent in nature and duration, and the PLAINTIFFS will permanently suffer pain, inconvenience and other effects of such injuries; the PLAINTIFFS incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries; and the PLAINTIFFS will be unable to pursue their usual duties with the same degree of efficiency as prior to this incident, all to the PLAINTIFFS' great damage.

200. The DEFENDANT's conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, and more particularly, the rights, life and safety of the PLAINTIFFS; and was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations.

201. Due to DEFENDANT's negligence, each of the PLAINTIFFS is entitled to compensatory damages in a sum to be determined by the jury, plus punitive damages in a sum equal to treble the damages determined to be adequate by the jury.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided

## SECOND CAUSE OF ACTION
### (Strict Liability Failure to Warn)
### Against all DEFENDANTS

202. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

203. As manufacturer, designer, distributor, supplier, seller and marketer of nuclear power, the DEFENDANT had a duty not to put a product in the market that poses a serious danger to land, air and soil without issuing warnings of the risk posed by the product to the PLAINTIFFS, the public, and public officials during "Operation Tomadachi."

204. DEFENDANT breached this duty by manufacturing, distributing, selling and marketing power produced by nuclear reaction with the actual or constructive knowledge that the product posed a high degree of risk to the safety and well-being of the PLAINTIFFS, without issuing any warnings or without sufficient warnings of the enhanced risk.

205. DEFENDANT breached this duty by manufacturing, distributing, selling and generating nuclear power at the Fukushima Daiichi reactors and by improperly storing nuclear fuel rods at the FNPP with the actual or constructive knowledge that the product posed a high degree of risk to the safety and health of the PLAINTIFFS, without issuing any warnings or without sufficient warnings of the enhanced risk.

206. DEFENDANT had actual and/or constructive knowledge that radiation would be released into soil, air and water upon which the PLAINTIFFS would rely. DEFENDANT had actual and/or constructive knowledge of the properties of radiation that would ensure that, once released into the environment, radiation would spread further and in concentrations that would cause injury to the PLAINTIFFS.

207. DEFENDANT represented and warranted that the levels of contamination to which the PLAINTIFFS would be exposed were less than harmful to them and that their presence during "Operation Tomadachi" would not cause any different or greater harm to them than they might have experienced on missions in the past.

208. At all relevant times, the DEFENDANT knew that the reactors and storage tanks at the FNPP were then leaking and emitting high levels of radiation.

1.  DEFENDANT knew that the U.S. Navy would necessarily operate the U.S.S. Reagan (CVN-76) with its crew of approximately 5,500 aboard, as well as other vessels in the waters adjacent to the FNPP, without the benefit of independent inspection or evaluation of the area for defects, and in reliance upon the veracity and completeness of representations made by the DEFENDANT.

209. At all relevant times herein, the DEFENDANT failed to warn the public, including PLAINTIFFS, of the properties and actual levels of radiation detected at the FNPP at that time.

210. At all relevant times herein, by example the DEFENDANT failed to warn the public, including PLAINTIFFS, that the levels of radiation in the waters adjacent to the FNPP posed significant threats to human, animal and aquatic health; created a need for those living or working aboard vessels in the adjacent waters to conduct frequent tests to determine the actual level of radiation exposure; failed to warn as to the actual risks and protective measures necessary to ensure the PLAINTIFFS' well-being; and failed to issue other required warnings as may be shown at trial.

211. The DEFENDANT knew or should have known of the properties and characteristics of radiation exposure that comprise the risk and danger which is different in kind, degree and magnitude from the risks and dangers inherent in the performance of the PLAINTIFFS' duties in non-nuclear radiation zones.

212. The public, including the PLAINTIFFS, the U.S. Navy, and other branch services were unaware of the true levels of such risks, which were not of a kind that they would ordinarily discover or could protect themselves against in the absence of sufficient warnings by DEFENDANT TEPCO.

213. Once DEFENDANT TEPCO became aware of the actual levels of contamination and decided to withhold such vital and accurate information as to those levels around the FNPP, including the zone in which the PLAINTIFFS were

performing their assigned duties, harm to the PLAINTIFFS was inevitable and could not be avoided or minimized due to the absence of warnings.

214. DEFENDANT's conduct was unreasonable in the circumstances. As set forth above, available scientific data, of which the DEFENDANT had actual or constructive knowledge, gives rise to the reasonable inference that the alleged dangers existed and were foreseeable.

215. DEFENDANT's failure to warn the PLAINTIFFS and others, as alleged herein, proximately caused reasonably foreseeable damages to the PLAINTIFFS. The harm to the PLAINTIFFS proximately caused by DEFENDANT's wrongful conduct includes those injuries and damages herein alleged.

216. By engaging in said conduct, the DEFENDANT's misconduct constituted a defective or unreasonably dangerous practice because of the DEFENDANT' failure to warn, for which DEFENDANT is strictly liable to PLAINTIFFS.

217. At all times herein mentioned, DEFENDANT TEPCO acted with malice, fraud and oppression, and engaged in despicable conduct that should not be tolerated in a civilized society, displaying a conscious, willful and intentional disregard for the health, safety and welfare of the public, the environment and the PLAINTIFFS. As a result of TEPCO'S conduct, PLAINTIFFS are entitled to punitive damages, as a means of protecting the public by deterring such wanton, callous and intentionally injurious conduct.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided

### THIRD CAUSE OF ACTION
**(Strict Liability for Design Defect)**
**Against all DEFENDANTS**

218. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

219. The DEFENDANT TEPCO during the relevant time period was the
    designer,

manufacturer, and creator of the FNPP.

220. DEFENDANT had a duty of due care to design and manufacture a reasonably safe FNPP.

221. DEFENDANT had a duty of care to test the FNPP to determine the risks posed to the environment generally, water, and air in the surrounding vicinity.

222. DEFENDANT had a duty not to put on the market an unsafe and defectively designed product that posed a serious danger to the PLAINTIFFS' and others' health and well-being.

223. DEFENDANT breached said duties of due care when it manufactured a defectively designed product, namely the FNPP, with actual or constructive knowledge of the defects.[55]Due to the design defect, the FNPP was not reasonably

---

[55] There exists an accumulation of evidence that the earthquake itself was the primary cause of the meltdowns, something [TEPCO] does not want to admit–that there are other inherent flaws in the way the power plant was built and operated. See Report on Nuclear Disaster Holds Key to Reactor's Fate,

http://online.wsj.com/article/SB10001424052702304441405774821136 58775518.html

Nuclear expert Gundersen points out that the service pumps failed because they were positioned in such a way that they were flooded by the tidal wave on 311. These pumps send water from the ocean to cool the back-up diesel generators. "There could have been 14 meltdowns and not three. If you look at the data, there were six units at Fukushima Daiichi (Power Station No. 1), there are four at Fukushima Daini (Station No. 2), three at Onagawa and one at Tokai. The net affect is that there were 37 diesel generators between those plants. 24 of those diesels were knocked out by the tsunami. You need the diesels to cool the plant." At FNPP no. 1 the tsunami flooded the actual diesel generators, but at the other plants, the "tsunami knocked out the cooling water to the diesels, something called service water. So, Japan narrowly missed 14 meltdowns and not three because the cooling water to 24 of 37 diesels was destroyed." See Gundersen, July 6, 2012, Pacifica Radio Host Ian Masters and Fairewinds' Arnie Gundersen: Lessons Not

safe and protective of the environment generally and PLAINTIFFS', among others, health and well-being.

224. Any utility of nuclear generated power does not outweigh the risks inherent in manufacturing and maintaining a FNPP designed in that manner.[56]

225. The defective design of the DEFENDANT's FNPP, as alleged herein, proximately caused reasonably foreseeable damages to the PLAINTIFFS.

226. The DEFENDANT's conduct in the design, manufacture, and maintenance of the FNPP, a defective or unreasonably dangerous product, makes DEFENDANT TEPCO strictly liable to the PLAINTIFFS.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided.

## FOURTH CAUSE OF ACTION
### (Public Nuisance)
### Against all DEFENDANTS

227. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

228. The DEFENDANT has manufactured, distributed, marketed and promoted their product in a manner that has unreasonably endangered or injured the property, health, safety and comfort of the PLAINTIFFS, causing inconvenience and annoyance.

229. The DEFENDANT, by its negligent, reckless and willful acts and

---

Learned From Fukushima Daiichi, http://www.fairewinds.com/radio; SolariIMG Podcast with Arnie Gundersen–Aug 10/2012, http://solarimg.org/?p=3021

[56] **Error! Main Document Only.**The FNPP site is fraught with danger, with constant reports of highly toxic water leaking from this pipe or that, or this reactor or that.  For example, water in Unit 2 turbine basement was found to have 47 million becquerels per liter.  Unit 2 Water 10 Times More Radioactive than Unit 1,

 http://enenews.com/unit-2-10-times-more-radioactive-than-unit-1-47000000-Becquerals-per-liter-in-turbine-room-basement

omissions as set forth above, has caused and permitted radiation contamination to a growing number of people who participated in "Operation Tomadachi" and others. This contamination has migrated, or threatens to continue to migrate into the environment, thereby contaminating the earth.[57]

---

[57] The level of cesium being emitted 500 days after March 11, 2011 was down from a peak of thousands of trillions of becquerals at the time of the reactor explosions." See <u>Fukushima Derived Radinuclides in the Ocean and Biota Off Japan,</u>

http//www.pnas.org/content/early/2012/03/26/1120794109.full.pdf=html?with-ds=yes;
<u>Scientists: Far more Cesium Released than Previously Believed</u>:

http://ajw.asahi.com/article/0311disaster/fukushima/AJ201202290025

A terabecquerel is a trillion Becquerals, a commonly used measure of radiation emitted by radioactive material.  So the New York <u>Times</u> is saying that early on 900,000,000,000,000,000 becquerals were released in the first 20 days of the nuclear disaster.  Radiation can damage the human body by breaking the chemical bonds in one's cells.  The amount of damage done depends on how much radiation one is exposed to.  This in turn depends on how much radioactive material is present in our environment, our food and so on.

"The greatest human experiment with radiation exposure is taking place in the Ukraine and Byelorussia, where much of the 50 million curies the Soviet government says were released by the 1986 accident at Chernobyl is being felt. . . . Chernobyl legacy could include hundreds of thousands of additional cancer deaths. . . . Current estimates predict anything from 14,000 to 475,000 deaths worldwide from Chernobyl."  (A curie measures the intensity of radiation and is equal to 37 billion disintegrations per second.  As a reference point, the Hiroshima and Nagasaki bombs released an estimated one million curies.)  It should also be noted that Belarusian scientists reported an increase in a rare childhood thyroid cancer to 5,000 times its spontaneous occurrence in "clean" countries. According to the 2000 report on Minsk's United Nations Development Program (UNDP), life expectancy in Belarus in the 1960s was almost level with that in Western Europe.  By 1999, 13 years after Chernobyl, it had fallen 12-14 years for men and 7-9 years for women. A baby born in rural Belelrus today can expect to live 59 years. But they may be

230. Actual and threatened radiation contamination caused by the DEFENDANT's conduct has damaged PLAINTIFFS' health and substantially and has unreasonably interfered with PLAINTIFFS' use, benefit and enjoyment of their properties, in a way that an ordinary, reasonable person would find, resulting in substantial inconvenience, annoyance and injury.

231. The ongoing conditions found site-wide at the FNPP and country-wide, have caused and are causing a material loss of good health because of actual and threatened continued radiation contamination and exposure.

232. PLAINTIFFS, who were exposed to excessive levels of radiation, suffer special damages because, unlike the general public, they are at a heightened risk of developing injuries related to their exposure, including cancer.

233. PLAINTIFFS' special damages also include loss of health and increasingly

very hard years, given that nearly half of Belarus' teenagers have serious health problems, with 45-47% of high school graduates suffering from physical disorders like gastrointestinal anomalies, weakened hearts, and cataracts; 40% of them have chronic "blood disorders" and malfunctioning thyroids. The number of handicapped adolescents has tripled in the last decade. It has always been known that ionizing radiation, in higher doses than background levels, can cause measurable increases in cancers and leukemias, as well as cause genetic mutations that affect future generations.

Thus, the New York Times has reported that in terms of radiation released in the first 20 days by the FNPP, 900,000 terabecquerels translates into 27 million curies. It is over a year later and no one knows or is saying how much aggregate radiation has been released, but clearly it's a staggering amount.

One curie is the amount of radiation equal to the disintegration of 37 billion atoms – 37 billion becquerals – per second. Obviously, it is a very large amount of radiation. If one multiplies these amounts (27 million curies times 37 billion radioactive atoms), the result is just a little more than 900,000 terabecquerels . . . all the way up to 999,000,000,000,000,000 becquerals, which translates into 999,000,000,000,000,000 nuclear particles decaying in the first 20 days after the Fukushima nuclear nightmare.

widespread necessity to seek treatment. Their future medical conditions have been rendered less certain, unsafe and unreliable. As a result, PLAINTIFFS suffer loss of enjoyment of life and fear, among other injuries.

234. The DEFENDANT knew or in the exercise of reasonable care should have known that the introduction and use of radiation based energy would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of the PLAINTIFFS' lives.

235. The DEFENDANT TEPCO has violated and/or threatened to violate a public

right to pure air and water. As a direct and proximate result of DEFENDANT's acts and omissions creating the above described nuisance, PLAINTIFFS, who were exposed to radioactive materials and who constitute a considerable number of people, have suffered special damages and injury in the form of damage to their persons and property and endangerment to their health and safety, more so than those persons not exposed to such materials in the zone of danger at the FNPP.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided

## FIFTH CAUSE OF ACTION
### (Private Nuisance)
### Against all DEFENDANTS

236. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

237. The PLAINTIFFS' bodies have been contaminated by radiation poisoning as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of the DEFENDANT, all as alleged herein.

238. The contamination of PLAINTIFFS' persons caused by the DEFENDANT's

conduct has substantially and unreasonably interfered with their physical well-being, use, benefit, and enjoyment of their properties and life.

239. The stigma and actual contamination of PLAINTIFFS' bodies has caused a material loss of value of their properties and life expectancy.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided

## SIXTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
### Against all DEFENDANTS

240. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

241. DEFENDANTs engaged in extreme and outrageous conduct by engaging in the following acts and omissions:

(a)   overstating any environmental benefits of the FNPP while neglecting to mention or understating its actual environmental costs;

(b)   marketing nuclear power as a "clean" and environmentally "safe" and beneficial fuel;

(c)   misrepresenting the actual levels of radiation, including statements that it posed no threat of harm to the PLAINTIFFS in the performance of their mission;

(d)   representing that the condition of the FNPP did not pose any unusual threat of harm as compared to a conventional, non-nuclear power plant;

(e)   failing to disclose that when radiation leaked from the FNPP, it would be unable to contain the radiation and would be far more likely to cause contamination than other sources of power generation;

(f)   leading the public and the PLAINTIFFS to believe that they could safely perform their duties in the waters adjacent to the FNPP despite the detected levels of radiation;

(g) stating that the air and water at and about the FNPP were adequately tested and shown not to pose a health hazard or enhanced risk to the environment while avoiding and discouraging additional testing; and

(h)  concealing the necessity for the PLAINTIFFS to take steps to undergo early detection modalities to determine whether or not they had been exposed to unsafe levels of radiation, a potential carcinogen.

242. As a direct and proximate result of the reckless and/or intentional conduct of DEFENDANT TEPCO, PLAINTIFFS suffered severe emotional distress and mental suffering by fearing that their exposure to DEFENDANT'S highly toxic and carcinogenic emissions would lead to the development of cancer as well as other life threatening ailments.

243. DEFENDANT'S acts proximately caused harm and damage to the PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. PLAINTIFFS will continue to incur losses and damage in the future. Based on PLAINTIFFS' repeated exposure to ionizing radiation, PLAINTIFFS have a reasonable fear that said exposure more likely than not increases their risk of developing cancer and other illnesses in the future.

244. DEFENDANT TEPCO intended to cause or acted with conscious disregard of the probability of causing injury to PLAINTIFFS, and therefore, is liable for punitive damages.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided

## SEVENTH CAUSE OF ACTION
### (Strict Liability for Ultrahazardous Activities)
### Against all DEFENDANTS

245. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

246. DEFENDANT engaged in an ultrahazardous activity that caused harm,

**SECOND AMENDED COMPLAINT FOR DAMAGES**

12-CV-3032-JLS-WMc

damages, losses, injuries, including fear of contracting cancer, birth defects for their children, born and unborn, and economic and non-economic damages.

247. DEFENDANT is responsible for that harm, injuries, damages, both economic and non-economic because DEFENDANT engaged in producing nuclear power, an ultra-hazardous activity, at FNPP.

248. PLAINTIFFS' injuries, damages, losses and harm is  the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at Fukushima.

249. DEFENDANT TEPCO'S acts proximately caused harm and damage to the PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. PLAINTIFFS will continue to incur losses and damage in the future. Based on PLAINTIFFS' repeated exposure to ionizing radiation, PLAINTIFFS have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

250. DEFENDANT intended to cause or acted with conscious disregard of the probability of causing injury to PLAINTIFFS, and therefore, is liable for punitive damages.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided.

## EIGHTH CAUSE OF ACTION
### (Negligence per se: Res Ipsa Loquitur)
### Against all DEFENDANTS

251. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs as though fully set forth herein.

252. PLAINTIFFS' harm was caused by a release of radiation from the FNPP which only DEFENDANT controlled.

253. PLAINTIFFS' voluntary actions did not cause or contribute to the events which harmed them.

254. PLAINTIFFS' harm, injuries, damages and losses ordinarily would not have happened unless someone was negligent.

255. PLAINTIFFS' injuries, damages, losses and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release of the nature and kind that was released at Fukushima.

256. DEFENDANT'S acts proximately caused harm and damage to the PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. Plaintiffs will continue to incur losses and damage in the future.  Based on Plaintiffs' repeated exposure to ionizing radiation, Plaintiffs have a reasonable fear that said exposure more likely than not increased their risk of developing cancer in the future.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided

## NINTH CAUSE OF ACTION
### (Presumption of Negligence Per Se)
### Against all DEFENDANTS

257. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

258. DEFENDANT TEPCO'S illegal, intentional, reckless and negligent conduct as herein above alleged, violated several State, Federal, and International laws, regulations, and statutes, which were enacted to protect the public, the communities and the environment, including the class of individuals to which PLAINTIFFS belong: Good Samaritans, rescue workers, indeed, the "TOMODACHIS" (friends), who offered help to the victims of the Fukushima meltdown. The 1972 Convention on the Prevention of Marine Pollution by

Dumping of Wastes and Other Matter, to which Japan is a signatory, bans the dumping of pollution at sea.

259. The Inter-Governmental Conference on the Convention on the dumping of Wastes at Sea, which met in London in November 1972 at the invitation of the United Kingdom, adopted this instrument, generally known as the London Convention. The London Convention, one of the first international conventions for the protection of the marine environment from human activities, came into force on August 30, 1975.

260. The London Convention contributes to the international control and prevention of marine pollution by prohibiting the dumping of certain hazardous materials. In addition, a special permit is required prior to dumping of a number of other identified materials and a general permit for other wastes or matter.

261. "Dumping" has been defined as the deliberate disposal at sea of wastes or other matter from vessels, aircraft, platforms or other man-made structures, as well as the deliberate disposal of these vessels or platforms themselves. Annexes list wastes which cannot be dumped and others for which a special dumping permit is required.

262. Amendments adopted in 1993 (which entered into force in 1994) banned the dumping into sea of low-level radioactive wastes. In addition, the amendments phased out the dumping of industrial wastes by 31 December, 1995 and banned the incineration at sea of industrial wastes.

263. DEFENDANTs, and specifically, DEFENDANT TEPCO, engaged in intentionally dumping in excess of 11,500 tons of radioactive water into the Pacific Ocean during and following the meltdown of the FNPP.

264. PLAINTIFFS' injuries, damages, losses and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at Fukushima.

265. DEFENDANT TEPCO"S acts proximately caused harm and damage to the

PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. PLAINTIFFS will continue to incur losses and damage in the future.  Based on PLAINTIFFS' repeated exposure to ionizing radiation, PLAINTIFFS have a reasonable fear that said exposure more likely than not increased their risk of developing cancer in the future.

WHEREFORE, PLAINTIFFS request relief as hereinafter provided

## TENTH CAUSE OF ACTION
**(Loss of Consortium)**
**Against all DEFENDANTS**

266. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

267. Each spouse of each PLAINTIFF herein alleges he/she has been harmed by the injury to his/her husband/wife/domestic partners. Each spouse/domestic partner of each Plaintiff seeks to be reasonably compensated for the loss of his/her husband/wife's/domestic partner's companionship and services, past and future, including:

1. The loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support; and

2. The loss of the enjoyment of sexual relations and/or the ability to have children.

## CLASS ACTION AVERMENTS

268. PLAINTIFFS hereby incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

**SECOND AMENDED COMPLAINT FOR DAMAGES**                12-CV-3032-JLS-WMc

269. PLAINTIFFS state, Pursuant to Federal Rule of Civil Procedure, 23(b) (1)(A)(B) that: (1) prosecuting separate actions by individual Class Members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the DEFENDANTs; or (B) would substantially impair or impede their ability to protect their interests.

270. PLAINTIFFS further state, Pursuant to Federal Rule of Civil Procedure 23(b) (2) and (3) that: (2) the DEFENDANT opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or (3) this Court should find that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions;(B) the extent and nature of any litigation concerning the controversy already begun by class members;(C) the desirability of concentrating the litigation of the claims in the this U.S. District Federal Court; and (D) the unlikely difficulties in managing this class action.

## PRAYER FOR RELIEF

1.   For a judgment ordering, requiring and compelling the DEFENDANTs to establish a fund in an amount not less than one BILLION ($1,000,000,000.00) DOLLARS available to advance and pay all costs and expenses for each of the PLAINTIFFS for medical examination, medical monitoring, and treatment by physicians of PLAINTIFFS' choice;

2.   For special and economic damages, including lost wages, for all Causes of Action;

3.      For general and non-economic damages for all Causes of Action;

4.      For punitive damages for all Causes of Action;

5.      For prejudgment interest at the prevailing legal rate;

6.      For costs of the suit including reasonable attorneys' fees; and

7.      For such other and further relief, including injunctive relief, as the Court may deem proper.

**Dated: February 6, 2014**

                        **RESPECTFULLY SUBMITTED,**

                        By: */S/ PAUL C. GARNER*
                        PAUL C. GARNER, ESQ.
                        Attorney for Plaintiffs

**Dated: February 6, 2014**

                        **RESPECTFULLY SUBMITTED,**
                        **LAW OFFICES OF BONNER & BONNER**

                        By: */S/CHARLES A. BONNER*
                        CHARLES A. BONNER
                        Attorney for Plaintiffs

**DEMAND FOR JURY TRIAL**

The PLAINTIFFS hereby demand a jury trial of all issues as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

**Dated: February 06, 2014**

**RESPECTFULLY SUBMITTED,**

By: */S/PAUL C. GARNER*
PAUL C. GARNER, ESQ.
Attorney for Plaintiffs

**Dated: February 06, 2014**

**RESPECTFULLY SUBMITTED,**
**LAW OFFICES OF BONNER & BONNER**

By: */S/CHARLES A. BONNER*
CHARLES A. BONNER
Attorney for Plaintiffs

**SECOND AMENDED COMPLAINT FOR DAMAGES**                    12-CV-3032-JLS-WMc

# CERTIFICATE OF SERVICE

I, CHARLES A. BONNER, am an attorney at Law Offices of Bonner & Bonner counsel of record for Plaintiffs in this action. I certify that on Febraury 6, 2014, I caused the attached document to be served via this Court's Electronic Filing System on JOHN B. OWENS, counsel for DEFENDANT, a registered user of that system. *See* Local Civil Rule 5.4.

DATED: February 6, 2014

                                   **BY:*/S/ CHARLES A. BONNER***
                                   CHARLES A. BONNER
                                   ATTORNEY FOR PLAINTIFFS